COURT OF CRIMINAL APPEALS NO._____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF ___RANDOLPH___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC 2001-114, 115___

CIRCUIT JUDGE ___HON HON RAY D MARTIN___

Type of Conviction / Order Appealed From: ___MURDER___

Sentence Imposed: ___ANTHONY BURDEN-30 YEARS   ANDREW BURDEN-LIFF___

Defendant Indigent: ☒ YES ☐ NO

___ANTHONY EUGENE BURDEN AND ANDREW PHILLIP BURDEN___

| | | |
|---|---|---|
| ___HON NATHANIEL OWENS___ | ___256-236-0111___ | **NAME OF APPELLANT** |
| (Appellant's Attorney) | (Telephone No.) | HON GREG VARNER   256-354-5464 |
| ___P O BOX 2641___ | | P O BOX 338 |
| (Address) | | ASHLAND AL 36251 |
| ___ANNISTON___   ___AL___ | ___36202___ | |
| (City)   (State) | (Zip Code) | |

V.

## STATE OF ALABAMA

(State represented by Attorney General)

**NAME OF APPELLEE**

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)



```
 1              MR. ALEWINE:  I didn't know what this case was and

 2    I wanted you to know where I stood.  No other reason other

 3    than just to be honest.

 4              THE COURT: The fact your family has been a victim

 5    of a crime.

 6              MR. OWENS:  Thank you.

 7              THE COURT: Frank Lovette.  Do you agree?

 8              MS. BALDWIN: Yes, sir, he said he could not be

 9    fair.

10              THE COURT: All right.  Granted.  Robert Staples has

11    previously been granted.  Marilyn Johnson.

12              MS. BALDWIN: Martha.

13              THE COURT: Martha.  I can't read my writing.  Do

14    you agree?

15              MS. BALDWIN: She said she did not want to serve

16    several times, Judge.

17              THE COURT: Silus Hill.

18              MR. RADNEY:  He's the one that also specifically

19    said he couldn't be fair.

20              MS. BALDWIN: I wrote down that he didn't know if he

21    could be fair.

22              THE COURT:  Let me hold on that one for a second.

23    Carl Cooley.

24              MR. RADNEY:  I made the motion.

25              THE COURT: Do you object?
```

```
 1              MS. BALDWIN: No, sir.

 2              THE COURT: You agree?

 3              MS. BALDWIN:  Yes, sir.

 4              THE COURT: Granted.  What about Alewine:  You still

 5  make the motion?

 6              MR. RADNEY: Yes, sir, Judge, you know, based on the

 7  circumstances that is a recent occurrence with his family.

 8  He testified they are going through terrible emotion because

 9  of that, Judge.  I don't think despite his wanting to be

10  straight forward with the Court, I think that his blurt and

11  bringing that to the attention of the Court is the emotion

12  he's going through.  I don't think there's any way he can be

13  fair.

14              MR. OWENS: Also, Judge, the reason I asked him why

15  he did it, his rational, I've got to say something means that

16  that case is paramount in his mind.  We are talking about

17  murder here.

18              THE COURT: I have to go with what he said, though.

19  Do you agree or object to this?

20              MS. BALDWIN: I don't think he gave us reason for

21  challenge for cause.

22              THE COURT: I'm going to deny it.  I am also ....

23              MR. RADNEY: One more that I had.  I am sorry.  Did

24  you rule on Alewine?

25              THE COURT: Alewine is denied.
```

1    MR. RADNEY:  You can refer to him as defendants'

2  strike number one when the time comes.

3            Cynthia Crenshaw, Your Honor, is an additional

4  challenge for cause by the Defense.  Mrs. Crenshaw was

5  specifically asked about some officers and she said that she

6  worked with them at church and such.

7            THE COURT: Granted.  That's number five.  Hill and

8  Johnson.  What was Hill again?

9            MR. RADNEY:  Silus Hill wsa the black fellow

10  sitting on the back row who specifically said he couldn't be

11  fair or something to that effect.

12            MS. BALDWIN: I've got him two different times.

13  I've got him one he said he couldn't be fair and then I've

14  got he didn't know if he could be fair.

15            THE COURT: Silus Hill.  Mr.  Hill, please come up.

16      Mr.  Hill, I have got to ask you this question and it is

17  the legal standard that we have to follow.  Can you base your

18  verdict solely on the evidence and solely on the law and be a

19  fair and impartial juror both for the State and for the

20  Defendants in this case?

21            MR. HILL:  Yes, sir, I believe I could do that.

22            THE COURT: Questions?  Anyone?  Thank you.

23            THE COURT: Marilyn Johnson.

24            MR. RADNEY:  Martha.

25            MS. BALDWIN:  Martha.

1        MR. RADNEY:  We agreed on that one, Judge.

2        THE COURT: Excuse me.  Denied on Mr. Hill.

3        MR. RADNEY:  Judge, the other one I had was Cottle.

4        THE COURT: Denied.

5        MR. OWENS: Hodges.

6        MR. RADNEY: That was the other one, Judge.  Janice

7   Hodges, Judge, I specifically asked her about Jeanette Baker

8   being a witness and whether she would believe Ms. Baker's

9   testimony and her response was fine Christian woman that she

10  blurted out and Frances would have to look.  I can't remember

11  beyond that how she responded.

12       THE COURT: Hold on just a minute.  Okay here is

13  what I have got on it.  Now, Robert was not included in the

14  47.  Forty-seven without him.  I have granted Cooley,

15  Johnson, Joiner, and Lovette, Crenshaw, Hodges and Lovette

16  are six challenges for cause.

17       MR. RADNEY:  That you have granted.  Are you

18  granting Hodges?

19       THE COURT:  Hold on for just a second.  I have

20  already granted Cooley, Johnson, Joiner, Lovette -- four.

21       MS. BALDWIN:  You've granted five.

22       MR. RADNEY: The ones you need to rule on are Cottle

23  and Hodges.

24       THE COURT: Denied.

25       MR. RADNEY:  Denied Cottle.  You need to rule on

1    Hodges.

2            THE COURT:  That would be a total of -- if I grant

3    Hodges, that will be a total of six granted, and leave 41 on

4    the venire.  I am going to grant Hodges.  That leaves 41.  We

5    can have two alternates.  Do you request alternates?  I'm

6    going to order at least one.

7            MR. CLARK:  Yes, Judge, we need one and may be two.

8            MS. BALDWIN:  Two.

9            THE COURT: We will do two.

10   (WHEREUPON, A SIDE BAR CONCLUDES.)

11           THE COURT: Ladies and gentlemen, we are going to be

12   in a position where we are going to take a break and allow

13   the attorneys and the clerk to go through the process of

14   selecting the jury.  Taking that and a lunch break together.

15   I'm going to need you back in here at 1:30.  At that time

16   I'll be in the position of impaneling the trial jury and

17   giving the rest of you some instructions as to what to do and

18   when to report back and that sort of thing follow.  Same

19   instructions that I have already given you.  Don't discuss

20   this case with anyone.  Don't let anyone discuss it in your

21   presence.  Don't engage in conversation about it coming and

22   going to and from the the courthouse.  Don't put yourself in

23   a position of possibly hearing attorneys or witnesses or

24   parties discussing the case.  I don't know if there will be

25   any media coverage of this or any other case on the docket.

1   If there is, then in that situation, you would need to

2   immediately tell them you are under a court order not to

3   discuss the case.  After this term of court is over, after

4   this trial is over, it will be a matter for you to decide if

5   you want to discuss your jury service with anyone.  That's

6   your personal choice.  You can either discuss it or not at

7   that time.  But, as for now, you are under a court order not

8   to discuss it.  Counsel, I'll need you one more second.

9        Everyone remain in while the jury exits.  Be back in

10  here at 1:30.

11  (VENIRE PANEL RECESSED FOR LUNCH)

12           THE COURT: As your name is called, please come

13  forward.

14           THE CLERK:  Stacy Bonnett, Patricia Boykin,

15  Stephanie Brown, Linda Caypless, Raymond Dunlap, Ruth Golden,

16  LaJuana Holloway, Detina Jones, Yolanda Jones, Kathy Langley

17  Ellis, Linda Pike, Charlotte Waters, Roy Weaver, and Joyce

18  White.

19           THE COURT: Ladies and gentlemen, it will be a few

20  minutes before we can actually commence the trial of this

21  case.  What I'm going to ask you to do is something that I

22  will be asking you to do over the next several days and that

23  there will come a time when I have to talk to attorneys about

24  some legal matter that really cannot be for your

25  consideration.  You are going to be the judges of the facts

*** Frances L. Roark ***

1   of the case, but I am the judge as far as the law which

2   applies to the case.  And, there will be times that I have to

3   talk to the attorneys about different aspects of the law as

4   it applies to the case.  When I do so, I'll have to send you

5   back to the jury room.  That is what I am about to do at this

6   time.  If you would, step back to the jury room and I'll call

7   you back in just a few minutes.

8   (JURY OUT)

9   (WHEREUPON, THE VENIRE PANEL WAS RELEASED UNTIL THURSDAY AT

10   9:00 A.M.)

11          MR. RADNEY:  Batson.

12          THE COURT: We will be on the record and outside the

13   presence of all jurors.

14          MR. RADNEY: Your Honor, this jury panel, and I have

15   not done the exact numbers, but it appeared to have the

16   appropriate number of Afro-Americans on it, and the panel, as

17   a whole.  In doing the striking, Judge, the State used seven

18   of its 14 strikes to strike Afro-Americans, leaving a jury of

19   14 persons that has three Afro-Americans on it.  Wasn't that

20   right, Kim?

21          THE CLERK:  Three and one alternate is black.

22          THE COURT: That person may be on the jury before it

23   is over.  So, on the jury of 14.  Four.

24          MR. RADNEY:  I had it as three, but you may be

25   right.  And, Judge, we believe that is a *prima facie* case of

1   race-based striking and that, therefore, a Batson Motion is

2   made.

3           THE COURT: What says the State?

4           MS. BALDWIN: Well, Judge, there's -- of course,

5   there are four on the panel and the last one struck was the

6   alternate by the Defense, and the Defense struck a number of

7   blacks as well.

8           THE COURT: What number?  I need to know exact

9   number.

10          MS. BALDWIN: Of the Defense's strikes?  I know of

11  at least four, Judge, if not more.

12          MR. RADNEY: Judge, who we struck is completely

13  irrelevant.  If she wants to make a motion that we violated

14  the rule, it becomes relevant, but she hasn't, and it is

15  completely irrelevant.

16          THE COURT: Well, I want to know the composition of

17  the State's strikes and the Defense's strikes.

18          MR. RADNEY: Of our 14 strikes, Judge, Kim can give

19  you a total.

20          THE COURT: What was the Defense strikes of the 14?

21          THE CLERK: How many were black?

22          THE COURT: How it broke down.

23          MR. RADNEY: As it relates to defendant, Phillip

24  Burden, I struck one black out of my possible seven.

25          MS. BALDWIN: Judge, they had four.

*** Frances L. Roark ***

 1          MR. RADNEY: And, as defendant, Anthony, he struck

 2    three blacks out of his seven.

 3          MR. OWENS: Two of those were cause that, Your

 4    Honor ....

 5          MR. RADNEY:  All four of them had a basis brought

 6    up in the cause hearing.

 7          THE COURT: And the State? Seven of the 14.

 8    Anything else that either Defense or State wants to put on

 9    the record?

10          MS. BALDWIN: I don't know that they have made a

11    *prima facie* case, Judge.

12          THE COURT: Anything else from Defense?

13          MR. RADNEY: No, sir, Judge.

14          THE COURT: Motion denied.

15          MR. RADNEY: Defense requests the Rule of

16    Sequestration.

17          THE COURT: Are the parties ready?

18          MS. BALDWIN: State is ready.

19          MR. OWENS: I believe a lady has come in that we

20    plan to call.  She did not make the subpoena list.  I see her

21    in the courtroom.

22          THE COURT: I'll say this for the State and Defense,

23    anyone you expect to call as a witness will have to wait

24    outside.  The Rule of Sequestration has been invoked by the

25    attorneys, and, Attorneys, you will be responsible for your

1   witnesses.

2          MR. RADNEY:  Your Honor, I notice some small

3   children in the courtroom.  Obviously there is no legal

4   objection, but I wonder if the Court would address that as it

5   relates to noise and what they may see and hear.

6          THE COURT: That's correct.  These are very serious

7   proceedings.  If you have children here, you might want to

8   rethink that.  Also there can be absolutely no interruption

9   or no disturbances caused by anyone.

10      All right.  Are we ready?

11          MR. OWENS: Ready.

12          THE COURT: Bring the jury?

13   (JURY PRESENT)

14          THE COURT: Ladies and gentlemen, I'll need for each

15   of you to stand where you are and once again raise your right

16   hands.

17   (JURY SWORN AND THE BAILIFF SWORN)

18          THE COURT: Ladies and gentlemen, I'm going to very

19   briefly tell you the outline or the phases that we will be

20   going through in this trial.

21      Initially the attorneys will address you in what's

22   called opening statements. Now, I'll tell you from the

23   beginning that what the attorneys say is not evidence.  The

24   only thing that you can consider in your deliberations is

25   legal evidence that comes to you from the witness stand in

1   the form of sworn testimony and other documentary evidence or

2   exhibits and the law that I charge you.  Now, what the

3   attorneys can do in opening statements is tell you what they

4   think the evidence will be.  They can tell you what they

5   think the case will show.  They can basically use the opening

6   statements as a sort of a roadmap to tell you where this case

7   is going.

8       After that time the State will be given an opportunity

9   to present their case.  Then Defense will be given an

10  opportunity to present their case.

11      After all testimony and evidence is at a close, the

12  attorneys will again address you in what's called closing

13  arguments.  At that time the attorneys can tell you what they

14  think the evidence has shown.  They can tell you what they

15  think has been proven or has not been proven in the case.

16  Again, I hasten to add that what the attorneys say, both in

17  opening and closing arguments, or at other points in the

18  trial, is not evidence.  You are the sole judges of the

19  evidence and the facts of the case.

20      After the attorneys have made their closing arguments to

21  you, I will charge you on the law that applies to these

22  cases.  You cannot substitute that with what you think the

23  evidence -- excuse me, what you think the law ought to be or

24  what you think the law is.  You must follow the law as I

25  charge you which applies to this case.

1    After that time I will send you out to deliberate and

2  reach your verdict.  You can choose one of your number to act

3  as a foreperson to basically moderate your deliberations.

4  Your foreperson will need to sign the appropriate verdict

5  forms to conform with what your verdict is.  Any verdict that

6  you reach must be unanimous.

7    Are there any additional instructions requested at this

8  time?

9         MR. RADNEY: No, sir, Your Honor.

10         MR. OWENS: No, sir, Your Honor.

11         THE COURT: With that you may state your case to the

12  jury.

13  (WHEREUPON, OPENING STATEMENTS WERE MADE WITHOUT OBJECTION.

14  OPENING STATEMENTS WERE NOT REPORTED.)

15         THE COURT: Call your first witness.

16         MS. BALDWIN: Marquail Trammell.

17                   **MARQUAIL TRAMMELL**

18         **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

19           **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

20                   **TESTIFIED AS FOLLOWS:**

21                   **DIRECT EXAMINATION**

22  A    BY MS. BALDWIN:

23  Q    State your name for the jury, please.

24  A    Marquail Trammell.

25  Q    How old are you Marquail?

*** Frances L. Roark ***

```
 1   A      Twenty-two.

 2   Q      Where do you live?

 3   A      35 Wilmer Road.

 4   Q      Is that in Roanoke?

 5   A      Yes.

 6   Q      Marquail, do you know the victim in this case, Jermicah

 7   Foster?

 8   A      Yes.

 9   Q      Did he have a nickname?

10   A      Rat.

11   Q      He was known as Rat.  Were you with Jermicah back on

12   June 17th of 2001?

13   A      Yes.

14   Q      That's the day he got killed.

15   Q      Yes.

16   A      Yes.

17   Q      Okay.  Now, where were you with Jermicah on that day?

18   A      Standing like right at Lafayette -- no, not Lafayette,

19   Government and Riley.

20   Q      Is there someone's house that is near the intersection

21   of Government and Riley Street that you were at?

22   A      Ernest Taylor.

23   Q      Ernest Taylor.  Does he have a nickname?

24   A      Tag.

25   Q      Tag.  Now, when you said you were standing in the area
```

*** Frances L. Roark ***

```
 1   of Government and Riley, can you describe in more detail

 2   where you were in relation to Tag Taylor's house?

 3   A     Like right on the front.  His grass is like at the edge

 4   of the road.

 5   Q     Was it near -- is there stop sign?

 6   A     Stop sign.  Right.

 7   Q     Now, did you, while you were standing there, did you

 8   see anybody pull up to the intersection there in front of

 9   Tag's?

10         You have going to speak out.

11   A     I don't know his full name.  I do know he was driving

12   the car.

13   Q     Tell us who was driving the car.

14   A     They call him Pokey.

15   Q     Pokey.  Do you know his real name?

16   A     No, I don't.

17   Q     Okay.  Now, was anybody else with Pokey?

18   A     I seen -- I seen Phillip Burden get out of the car.

19   Q     The person you are referring to, Phillip Burden, is he

20   in the courtroom?

21   A     Yes.

22   Q     Point him out for us.

23   A     Right here.

24   Q     Which one are you pointing to?

25   A     The second guy.
```

| | | |
|---|---|---|
| 1 | Q | In the middle? |
| 2 | A | In the middle? |
| 3 | Q | Okay.  Now, you say you saw Phillip Burden.  Where did |
| 4 | | you see Phillip Burden at? |
| 5 | A | Excuse me? |
| 6 | Q | Where did you see Phillip? |
| 7 | A | Get out of the car. |
| 8 | Q | Whose car? |
| 9 | A | Pokey's. |
| 10 | Q | Pokey's car.  All right.  After Phillip got out, what, |
| 11 | | if anything, occurred there? |
| 12 | A | A fight broke out. |
| 13 | Q | Okay.  Did he talk to anybody there? |
| 14 | A | Well, yes.  Yes, he talked -- he talked to Rat. |
| 15 | Q | Did Phillip talk to Rat? |
| 16 | A | Um-hmmm. |
| 17 | Q | Is that who you are saying?  Tell us about that. |
| 18 | A | I just -- I know caught the tail end of it.  He just |
| 19 | | told -- you know, what I am saying? |
| 20 | Q | When speaking about the Burdens, be specific who you |
| 21 | | are talking about. |
| 22 | A | All right. |
| 23 | Q | Speak loud enough for the jury. |
| 24 | A | Basically he told him, because I don't know what the |
| 25 | | altercation was about.  I -- you know, what I'm saying. |

1    Q     When you're talking about the Burdens be specific.  He

2    told Rat -- when you're talking about a Burden be specific

3    who you are talking about.  Okay.  What, if anything,

4    happened at that time?

5    A     Nothing.

6    Q     Okay.  Did Rat make any sort of response?

7    A     (Nonverbal reply)

8    Q     Now, did you see Shawn Baker that day?

9    A     Yes.

10   Q     Where did you see Shawn?

11   A     Coming out of Ernest Taylor's house.

12   Q     Now, was Phillip still there at that time when Shawn

13   came out?

14   A     Um-hmmm.

15   Q     What about Jermicah or Rat?

16   A     Um-hmmm.

17   Q     Did anything happen at that time?

18   A     He basically told Shawn the same thing.

19   Q     Okay.  Who told Shawn the same thing?

20   A     Phillip did.

21   Q     What did he tell Shawn?

22   A     Told ....

23   Q     Be specific about the Burdens.  Be specific who you are

24   talking about.

25   A     Okay.

1    Q    What, if anything, happened at that time?

2    A    Then the fight broke out after that between him and

3    Phillip.

4    Q    Did you see that fight when it started?

5    A    Yes.

6    Q    Now, tell us what you observed at that point?

7    A    I just saw them fight.

8    Q    You saw how it started.  Do you recall how that fight

9    started?

10   A    Well, like what?

11   Q    Well, you said that Phillip told Shawn the same thing

12   he told Jermicah.

13   A    Yes.

14   Q    After Phillip told that to Shawn, what, if anything,

15   occurred that resulted in a fight if you know?

16   A    Somebody, I believe, I think, I think Phillip hit Shawn

17   and that's how -- intermingled after that.

18   Q    And, they intermingled as you say.  What, if anything,

19   occurred then what happened next?

20   A    They broke it up and I left.

21   Q    Okay.  Who broke it up if you know?

22   A    It was like I think Shawn's sister, you know, what I am

23   saying.  There were a lot of people out there that day.

24   Q    After the fight broke up, did you see where Phillip

25   went?

```
 1    A      I seen him get up and walk up the road.

 2    Q      Does he know anybody that lives in that area or do you

 3    know?

 4           MR. RADNEY: Object.  He can't testify to what

 5    Mr.  Burden knows.

 6           THE COURT: Sustained.

 7    MS. BALDWIN:

 8    Q      Let me ask you this:  Does he have a relative that

 9    lives in the area that he was walking toward?  Phillip?

10    A      I think his brother stay around the corner or some kin

11    to him.

12    Q      Now, after the fight was broken up and Phillip walked

13    away, what, if anything, happened after that that you know?

14    A      I walked up the road.

15    Q      Did you go by yourself or did somebody go with you?

16    A      Me and Rat walked together.

17    Q      When you say up the road, what road are you talking

18    about?

19    A      Wilkie Clark Drive.

20    Q      Does Riley turn into Wilkie Clark?

21    A      The same street.

22    Q      Now, where did you and Rat go when you went up Wilkie

23    Clark?

24    A      Up to his nieces.  I mean, I think that is his aunt's

25    house.
```

```
 1    Q     Where did Jermicah live at that time if you know?

 2    A     Like across -- I can't give you a specific.  It is

 3    across town.  Not right where he went, though.

 4    Q     Now, you and -- you say Rat walked up to his auntie's

 5    house, aunt's house.

 6    A     I think that would be his aunt.  His relative.  His kin

 7    people.

 8    Q     And, did you ever see Pokey or Phillip anymore that

 9    day?

10    A     At the four-way again.

11    Q     When you say four-way, is that the same intersection?

12    A     Where we were standing at.

13    Q     Okay.  Was Shawn out there at that time?

14    A     I think he had walked in the house, the same house that

15    -- what he walked to.  Shawn had went in that house.

16    Q     Were you standing in front of that house or near?

17    A     Close by it.  Like on the other side of the road.

18    Q     Okay.  And where was Phillip:  You say at the four-way?

19    A     Well, where the altercation first started.

20    Q     Okay.  And, you were not at that four-way anymore.  You

21    are going to have to answer out loud.

22    A     No.

23    Q     You were not at that four-way?

24    A     No.

25    Q     Now, was -- at the time that Phillip walked up the
```

1    street at the four-way, was there any fighting going on at

2    that time that you knew about?

3    A    No.

4    Q    All right.  What happened after you saw Phillip coming

5    at the four-way?

6    A    I left.

7    Q    All right.  Why did you leave?

8    A    You know, what I am saying, I'd already seen what --

9    the fight.  I didn't want -- want to break out again.  I just

10   left, you now what I am saying.

11   Q    Well, did you -- okay.  At the time that you -- that

12   Phillip came up the street, did you see what direction he was

13   coming in?

14   A    I just seen when me and Rat -- I don't remember.  Shawn

15   was up like all at the same place where we walked to when we

16   was standing out there.  I turned around and seen the car

17   back at same spot with -- where the altercation was.

18   Q    Which car?

19   A    Pokey's car was there again.

20   Q    Had it left after the first fight?

21   A    We left.  He had to leave there again.  You know, what

22   I am saying?  We left.  So, when I looked back, I seen the

23   car and I left from where we had walked to.

24   Q    Okay.  And, you said you saw Phillip.

25   A    Yes.  Get out of the car.

*** Frances L. Roark ***

1   Q      Did he have anything with him?

2   A      He had something but, you know I am saying, I didn't

3   know what it was then.  I left he had something.

4   Q      Okay.  All right.  I don't have anything further.

5          THE COURT: Cross-examination.

6                        **CROSS EXAMINATION**

7   **BY MR. RADNEY:**

8   Mr. Trammell, the fight you saw was between Phillip and Sean

9   Baker; correct?

10  A      Um-hmmm.

11  Q      And, Sean Baker got the best of Phillip.  Busted up his

12  eye pretty good; correct?

13  A      Yes.

14  Q      Answer out.

15  A      Yes.

16  Q      Shawn's girlfriend got in the middle of it with some

17  sort of shoe and also beat up Phillip with the butt end of

18  her shoe; correct?

19  A      Lot of people was out there.

20  Q      But you saw that, too.

21  A      Lot of people was out there.

22  Q      Shawn goes walking up the street and you hear Shawn

23  doing pretty loud screaming, yelling at Phillip, come on FM,

24  come on get some more.

25  A      Remarks, but he went in the house.

```
1    Q       Shawn?

2    A       Yes.

3    Q       Wasn't he jumping up and down on a car when he was

4    doing this screaming and cussing; wasn't he?

5    A       Yes.

6    Q       Yes?

7    Yes.

8    Q       You and Rat were good friends; right?

9    A       Yes, we talked.

10   Q       Had you been out in the street with Rat on Friday night

11   and Saturday night before this happened on Sunday?

12   A       Un-huh.

13   Q       Rat was out there with a weapon?

14   A       No.

15   Q       You had not been out there on Friday night and Saturday

16   night?

17   A       No.

18           MR. RADNEY: That's all I have.

19                        CROSS EXAMINATION

20   BY MR. OWENS:

21   Q       The house that you were at with Rat and Shawn, was that

22   Tag's house.

23   A       Which:  The first or second time?

24   Q       First time.

25   A       Yes, I won't say Tag's house.  Close by Tag's house.
```

| | | |
|---|---|---|
| 1 | | That's where everybody was -- say Tag's house. |
| 2 | Q | Had you been in Tag's house earlier that day? |
| 3 | A | No. |
| 4 | Q | You had not? |
| 5 | A | No, I had not. |
| 6 | Q | Was Shawn drinking that day? |
| 7 | A | I believe he was.  He had been drinking. |
| 8 | Q | He was -- had been drinking. This was Sunday. |
| 9 | A | Yes. |
| 10 | Q | What time of day was this? |
| 11 | A | Before 5 o'clock. |
| 12 | Q | In the afternoon? |
| 13 | A | Yes. |
| 14 | Q | While you were there, and you saw Phillip come out and |
| 15 | | Rat come up, did you see Rat shake hands with Phillip? |
| 16 | A | I can't recall. |
| 17 | Q | You don't recall that? |
| 18 | A | No. |
| 19 | Q | Okay.  Did you see a fight between Phillip and Rat? |
| 20 | A | No. |
| 21 | Q | So, there was not a fight between Phillip and Rat? |
| 22 | A | No. |
| 23 | Q | Let me make sure that I understand something after Rat |
| 24 | | and Phillip had their discussion -- |
| 25 | A | Um-hmmm. |

*** Frances L. Roark ***

1   Q       -- then Shawn came out of Tag's house; is that right?

2   A       Hum.

3   Q       Isn't it true that Phillip extended his hand to Shawn

4   just as he did to Rat?

5   A       Yes.

6   Q       Please answer out so we can ....

7   A       Yes.

8   Q       Okay.  After he extended his hand to Shawn, what

9   happened?

10  A       I think Shawn told him he didn't need to shake his

11  hand.

12  Q       So, Shawn said, I don't need to shake your hand or he

13  didn't need to shake his hand?

14  A       He didn't need to shake his hand.

15  Q       Did Phillip have a weapon in his hand?

16  A       No.

17  Q       So, there wasn't any weapon?

18  A       No.

19  Q       So, when Shawn said, he didn't need to shake his hand,

20  what happened?

21  A       That was when the fight started.

22  Q       Isn't that when he sucker-punched Phillip at that time?

23  A       I don't know who hit first.  Two men.  You can't really

24  tell.  You be fighting, man.

25  Q       So, the two men just went together.  How long had you

*** Frances L. Roark ***

```
 1   been with Rat that day before the fight?

 2   A     We had just gone from the house.  We talked to -- just

 3   walked down to that four-way.

 4   Q     Was Rat smoking marijuana?

 5   A     No.  We were not smoking anything.  We were together.

 6   Q     You were with him then?

 7   A     Hum.

 8   Q     Where had you come from?

 9   A     Like to get with him?

10   Q     Yes.

11   A     From my house.

12   Q     Where is your house in relation to this?

13   A     Maybe five minutes across town.  Three minutes.  Four

14   minutes.

15   Q     How did you get over there?

16   A     My girlfriend.

17   Q     Your girlfriend dropped you off?

18   A     I went over there every day.

19   Q     You went over there every day.  Did Rat live over

20   there?

21   A     Where we were?

22   Q     Near Tag's house?

23   A     No.

24   Q     He didn't live in that area, did he?

25   A     No.
```

*** Frances L. Roark ***

\*\*\* Frances L. Roark \*\*\*

1    Q    Where did he live?

2    A    Across town.

3    Q    Across town.  But, he was over there.

4    A    Um-hmmm.

5    Q    Was that the first time you had been over there with

6    Rat?  That fight Saturday or Sunday -- so, you were not out

7    there Friday night or Saturday night, so you don't know what

8    happened?

9    A    I don't know anybody there.

10   Q    Okay.  Have you and Rat had occasion before to smoke

11   marijuana together?

12   A    No.

13   Q    To your knowledge, did Rat use marijuana?

14   A    To my knowledge?

15   Q    To your knowledge.

16   A    No.

17   Q    To your knowledge; no?

18   A    I don't know of him smoking marijuana.

19   Q    You don't know.

20   A    I can't answer for him.

21   Q    I can't hear.

22   A    I don't know what he do on a daily basis.  We -- not

23   nothing.  I don't know.

24   Q    He was your friend.

25   A    Yes, you can say that.

*** Frances L. Roark ***

```
1    Q      How long have you been knowing him?

2    A      Like, you know, what I am saying, he was never in

3    school when I was growing up.  I knew of him.  I knew him.  I

4    knew -- he is kind of related to my sister.

5    Q      Your -- his ....

6    A      Taquaya Trammell.

7    Q      Okay.  So, we're -- you see Shawn refuse to take

8    Phillip's hand and you say they come together.

9    A      Hum.

10   Q      You don't know whether Shawn swung at him or not?

11   A      I don't know.

12   Q      When they came together, did they fall in some hedges?

13   A      Yes.

14   Q      When they fell in those hedges, was Shawn on top of

15   Phillip or was Phillip on top of Shawn?

16   A      Shawn was on top.

17   Q      Shawn was on top of Phillip.

18   Q      Did you see any weapons in either of their hands at

19   that time?

20   A      No.

21   Q      The hedges where they fell, were they right in front of

22   Tag's place?

23   A      Yes.

24   Q      Were they real thick hedges?

25   A      Kind of, yes.
```

*** Frances L. Roark ***

1    Q       Could you move in the hedges or would the hedge hold

2    you in place?

3    A       They can move.

4    Q       They can move in the hedges.  Is that when Shawn's

5    girlfriend took off her wooden shoe and hit Phillip in the

6    eye with her heel?

7    A       I seen Shawn's girlfriend in the fight.

8    Q       You saw her in the fight.

9    A       Yes.  Lots of people was trying to break it up and lots

10   of people was in there.  That is why I was like let them go.

11   I ain't jumping in it.

12   Q       Who else did you see in the fight?

13   A       Many people.  It was like people -- a lot of people

14   trying to break it up.

15   Q       If you saw Shawn's girlfriend in the fight, did she

16   have her shoes off?  Did you see him get hit in the

17   eye?

18   A       I didn't see if she had her shoe off.

19   Q       Did she have a shoe off?

20   A       I don't know what they did in the area like in the

21   bushes in the hedge now.  It was all off in there, man.

22   Q       Was anybody else in there with a shoe off?

23   A       I don't remember.

24   Q       Okay.  Did you see any blood?

25   A       Yes.

*** Frances L. Roark ***

| 1 | Q | Was it blood from Shawn or blood from Phillip? |

1    Q    Was it blood from Shawn or blood from Phillip?

2    A    I believe most of it was from him.

3    Q    Was it his eye?

4    A    Yes, he had lot on his shirt.  I seen his eye bleeding.

5    You saw his eye bleeding.  Did you see the gash over his eye?

6    A    I think so.

7    Q    Okay.  And, it is your testimony that -- did you ever

8    see Phillip hit Shawn during this fight?

9    A    When they both came together.  I didn't know who was

10   hitting who.  They wrestled to the ground.

11   Q    They went to the ground.

12   A    Yes.

13   Q    Did you see any punches while they were on the ground?

14   A    Just a lot ....

15   Q    Holding each other, trying to keep the other from

16   hitting, basically is what you saw?

17   A    I guess.  The hedges, the bushes, it is the curb and

18   the hedge, bushes, on other side of curb went back like this.

19   Everybody was looking around like for somebody to break it up

20   or the police were coming or whatever.  I couldn't see who

21   was hitting who or who was doing what to who.  I just knew it

22   was a big commotion.

23   Q    You knew his girl had her shoe off and you know you saw

24   blood.

25   A    Yes.

1  Q    And, can you tell us how long they were in this

2  scuffle?

3  A    Maybe ten or fifteen minutes, maybe.

4  Q    Okay.  Were there other people that you can identify

5  that got involved in this fight between Shawn and Phillip?

6  A    I just recall a lot of people trying to break it up.

7  Q    Lot of other people trying to break it up?

8  A    Yes.

9  Q    Did you ever see Anthony at the fight.

10 A    Who's Anthony?

11 Q    That gentleman sitting next to Phillip.

12 A    At the fight?

13 Q    Yes, at the fight?

14 A    No, I didn't see him.

15 Q    You didn't see him?  Okay.

16       MR. OWENS:  That's all I have.

17       THE COURT: Anything further from this witness?

18       MS. BALDWIN: No, Your Honor.

19       THE COURT: You can step down.

20 (WHEREUPON, THE WITNESS WAS EXCUSED.)

21       THE COURT:  Call your next witness.

22       MS. BALDWIN:  Michael Hines.

23                    MICHAEL HINES

24    HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

25      THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

*** Frances L. Roark ***

| | |
|---|---|
| 1 | **TESTIFIED AS FOLLOWS:** |
| 2 | **DIRECT EXAMINATION** |
| 3 | BY MS. BALDWIN: |
| 4 | Q      State your name, please. |
| 5 | A      Michael Hines. |
| 6 | Q      And, Michael, where do you live? |
| 7 | A      798 Seymore Drive. |
| 8 | Q      That's in Roanoke; is that correct? |
| 9 | A      Right. |
| 10 | Q      Down where Riley Street is? |
| 11 | A      Yes. |
| 12 | Q      And, where Tag Taylor lives? |
| 13 | A      Yes. |
| 14 | Q      I direct your attention to June the 21st of 2001, and |
| 15 | ask if you had occasion on that day to go to Tag Taylor's |
| 16 | house? |
| 17 | A      I mean, what are you saying? |
| 18 | Q      Did you go, on June 21st a Sunday, did you go to Tag |
| 19 | Taylor's house? |
| 20 | A      I didn't go inside the house. |
| 21 | Q      Did you go to the house, up to the area of .... |
| 22 | A      I was in that area. |
| 23 | Q      Who did you go with? |
| 24 | A      Well, me and about three more guys. |
| 25 | Q      Who were the other three guys? |

*** Frances L. Roark ***

```
 1   A      Well, me -- in the beginning how I went?  I was sitting
 2   on my door step, on my aunt's door step, and this guy Pokey
 3   had come by and asked me to ride with him.  And I really
 4   didn't want to go.  But, he said, well, everything is on me.
 5   I'm going to buy everybody something to drink.  So, when -- I
 6   told him, yes, I'd go.  I got in the back seat on the
 7   driver's side.  When I was in there, just riding, we went
 8   over to Border Street.  And, when we was going on Border
 9   Street, where the guy was in the front, which is Mr. Burden,
10   he spoke to -- talking to the guy about going back to work.
11   And, him and that guy talked for a few minutes.  We left from
12   there and went down Border Street and rode over by Tag's.
13   So, we made one circle.  And, then we come back down
14   Government Street and made another circle.  We come up
15   through by where Phillip Burden's brother live.
16   Q      Who is that?
17   A      James Burden.  We come up through there one time.
18   That's the first time.  And, then we went back down through
19   there by Tag's.  That's when we seen this guy named -- well,
20   I call him Rat.  I ain't never knew his name.  Called him
21   Rat.
22   A      Seen him standing in the street.  He had a do rag on.
23   A black do rag or whatever you call it.  He had the do rag
24   on.  The guy, which was driving, Pokey, which his name is
25   really Kenney Burden, Jr., is what I call him, he pointed
```

1    out.  He said, "That's the guy that tried to jump on your

2    nephew last night."  I looked at the guy in the back ....

3            MR. RADNEY:  Your Honor, we object to the hearsay,

4    move to strike, and strike his response in whole as

5    nonresponsive to the question of the prosecutor.

6            THE COURT: Sustained.

7    MS. BALDWIN:

8    Q    Mr. Hines, if you would just respond to my questions;

9    okay?

10       Mr. Hines, you said that you saw Rat; is that correct?

11   A    Yes, I seen Rat standing in the street.

12   Q    What street was this?

13   A    Riley Street.

14   Q    Is this near Tag Taylor's house?

15   A    In front of his house.

16   Q    In front of his house?

17   A    Right.

18   Q    Did you stop or did Pokey, as you call him, did he stop

19   the vehicle?

20   A    Pokey asked everybody did they want something to drink.

21   We was going to pull over.

22            MR. RADNEY:  Your Honor, object to anything Pokey

23   said.

24            THE COURT: Sustained.

25   MS. BALDWIN:

*** Frances L. Roark ***

```
 1    Q      Mr. Hines, you pulled over; is that correct?

 2    A      I didn't pull over.  I wasn't driving.

 3    Q      Okay.  Well, the driver pulled over; is that right?

 4    A      Yes.

 5    Q      That was who?

 6    A      Pokey.

 7    Q      Okay.  Did you get out of the vehicle?

 8    A      Yes.

 9    Q      Okay.  Did anybody else get out of the vehicle?

10    A      We all got out of the vehicle.

11    Q      Okay.  And, after you got out of the vehicle, did

12    Mr.  Burden, Phillip Burden, get out of the vehicle?

13    A      Mr. Burden got out.  We all -- he just walked up and

14    started talking to the man.

15    Q      Talking to who?

16    A      Rat.

17    Q      What happened after that?

18    A      After he got through talking, Rat went up one direction

19    and we was walking to Tag's house.  But, before we was going

20    in Tag's house, this guy named Shawn was coming out of Tag's

21    house with his girlfriend, and he was telling Phillip that

22    they had talked to Rat.

23           MR. RADNEY: Your Honor, I object to anything Shawn

24    had said.

25           THE COURT: Who?
```

*** Frances L. Roark ***

```
 1              THE WITNESS:She asked me ....

 2              THE COURT: Who was talking to you?  Who was telling

 3   you these things at this time that you are talking about

 4   right now?

 5              THE WITNESS:What I'm telling her now?

 6              THE COURT:  Okay.  Who ....

 7              THE WITNESS:When we got out of the car, Pokey had

 8   already asked if we wanted something to drink, and he pulled

 9   over on the side of the road.  And, we got out -- he stopped

10   the car and we all got out of the car.  When we got out of

11   the car is when Mr. Burden hollered at Rat.  Let me -- speak

12   to him.  They just talked like two gentlemen talk.  After

13   they finished talking, Rat went one way, which is up Riley

14   Street, on up further and we were fixing to go in the house.

15   MS. BALDWIN:

16   Q     Did you go in the house?

17   A     Nope, never did make it in the house.

18   Q     What happened after that?

19   A     Before we even get up in the yard good, that's when

20   Shawn was coming out of the house with his girlfriend.

21   Q     You're talking about Tag Taylor's house.

22   A     Right.  Coming out of the house.  He was talking to the

23   girl -- I could hear him say this.  They had already talked

24   to Rat because they know Rat and know Rat used to make

25   trouble.  Next thing I know, they just -- looked like pit
```

*** Frances L. Roark ***

```
 1    bulls.  They are just fighting all of a sudden.  I didn't

 2    know who passed the lick first.  Maybe -- it just happened so

 3    fast.

 4    Q    And, after -- well, were you there when this fight was

 5    broken up?

 6    A    Yes.

 7    Q    Okay.  You said you didn't see who hit who first; is

 8    that right?

 9    A    Nope.  Right.

10    Q    But Shawn and Phillip got into a fight.

11    A    Right.  But, Shawn was on Phillip.  Shawn was hitting

12    on Phillip.

13    Q    Okay.  And, after the fight was broken up, what, if

14    anything, did you do?

15    A    Well, after the fight was broke up.  Well, first of all

16    Shawn's mother came down and pulled him off of Phillip and

17    told him to go home to the house.  And, as she was getting

18    him off Phillip, she hit him on his left shoulder.  When she

19    done that, Shawn reached back and he kicked Phillip back into

20    the bushes with his right leg, foot, or whatever you want to

21    call it.  Kicked him back.  So, she made her son go on back,

22    go back up the street, up Riley Street, which is where Rat

23    had been to.  Same place.  And, so I got back in the back

24    seat on the driver's side and Pokey, which is kin to Burden,

25    he was the driver.  He made another circle and went back over
```

```
 1   towards James Burden's house.  I don't know the name of the

 2   street.  But, as we was coming right there in front of the

 3   trailer, house, whatever you want to call it, that's when

 4   Phillip was coming out of the woods -- I saw him coming out

 5   of the wooded area.

 6   Q    It's a wooded area?

 7   A    Well, it's not just packed woods.  But it's just a

 8   little wooded area where it has done growed up behind some

 9   houses.  I seen him when he walked up to the house.  He

10   walked up in the house and before we could get in the house,

11   he was coming back out with the gun.

12   Q    You saw Phillip come out of James Burden's house with a

13   gun?

14   A    Right.

15   Q    What was he doing at that point, if you know?

16   A    Well, when he come back out, I can remember him putting

17   a shell in it and he just asked Phillip -- not Phillip.  He

18   asked Pokey to take him back up the street.  When he done

19   that, I never did get back in the vehicle.

20   Q    Where did you go after that?

21   A    Back toward First Baptist.  Riley Street still.

22   Q    And, you didn't stay at the scene, so you didn't see

23   what happened after he got in the car with Pokey; is that

24   what you are saying?

25   A    Uhn-huh.
```

*** Frances L. Roark ***

1    Q     But he did get in the car with Pokey.

2    A     Right.

3    Q     Do you know if they are related somehow?  Are Pokey and

4    Phillip related?

5    A     Well, they said Phillip is his uncle, but really if I'm

6    not mistaken, they are cousins.  But really they call Phillip

7    his uncle because -- they are cousins but that's Pokey's

8    father is Kenney Burden, Sr. is Pokey's father, but I think

9    that Phillip and Kenney is cousins, but they really call

10   Phillip uncle.

11   Q     Okay.  Now, whenever -- whenever Phillip got in the car

12   with Pokey, was that in the area of James Burden's residence

13   there?

14   A     When he got in the car?

15   Q     Is there where James ....

16   A     You are speaking after the fight or what?

17   Q     Okay.  You said you saw Phillip coming out of James

18   Burden's residence with a gun.

19   A     Right.  Right.

20   Q     And, he got in Pokey's car?

21   A     He asked Pokey to take him back up there.

22   Q     You were at James Burden's residence when he asked

23   Pokey that?

24   A     Correct.

25   Q     And, that is not on Wilkie Clark Drive, is it not?

*** Frances L. Roark ***

```
 1   A      I don't even know the name of the street.  I don't even

 2   really know.

 3   Q      It is not in front of Tag Taylor's house though, is it?

 4   A      Nope.

 5   Q      Nothing further.

 6          THE COURT: Cross-examination.

 7                      CROSS EXAMINATION

 8   BY MR. RADNEY:

 9   Q      Mr. Hines, how much had you had to drink before they

10   picked you up to head over to Tag's house?

11   A      None.

12   Q      You were headed over there to get your first drink?

13   A      Maybe.  If I were going to drink, I was.

14   Q      Somebody promised to buy you one if you'd ride with

15   them over there; is that right?

16   A      He was going to buy all of us one.

17   Q      By all of you one, if you'd ride with him over there.

18   A      Yes.

19   Q      Is that right?

20          And, Tag, we're talking about a bootlegger's house over

21   there; is that right?

22   A      I mean -- you know, ....

23   Q      You go over there and buy drink a good bit, don't you?

24   A      No, I don't.

25   Q      How often do you go over to Tag's and drink?
```

```
 1    A      Whenever I have money.

 2    Q      Or whenever somebody offers to buy you one.

 3    A      Whenever I have money.

 4    Q      Well, on this day somebody had offered to buy you one.

 5    A      They offered to buy it.  But, you asked me how often do

 6    I go.

 7    Q      And, the fight you saw was between Shawn and Phillip?

 8    A      Right.

 9    Q      Correct?

10    A      Right.

11    Q      And, Shawn's girlfriend got a couple licks in too,

12    right?

13    A      I don't know.

14    Q      Did you see her with her shoe off trying to get some

15    licks in?

16    A      Unh-huh.

17    Q      You didn't see that?

18    A      Unh-huh.

19    Q      And, then Shawn's mother, Jeanette, shows up on the

20    scene; is that right?

21    A      Yes.

22    Q      And, Jeanette is trying to break it up or do something.

23    A      A lot of people was trying to break it up.

24    Q      Did I hear you right that you said after Jeanette got

25    it busted up that Shawn then kicked Phillip one last time; is
```

*** Frances L. Roark ***

```
 1    that right?

 2    A    Kicked him back into the bushes.

 3    Q    Did you say Jeanette hit somebody?

 4    A    Her son.  She hit him on the shoulder.  Made many

 5    leave.

 6    Q    She hit Shawn.

 7    A    Yes.

 8    Q    What time of day was it?

 9    A    I don't know.

10    Q    What had you done that day?

11    A    What you mean what have I done?

12    Q    About what time did you wake up?  It was a Sunday;

13    right?

14    A    Yes, I guess.

15    Q    You don't know?

16    A    What I am saying, I don't know what time I woke up.

17    Q    Let me reask it.  What day of the week did this happen?

18    A    It was Father's Day if I'm not mistaken.

19    Q    What day of the week?

20    A    I guess, it was Sunday.

21    Q    What time --

22    A    I don't know.

23    Q    -- did you leave your house in the car with the person

24    that promised to go buy you a drink?

25    A    I don't know.  I don't wear a watch.
```

*** Frances L. Roark ***

1  Q     What time did this fight supposedly happen?

2  A     I don't know that either.

3  Q     Don't know.

4  A     Unh-huh.

5  Q     Don't know anything?

6  A     I couldn't tell you.  It was on up in the day, but I

7  couldn't tell you what time.

8  Q     Was it light outside or was it dark outside?

9  A     Light.

10  Q     Light.

11  A     Yeah.

12  Q     How far away do you live from over here in this area of

13  town?

14  A     What area?

15  Q     Where this happened.

16  A     I live across town.

17  Q     How far away?

18  A     Pretty good piece.

19  Q     Did you hang out over in this area much?

20  A     What area are you talking about?

21  Q     Talking about Tag's house.

22  A     Nope.

23  Q     You don't go over there much.

24  A     Only when I have money.

25  Q     Only when you have money to go buy a drink.

1  A      Yes.

2  Q      Nothing further.

3          THE COURT: Mr. Owens, anything?

4          MR. OWENS: No questions, Your Honor.

5          THE COURT: Thank you, sir.  You may step down.

6  (WHEREUPON, THE WITNESS WAS EXCUSED.)

7          THE COURT:  Call your next witness.

8          MS. BALDWIN: LaTarsha Winston.

9                    **LaTARSHA WINSTON**

10      **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

11        **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

12                  **TESTIFIED AS FOLLOWS:**

13                  **DIRECT EXAMINATION**

14  **BY MS. BALDWIN:**

15  Q      Tell the jury your name, please.

16  A      LaTarsha Rene Winston.

17  Q      Is LaTasha or LaTarsha?

18  A      LaTarsha.

19  Q      Okay.  With an R; is that right in your first name.

20      How old are you?

21  A      Twenty-five.

22  Q      Now, I direct your attention to June 17th of 2001, and

23  ask if you were in the area where a fight occurred between

24  Shawn Baker and Phillip Burden.  Were you?

25  A      I was at my momma's house, but I had walked down the

1    street.

2    Q    Where is your mom's house?

3    A    On Wilkie Clark Drive.

4    Q    Who is your mother?

5    A    Michelin Winston.

6    Q    Okay.  Now, you say you had walked down the street?

7    A    Um-hmmm.

8    Q    Down Wilkie Clark?  Did you go down Wilkie Clark Drive?

9    A    Um-hmmm.

10    Q    Were you going in the direction of Riley Street?

11    A    Um-hmmm.

12    Q    You were. Okay.

13    A    Um-hmmm.

14    Q    Why were you going in that direction?

15    A    Because they said somebody was fighting.

16    Q    You were going to go see the fight?

17    A    I had walked down there.

18    Q    Okay.  Is there a person that lives in that area named

19    Tag Taylor?

20    A    Um-hmmm.

21    Q    Where does he live, if you know?

22    A    Riley Street.

23    Q    On Riley Street?

24    A    Um-hmmm.

25    Q    Does Wilkie Clark turn into Riley Street?

*** Frances L. Roark ***

1   A    Does it turn in to it?  I don't know.  I don't know.

2   Q    You live on Wilkie Clark; is that right.

3   A    Wilkie Clark Drive.

4   Q    When you walk down Riley to get to Tag's, do you have

5   to turn?

6   A    Unh-huh, you go straight.

7   Q    Straight.

8   A    Um-hmmm.

9   Q    So, when you get in front of Tag's, thought, it is

10  Riley Street; is that right?

11  A    I think so.  I think that's the name of that street.

12  Q    Now, does Riley Street intersect there with another

13  street?

14  A    Government Street.

15  Q    Government Street. There is an intersection at Riley

16  and Government?

17  A    Is it what?

18  Q    There's an intersection there between Riley and

19  Government Streets.  You said Riley intersects with

20  Government Street; is that right?

21  A    I think so.  Government Street is up the hill.

22  Q    Okay. It is up the hill.

23  A    Um-hmmm.

24  Q    All right.  Now, you went down to see who it was, did

25  you ever see the fight?

*** Frances L. Roark ***

*** Frances L. Roark ***

1    A       I seen them fighting.

2    Q       Who was it?

3    A       Shawn and Phillip.

4    Q       Okay.   What did you see when you got there?

5    A       I just seen them fighting.

6    Q       Were they already fighting when you got there?

7    A       When I got there they was already fighting.

8    Q       Okay. Now, how long were you there when you got there

9    watching the fight?

10   A       I wasn't there that long.  Well, when they got through,

11   I left.   We was walking up the street, back up where my momma

12   stay.

13   Q       Okay.   When you say we were walking back up the street,

14   do you remember who that was?

15   A       A bunch.   Like me and my family.

16   Q       Did you see Shawn at that point after the fight was

17   over?

18   A       He was walking up the street, too.

19   Q       Was he walking up the street?   Was he with your group?

20   A       Yes.

21   Q       Now, did you see Jeanette Baker at that time, too?

22   A       Um-hmmm.

23   Q       Where was she?

24   A       She was walking back up the street.

25   Q       Did you see Phillip any more that day?

*** Frances L. Roark ***

1    A    After the fight?

2    Q    Um-hmmm.   Yes.

3    A    Um-hmmm.

4    Q    Where did you see him?

5    A    He was coming back up the road.

6    Q    When you say up the road ....

7    A    Back up on Wilkie Clark Drive.

8    Q    He was coming up Wilkie Clark Drive?

9    A    Um-hmmm.

10   Q    The fight you saw was not on Wilkie Clark, was it?

11   A    Unh-huh.

12   Q    It was in front of Tag Taylor's?

13   A    Yes.

14        MR. RADNEY:  Your Honor, I object to her leading

15   her own witness.

16        MS. BALDWIN: I'm trying to clarify what she's

17   already testified to, Judge.

18        THE COURT: Sustained.

19   MS. BALDWIN:

20   Q    Now, Ms. Winston, whenever you said you and Shawn and

21   the group you were with walked up Wilkie Clark Drive, was

22   Phillip in that group when you walked up there?

23   A    Unh-huh, he wasn't.

24   Q    Did you see whether or not he went anywhere after the

25   fight?

1    A    Yes.  He walked off.  Got in a car, I think.

2    Q    You didn't see where he went?

3    A    Unh-huh.

4    Q    Now, how long was it before you saw him good again?

5    A    Probably like five or ten minutes later.

6    Q    Okay.  What happened after that?

7    A    He was walking up the road with a gun.

8    Q    You saw a gun?

9    A    Um-hmmm.

10   Q    Can you describe for us what it looked like?

11   A    It was a sawed off shotgun.

12   Q    Okay.  Now, what, if anything, happened after that?

13   A    Huh?

14   Q    What, if anything, happened after you saw him walking

15   up the street with a sawed off shotgun?

16   A    Can you repeat that?

17   Q    You said you saw him walking up the street with a sawed

18   off shotgun.

19   A    Hum.

20   Q    What did you see next?

21   A    He was just still walking, him and Tony and James.

22   Q    Did you see Tony Burden?

23   A    Hum.

24   Q    Is his name Anthony?

25   A    I don't know.  I just know Tony.

*** Frances L. Roark ***

1    Q    You know him as Tony.

2    A    Um-hmmm.

3    Q    Okay.  And James.  Who is James?

4    A    Their uncle.

5    Q    The uncle.

6    A    Um-hmmm.

7    Q    Now, what did you see after that?

8    A    They was still walking up the street and my Aunt

9    Jeanette kept telling them not to do nothing.

10         MR. RADNEY: Object to anything Jeanette said.

11         THE COURT: Sustained.

12   MS. BALDWIN:

13   Q    Was Phillip there whenever Jeanette was saying this?

14   A    Um-hmmm.

15   Q    Who was she talking with?

16   A    Who was she talking with?

17   Q    Whatever Jeanette was saying at the time?

18   A    Telling Phillip not to go up there.

19         MR. RADNEY: Object to anything she said, Judge.

20         THE COURT: Sustained.

21         THE COURT: Ask your question again.

22   MS. BALDWIN:

23   Q    Ms. Winston, was Jeanette Baker talking to the

24   defendant, Phillip Baker, at that time?

25   A    She was asking him not to come up the road.

*** Frances L. Roark ***

*** Frances L. Roark ***

```
 1                  MR. RADNEY:  Object to anything she said, Judge.

 2   Hearsay.  Doesn't matter who she's talking to.

 3                  THE COURT: Overruled.

 4                  MS. BALDWIN: All right.

 5   MS. BALDWIN:

 6   Q     Now, Ms. Winston, what, if anything, did Jeanette Baker

 7   say to or did Phillip say to Ms. Jeanette Baker that you

 8   heard?

 9   A     He said, "B, I shoot you."

10   Q     Who said that?

11   A     Phillip.

12   Q     He said, "B, I'll shoot you"?

13   A     Yes.

14   Q     Did he say the letter B or did he say a word?

15   A     I can say it.  He said, "Bitch, I'll shoot you."

16   Q     Okay.  Who was he talking to?

17   A     Jeanette.

18   Q     Did she make any response?

19   A     She didn't say nothing.

20   Q     Now, what happened, or what did you see after that?

21   A     He was still walking up the road.

22   Q     Okay.  So, after he said this to Ms. Baker, he

23   continued to walk up the road.

24   A     Um-hmmm.

25   Q     Was anybody with him at that point?
```

*** Frances L. Roark ***

1    A      Tony and James.

2    Q      Was Tony saying anything if you know?

3    A      Tony kept saying, as we was going up the road, "You're

4    going to shoot this motherfucker.  You're going to shoot this

5    motherfucker."  He kept saying that.

6    Q      Did he say a name of who he was going to shoot?

7    A      No, didn't say his name.  He just said, "You're going

8    to shoot that motherfucker."

9    Q      And, you heard him say that.

10   A      Yes.

11   Q      Did you know who he was talking about at that time?

12   A      I didn't know who he was talking about.  I just heard

13   him.  He kept saying, "You're going to shoot that

14   motherfucker."  That's all I kept hearing.

15   Q      Okay.  Now, after you heard Tony saying that, and after

16   Phillip said what he did to Ms. Baker; what, if anything, did

17   you see after that?

18   A      He just kept walking up the road.  Tony kept making him

19   walk up the road with the gun.

20   Q      Okay.  And, was Shawn there at that point outside?

21   A      Unh-huh.

22   Q      Do you know where he was?

23   A      He was in the house.

24   Q      How do you know?

25   A      Because I seen him go into the house.

```
 1    Q      Do you know whose house that was?

 2    A      My momma.

 3    Q      Your mom's house?

 4    A      Yes.

 5    Q      What is your mom's name?

 6    A      Michelin Winston.

 7    Q      You have already said that and I didn't write it down.

 8           Is this also the residence of -- your grandmother's old

 9    home place?

10    A      Yes.

11    Q      Okay.  Now, did you ever see Jermicah Foster out there

12    that day?

13    A      I had seen him.

14    Q      Where did you see him at that day?

15    A      He was standing by the car.

16    Q      What car was that?

17    A      My brother's old brown car.  It was an old car.

18    Q      Where was your brother's old brown car located?

19    A      Like besides our house.  Not right beside it but beside

20    a fence.

21    Q      Was it parked in a yard or where?

22    A      On the side of the road.

23    Q      On the side of the road.

24    A      Um-hmmm.

25    Q      Is that Wilkie Clark?
```

```
 1   A      Um-hmmm.

 2   Q      Is it sort of like in front of your mom's ....

 3   A      It was in between, you know.

 4   Q      I am sorry what was that?

 5   A      Like in between.  On our side, but it was on the side

 6   of the road.

 7   Q      In between whose house?

 8   A      Between ours and Carolyn's yard.

 9   Q      And whose Carolyn?

10   A      Our neighbor.

11   Q      Okay.  And, that's your brother's vehicle?

12   A      Um-hmmm.

13   Q      And, you said that is where Rat was.

14   A      Yes.

15   Q      Was standing in front of it, beside it, or behind it?

16   A      Behind it.

17   Q      Behind it.

18   A      Um-hmmm.

19   Q      Okay.  Whenever Phillip was coming up the street was

20   Jermicah out there then?

21   A      Yes, ma'am, he was standing out there.

22   Q      Did you see anything happen at that point?

23   A      Yes.  Tony and Phillip kept walking up the road and

24   Tony kept telling him to shoot that motherfucker.  "You're

25   going to shoot that motherfucker."  So, by the time they got
```

*** Frances L. Roark ***

up there by Jermicah, Tony punched him and Jermicah

tried to hit him back, and then Tony told Phillip to shoot

Jermicah.

Q     Did Jermicah ever get -- did ever get a hit back?

A     He didn't get a chance to hit him back, because he had

shot him.

Q     And, you saw that?

A     I saw all of it.

Q     Did you see where it was that Jermicah was shot?

A     Like somewhere on the side of his face or head or

somewhere.

Q     Now, where was Shawn at that point, at the moment he

was shot?

A     In the house.

Q     Prior to that, where had Shawn been?  Just prior to --

before Shawn went in the house, where was Shawn if you

recall?

A     I don't remember seeing him.  I remember seeing him go

in the house.  That's all I remember.

Q     I have nothing further.

                    **CROSS EXAMINATION**

**BY MR. RADNEY:**

Q     Ms. Winston, Jeanette Baker is your aunt; correct?

A     Um-hmmm.

Q     That your mother's sister; is that right?

1    up there by Jermicah, Tony punched him and Jermicah

2    tried to hit him back, and then Tony told Phillip to shoot

3    Jermicah.

4    Q    Did Jermicah ever get -- did ever get a hit back?

5    A    He didn't get a chance to hit him back, because he had

6    shot him.

7    Q    And, you saw that?

8    A    I saw all of it.

9    Q    Did you see where it was that Jermicah was shot?

10   A    Like somewhere on the side of his face or head or

11   somewhere.

12   Q    Now, where was Shawn at that point, at the moment he

13   was shot?

14   A    In the house.

15   Q    Prior to that, where had Shawn been?  Just prior to --

16   before Shawn went in the house, where was Shawn if you

17   recall?

18   A    I don't remember seeing him.  I remember seeing him go

19   in the house.  That's all I remember.

20   Q    I have nothing further.

21                        CROSS EXAMINATION

22   BY MR. RADNEY:

23   Q    Ms. Winston, Jeanette Baker is your aunt; correct?

24   A    Um-hmmm.

25   Q    That your mother's sister; is that right?

1    A    Um-hmmm.

2    Q    Are you close?  Do you visit each other's house, spend

3    a lot of time together?

4    A    Sometimes.

5    Q    And, it was the house that she lives in right around

6    there where Shawn went inside; is that right?

7    A    Who?  Jeanette?  She don't live there.

8    Q    Your other aunt, excuse me; is that right?

9    A    My other aunt?

10   Q    It was your momma's house, you were talking about where

11   Shawn went into.

12   A    That's my momma's house.

13   Q    Your grandmother's house that your momma lives in; is

14   that right?

15   A    Um-hmmm.

16   Q    And, Shawn is your cousin.

17   A    Um-hmmm.

18   Q    And Rat was your cousin; correct?

19   A    Um-hmmm.

20   Q    And, when you hear about this fight, you go down there

21   and Shawn and Phillip are fighting; correct?

22   A    But I didn't know who it was until I got down there.

23   Q    Right.  You didn't know who it was, but when you got

24   down there you saw it was Shawn and Phillip that were

25   fighting; correct?

1    A    Yes.

2    Q    And, then a few minutes later your aunt, Ms. Jeanette

3    comes and tries to break it up.  Did you see that?  Did you

4    see her break up the fight?

5    A    I don't remember her breaking up the fight.

6    Q    Do you remember that?

7    A    Unh-huh.

8    Q    Did you see other people break up the fight?  How did

9    the fight stop?

10   A    I don't know.  I don't know how the fight stopped.

11   Q    You don't know how that stopped.

12   A    Unh-huh.

13   Q    Do you remember what day of the week it was?

14   A    Sunday.

15   Q    And, you had been at your momma's house.

16   A    Yes.

17   Q    And that's how you get the word to walk down there and

18   see this fight; is that right?

19   A    Um-hmmm.

20   Q    Did you live over there?

21   A    I live with my momma.

22   Q    Had you been out in the street on Friday night and

23   Saturday night when Rat had been out there with a gun?

24   A    I was not out there.

25   Q    Were you out there?  Do you know what I'm talking

*** Frances L. Roark ***

1    about?

2    A    No, I don't.

3    Q    Do you know about your momma going out in the street on

4    Friday or Saturday night with this deal going on?

5    A    Unh-huh.  My momma wasn't out there.

6    Q    Did you spend the night up at your momma's house Friday

7    night?

8    A    I live with momma.

9    Q    Did you spend the night there on Friday night?

10   A    No.

11   Q    This happened on Sunday.

12   A    Yes.

13   Q    On Friday night and Saturday night before Sunday, had

14   you spent the night over there?

15   A    I stayed at home with my momma.

16   Q    That is my question.  You had been at that house those

17   two nights.

18   A    Um-hmmm.

19   Q    And, had you gotten up, gone out in the street and seen

20   the commotion right over there when Rat and others were out

21   there with a gun?

22   A    No, I ain't seen that.  I didn't know nothing about

23   that.

24   Q    You didn't know nothing about that?

25   A    Unh-huh.

*** Frances L. Roark ***

*** Frances L. Roark ***

```
 1   Q     You'd never heard about it until I just asked you;  is

 2   that what you're telling me?

 3   A     I didn't know about it until the next day.

 4   Q     Until the next day.  So, you knew about it on Saturday.

 5   A     No, I didn't know about it Saturday.

 6   Q     You didn't know about it until Sunday?

 7   A     I knew about it on Sunday.

 8   Q     Until Sunday?

 9   A     Yes.

10   Q     Before all this happened on Sunday, you knew about it;

11   is that what ....

12   A     No, I didn't know about it until Sunday.

13   Q     All right.  I'm not trying to trick you.

14         Sunday afternoon this all happened.  Before this

15   happened, did you know about Rat being out in the street on

16   Friday night and Saturday night with a gun?

17   A     No, I don't.

18   Q     You didn't know about it?

19   A     Unh-huh.

20   Q     Did you hear Shawn -- strike that.

21         Did you see Shawn jumping up and down on a car,

22   screaming at Phillip, saying, "Come on, MF.  Get some more."

23   All that sort of stuff.

24   A     I didn't see none of that.

25   Q     You didn't see none of it.
```

*** Frances L. Roark ***

```
 1    A      Unh-huh.

 2    Q      You were around, you say, right after the fight.

 3    A      I just seen what I said.

 4    Q      You seen what you testified to, but you don't remember

 5    seeing any of Shawn's screaming, yelling, and cusing; you

 6    don't remember seeing any of that?

 7    A      Unh-huh.

 8    Q      What is your mother's name?

 9    A      Michelin Winston.

10           MR. RADNEY:   That's all I have right now.

11           THE COURT: Mr. Owens?

12           MR. RADNEY: I have one follow-up question, Judge, I

13    am sorry.

14    MR. RADNEY:

15    Q      You said at some point Phillip and Jeanette had a

16    confrontation and he cussed at her.  Do you remember

17    testifying to that?

18    A      Yes.

19    Q      Isn't it true that right after that happened they

20    actually hugged and made up and did he apologize to her?  Did

21    you see that?

22    A      I seen that.

23    Q      They hugged, made up, Phillip apologized to her, and

24    that was it and they were all right.

25           MR. RADNEY:  That's all I have.
```

*** Frances L. Roark ***

|   |   |
|---|---|
| 1 | **CROSS EXAMINATION** |
| 2 | **BY MR. OWENS:** |
| 3 | Q    So, you saw Jeanette and Phillip hug each other. |
| 4 | A    I seen that. |
| 5 | Q    You saw that. |
| 6 | A    Um-hmmm. |
| 7 | Q    How close to them were you? |
| 8 | A    I was standing by Mary Neal Blake's yard. |
| 9 | Q    Mary Neal Blake's yard. |
| 10 | A    Um-hmmm. |
| 11 | Q    Had you gone down to Tag's house where they were |
| 12 | fighting, or did you stay in Ms. Blake's yard and just |
| 13 | watched? |
| 14 | A    I had walked down there. |
| 15 | Q    You'd walked down to Tag's. |
| 16 | A    I didn't walk down to Tag's.  I had walked to the stop |
| 17 | sign. |
| 18 | Q    All right.  You are going to have to help me.  I have |
| 19 | got to get some dimensions.  I have got to get a better |
| 20 | understanding of where we are. |
| 21 | MR. OWENS:  Do we have a piece of chalk? |
| 22 | MR. OWENS: |
| 23 | Q    I'll go on to something else and come back to that. |
| 24 | So you saw Ms. Baker and Phillip hug each other or |
| 25 | embrace. |

*** Frances L. Roark ***

```
 1   A      He hugged her.

 2   Q      He had a shotgun in his hand?

 3   A      Yeah, he still had it in his hand.

 4   Q      Were you close enough to hear what Ms. Baker said to

 5   him before he hugged her?

 6   A      She told him just you don't want to go up there.  You

 7   don't want to do this.

 8   Q      How close to them were you?

 9   A      I can't really -- I don't really -- I really can't tell

10   how close I was.  I heard everything.

11   Q      You heard what she said and what he said?  Did you hear

12   -- well, first of all, were you as close as you are to me, to

13   Ms. Baker and Phillip when they hugged?

14   A      Not this close, but I seen them hug.

15   Q      All right.  How close were you?  We'll use where you

16   are and you tell me when to stop?

17   A      Okay.  About right there.

18   Q      About right here?

19   A      Um-hmmm.

20   Q      And, you tell us that you heard whatever Ms. Baker said

21   to Phillip and whatever he said to her?

22   A      I heard them.

23   Q      Did you hear Ms. Baker say to Phillip, "You Burden's

24   ain't shit"?

25   A      No, I didn't hear that, because she don't cuss.
```

*** Frances L. Roark ***

*** Frances L. Roark ***

```
 1   Q      Oh. Okay.  Hum.  Did you see Phillip's eye from where

 2   you were?

 3   A      Did I see his eye?

 4   Q      Yes.

 5   A      What you talking about?

 6   Q      Did you see anything wrong with Phillip's eye?

 7   A      The only thing that I seen was that little mark right

 8   there on his eye.

 9   Q      He had a little mark?

10   A      Little birth mark or whatever it is.

11   Q      Oh, he had a birth mark.  He didn't have any blood on

12   his eye?

13   A      I didn't see that.

14   Q      You didn't see any blood?

15   A      Unh-huh.

16   Q      Okay.  How long was Phillip out there in the road with

17   Ms. Baker before he went up the street and shot the shot you

18   say you saw?

19   A      How long was he out there?  He was out there the whole

20   time.

21   Q      All right.  Were you out there the whole time he was

22   out there?

23   A      Um-hmmm.

24   Q      All right.  Would you say the whole time he was out

25   there was five minutes?
```

*** Frances L. Roark ***

```
1    A    It might have been longer than five minutes.

2    Q    Would you say it was 30 minutes?

3    A    I really can't say how many minutes it was, you know.

4    Q    Would you say it was longer than 30 minutes?

5    A    I don't know how long it was.

6    Q    I understand you don't know how long.  Was it a short

7    period of time then?

8    A    I would say about 15 or 20 minutes.

9    Q    Okay.  Fifteen or 20 minutes.  During this 15 or 20

10   minutes, did you see anybody else, other than Jeanette Baker

11   come up close to Phillip?

12   A    That was the only person that I seen.

13   Q    I'm going to ask you to help me for the benefit of all

14   of us to see if we can identify what the area looked like

15   since we are not able to go over there right now.  But, you

16   said that you were there; right?

17   A    Um-hmmm.

18   Q    I'm going to draw this as Wilkie Clark.  All right?

19   A    The shooting took place on Wilkie Clark; is that right?

20   A    Yes.

21   Q    Was it on the right side or -- the left side or the

22   right side of the road as you look up Wilkie Clark?

23   A    I don't know.

24   Q    Wasn't it on the right?

25   A    As you looking?  What are you talking about?
```

*** Frances L. Roark ***

1    Q    Is there a hill, first of all?  Does Wilkie Clark have

2    an incline to it?

3    A    We don't have a hill.  It is just a straight road.

4    Q    Is there a hill down from it?  There's a road from

5    another road that comes in to it and there's a stop sign.

6    A    Government Street.

7    Q    Government Street intersects with this road, but it is

8    called Riley down there; isn't it?

9    A    Um-hmmm.

10   Q    And, is it your testimony that from this four-way stop.

11   It's a four-way stop, isn't it?

12   A    Um-hmmm.

13   Q    So, there's a stop sign on each side; right?  Okay.  I

14   think that's right.  Does the road go down from there or up

15   from that four-way stop?

16   A    Which road?

17   Q    The straight.

18   A    Wilkie Clark Drive?

19   Q    Yes, ma'am.

20   A    I mean, I don't understand what you're talking about.

21   Q    I realize I am -- when you stand in the middle of this

22   intersection, can you stand here and look directly down

23   Wilkie Clark and see all the houses on Wilkie Clark from

24   there to the next corner?

25   A    You can stand -- you could see from our stop sign so

*** Frances L. Roark ***

1    Quattlebaum's stop sign from where we live.

2    Q    Quattlebaum's, where is that?

3    A    That's a funeral home on Wilkie Clark Drive.

4    Q    So, there's another stop sign up this street?

5    A    It is down.  But, we wasn't down by Quattlebaum's.

6    Q    So, we are up here at the intersection of Government.

7    A    Where my momma live.

8    Q    Where is Tag's house in relation to this four-way stop?

9    A    Down the street.

10   Q    Down this way or this way?

11   A    Down the street.

12   Q    All right.

13   A    Down the street from any momma's house.

14   Q    Let's see if we can find your momma's house.  Your

15   momma's house is on Wilkie Clark.

16   A    Um-hmmm.

17   Q    Is your momma's house on the right side or the left

18   side of the road?

19   A    It is on the right.

20   Q    In relation to this drawing, going from the

21   intersection of Government Street up Wilkie Clark, you say it

22   is on the right-hand side.

23   A    Um-hmmm.

24   Q    Okay.  Is it down near Wilkie Clark intersection and

25   Government or is it farther up?

\*\*\* Frances L. Roark \*\*\*

1   A      It is up.

2   Q      Farther up.

3   A      But, it ain't too far.

4   Q      Can you see the intersection of Wilkie Clark and

5   Government from your momma's house?

6   A      You can't see Government Street.  Government Street is

7   up the hill.

8   Q      So, this is Government in my drawing.  Would you say

9   that?

10  A      You can say that.

11  Q      Okay.  Thank you.  So, we'll put Government Street on

12  here.

13         What is over here?  Is this Government also on the other

14  side of the four-way or is it a different named street?

15  A      That's still Government Street coming from the hill

16  down to the other street.

17  Q      Government is on this side of the intersection as well.

18  All right.  On this side of the intersection, is this called

19  Riley Street?

20         That's all right.  I will ask somebody else.  So, this

21  is Wilkie Clark, though, all the way through here; is that

22  right?

23  A      (Nonverbal Response).

24  Q      And, you say your momma's house is on the right-hand

25  side of Wilkie Clark as we come from that intersection?

```
 1    A      Um-hmmm.

 2    Q      So, on that Sunday, you say that you were in whose

 3    yard?

 4    A      In Mary Neal.

 5    Q      Mary Neal?

 6    A      Blake.

 7    Q      Blake.   Where does Mary Neal Blake live?

 8    A      On Wilkie Clark Drive?

 9    Q      Is Mary Neal Blake on the same side of the road as your

10    mother or the other side?

11    A      Down there on the left.

12    Q      Say again.

13    A      The other side.

14    Q      Oh, so she's on the left side.

15    A      Um-hmmm.

16    Q      Is she nearer the intersection or farther away from the

17    intersection of Government and Wilkie Clark?

18    A      Her house is, like, up by ours.

19    Q      Say again.

20    A      Her house is, like, up by my momma's house.

21    Q      Is it directly across the street from momma's house?

22    A      No.   There's a trailer across the street from my

23    momma's house.

24    Q      Okay.   Do you come to the trailer first or to --

25    A      Nope.
```

1   Q       -- to ....

2   A       You go to Mary Neal's then the trailer.

3   Q       Then the trailer. Is the road straight or flat from

4   your house to this intersection, or is there some kind of

5   incline or does the road go down?

6   A       It is straight.

7   Q       It is straight.  So, it's flat like this.

8   A       Um-hmmm.

9   Q       Okay.  Whose house is next to your momma's house?

10  A       Ms. Winston and Carolyn.

11  Q       Is it closer to the intersection or on the other side

12  of your momma's house?

13  A       It is on the right side.

14  Q       On this side. Is that correct?

15  A       Carolyn's house is on the same side as my momma's

16  house and then there's a trailer beside Carolyn's house.

17  Q       And, then there's a trailer next to her house.

18  A       The trailer, like, it ends where the stop sign is.

19  Q       And, then there's a stop sign up here?

20  A       Um-hmmm.

21  Q       Okay.  The day that you say you saw this shooting, you

22  testified that there was a car parked on the side of the

23  road.

24  A       Um-hmmm.

25  Q       Was that car parked near your momma's house or Carol's

*** Frances L. Roark ***

1    house?

2    A    It was in between.  It was on the side of the road.

3    Q    In between your momma's and Carol's?

4    A    Um-hmmm.

5    Q    We will put the car -- I don't profess to be an artist,

6    but that's a car.  Is that correct?

7    A    Um-hmmm.

8    Q    Okay.  Now, is the trailer, where you were say you were

9    standing, ....

10   A    I wasn't standing at no trailer.

11   Q    Excuse me.

12   A    Mary Neal Blake.

13   Q    Ms. Blake's house.  Is it a house or a trailer?

14   A    She stay in the house.  Her daughter stay in the

15   trailer.

16   Q    Okay.

17   A    On the left.

18   Q    On the left side of the road?

19   A    Yes.

20   Q    The house is right next to the trailer.

21   A    Um-hmmm.

22   Q    And, it is across from your momma's house or above your

23   momma's house?

24   A    It's across from my momma's house.

25   Q    Across from your momma's house.

*** Frances L. Roark ***

```
 1   Q     Ms. Clark; is that right?

 2   A     That's not her name.

 3   Q     What's her name again?

 4   A     Blake.

 5   Q     Blake.  I am sorry. Okay.  So, you are standing -- were

 6   you in her yard or on her porch or where?

 7   A     At first I was standing by the mailbox.

 8   Q     Standing by her mailbox.

 9   A        Um-hmmm.

10   Q     Is her mailbox down near the road or where is it?

11   A     Yes, in her driveway.

12   Q     In her driveway.  Is her driveway on this side or that

13   side of her house?

14   A     I can't --

15   Q     You can't remember.

16   A     I don't know which side it's on.

17   Q     We'll put mailbox right here.  You were by the mailbox.

18   A     Um-hmmm.

19   Q     And you say you were out there about 20 minutes maybe?

20   A     I really can't say how long it was.  I was guessing

21   some minutes.

22   Q     You were guessing 20.  It may have been longer.

23   A     It may have been.

24   Q     Okay.  And, it's your testimony that you saw the fight

25   that was at Tag's.
```

1   A      Um-hmmm.

2   Q      Now, is Tag's house on this side or this side of

3   Government?

4   A      I don't know what side his house is on.  It might be on

5   the left.  His house might be on the left.

6   Q      All right.  We'll find out.  Somebody else may know

7   where his house is.

8          But, it's your testimony you saw Phillip Burden in a

9   fight somewhere down here?

10  A      At Tag's house.

11  Q      At Tag's house.

12         I'm going to put Tag's house right there for the time

13  being.  Okay.  We'll move it if we have to.  Right now it is

14  there.  You say you saw down here and you saw the fight

15  between Shawn and Phillip.

16  A      Um-hmmm.

17  Q      Was Tony at the fight with Shawn and Phillip?

18  A      I can't remember seeing him.  I don't know.  I don't

19  remember seeing him.

20  Q      You do not?

21  A      I don't know if he was there or not.

22  Q      After the fight between Shawn and Phillip, you say that

23  Phillip left, but you didn't see him leave.

24  A      I was walking back home.

25  Q      So, you started, what, across the street?

| 1 | A | It is a straight up shot up from Tag's house. |
|---|---|---|
| 2 | Q | So, you were down here? |
| 3 | A | Yes.  Walking home.  I walked back home. |
| 4 | Q | You walked back home. |
| 5 | Q | Who all was with you? |
| 6 | A | Really we wasn't together, but we was .... |
| 7 | Q | Name the people that were there that you remember |
| 8 | | seeing. |
| 9 | A | I remember seeing Lenice. |
| 10 | Q | Who else? |
| 11 | A | Jeanette. |
| 12 | Q | Who else? |
| 13 | A | Marquail. |
| 14 | Q | Marquailly? |
| 15 | A | Marquail. |
| 16 | Q | Oh.  Marquail.  I am saying her first name wrong. |
| 17 | A | It's a boy. |
| 18 | Q | Excuse me.  His first name. |
| 19 | Q | What is Marquail's last name? |
| 20 | A | Trammell. |
| 21 | Q | Trammell. |
| 22 | Q | Who else? |
| 23 | A | Leonard. |
| 24 | Q | Leonard what? |
| 25 | A | Baker? |

*** Frances L. Roark ***

```
 1   Q      Who else?

 2   A      Tonya.

 3   Q      Tonya?

 4   A      Um-hmmm.

 5   Q      Baker?

 6   A      Winston.

 7   Q      Winston.  Did you see any of them break up the fight?

 8          After you saw Jeanette Baker and Phillip embrace, okay,

 9   describe what Phillip did then.

10   A      He pointed the gun at her and said, "Bitch, I'll shoot

11   you."  Well, this is before he hugged her.

12   Q      Okay.  Then what happened?

13   A      She said, "You don't want to do that."

14   Q      Then what happened?

15   A      Then they hugged.

16   Q      Okay.  Then what happened?

17   A      Then that's when Tony started coming back up.  They was

18   coming up the road.

19   Q      Where did Tony -- you say after Jeanette hugged

20   Phillip, Tony came up to them.

21   A      He was Walking.

22   Q      He was walking from which direction?

23   A      From -- I don't know where he was coming from.  I know

24   he was walking on Wilkie Clark Drive.

25   Q      So, you saw Tony on Wilkie Clark?
```

*** Frances L. Roark ***

```
 1    A      Yes.

 2    Q      Was he on the right side or the left side of the road

 3    when you saw him?

 4    A      I can't remember what side he was on.  I remember him

 5    walked up with Phillip.

 6    Q      You saw him with Phillip?

 7    A      Um-hmmm.

 8    Q      How long had Phillip been out there before you saw Tony

 9    as you have described?

10    A      I really can't tell you how long it was.

11    Q      Okay.  Where was Rat when you saw Tony?

12    A      Standing up by the car.

13    Q      So Rat was up here when you saw Tony?

14    A      Um-hmmm.

15    Q      And, where was Phillip when you saw Tony?

16    A      They was walking up the road.

17    Q      So, you are saying that Tony and Phillip were down here

18    in the intersection together.

19    A      Um-hmmm.

20    Q      Okay.  And Jeanette Baker was down here in the

21    intersection with Tony and Phillip.

22    A      She was trying to stop them from coming.

23    Q      Who else was in the road with Tony and Phillip?

24    A      James.

25    Q      James.  So we have got James, Tony, and Phillip, and
```

*** Frances L. Roark ***

```
 1    Jeanette Baker.   All right here; is that right?

 2    A       Um-hmmm.

 3    Q       Then what happen?

 4    A       She was trying the stop them from coming up the road

 5    and James had stopped.

 6    Q       James stopped?

 7    A       Um-hmmm.

 8    Q       What's James' last name?

 9    A       Burden I guess.   I don't know.

10    Q       James Burden.

11         So this is James Burden, Tony Burden, Phillip Burden all

12    out there in the road and Jeanette Baker.

13    A       Um-hmmm.

14    Q       And, it is your testimony that the four of them

15    proceeded up the road?

16    A       Um-hmmm.

17    Q       Do you recall where Shawn was as they were walking up

18    the road?

19    A       He was in the house.

20    Q       He was in which house?

21    A       My momma's house.

22    Q       Your momma's house.   This house.   The first house?   I'm

23    going do put "momma's house."   And, you say he was in the

24    house.   Did he ever come back out?

25    A       I don't remember seeing him.
```

1   Q      You never saw him again?

2   A      Until it was over with.

3   Q      Until it was over. After the shooting?

4   A      Yes.

5   Q      He never came back out after the fight before the

6   shooting?

7   A      Unh-huh.

8   Q      Okay.

9   Q      Did you ever see Phillip and Ms. Baker on the left side

10  of the road sitting down?

11  A      I don't remember seeing that.

12  Q      You don't remember that.  If that happened, you don't

13  know?

14  A      I don't know if it happened.

15  Q      So, there was not anybody else, except the four of them

16  coming up the road?

17  A      That's all I know I seen.

18  Q      And, it is your testimony that they come on up the road

19  and you say that Rat is by the car.

20  A      Um-hmmm.

21  Q      Is Rat saying anything to these four people as they are

22  coming up the road?

23  A      He wasn't saying nothing.

24  Q      He was not saying anything.  Was he making any kind of

25  gestures or doing anything?

*** Frances L. Roark ***

1   A    He wasn't doing nothing.

2   Q    He was just peacefully standing in the road.

3   A    Standing there.

4   Q    All right.  Tell me, then, what happened.

5   A    Then they came on up the road.

6   Q    All four of them come together.

7   A    James had stopped.

8   Q    James stopped.  Was James near the intersection?

9   A    He was down by, like, by the pole by KK's house.

10  Q    By KK's house.

11  A    In between KK and Carolyn.

12  Q    This way?

13  A    Um-hmmm.  It's a pole right there.

14  Q    There's a pole?  I am confused.  Please, help me.  I

15  thought everybody was coming from this direction.  There were

16  people coming from this way?

17  A    They was going up the road.  I am just saying from

18  Tag's, from Tag's way, we was coming back up the road.

19  Q    Now, you're talking about up the road.

20  A    It still down.  I mean, I am just saying, from Tag's.

21  You know, you can walk back up the road.  That's what I am

22  saying.

23  Q    Yes, ma'am.  How far is it from the car to the

24  intersection of Government and Wilkie Clark that Sunday?  Do

25  you understand what I'm asking you?

1    A    I don't know how far it is.

2    Q    Let's see if we can -- was it -- how many houses are

3    there between your momma's house and the four-way stop where

4    Government and Wilkie Clark or Riley come together?

5    A    What I told you.  That's how many houses on that side.

6    Q    Yes, ma'am.  Are there any houses from your momma's

7    house down to the corner of the intersection of Government

8    and Wilkie Clark?

9    A    That trailer is the last house on the right side.

10   Q    So, there's a trailer on this side of your momma's?

11   A    Unh-huh.

12        MR. OWENS: I am not going to ask her anymore

13   questions.

14        THE COURT: Anything further of this witness?

15        MR. OWENS: Judge, we ask that this witness be kept.

16   I do want to bring her back later.  I just need ....

17        MR. RADNEY: I have one follow-up question.

18                    **RECROSS EXAMINATION**

19   **BY MR. RADNEY:**

20   Q    You named everybody out there.  Have you named

21   everybody that was out there?

22   A    I really can't remember.

23   Q    You can't remember.  You've named everybody you can

24   remember; is that right?

25   A    Um-hmmm.

*** Frances L. Roark ***

1    MR. RADNEY:  Nothing further.

2    THE COURT: Ma'am, you'll have to remain.  You're

3  not going to be excused.  You will have to wait outside.

4  (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.)

5    THE COURT: Who is your next witness?

6  (WHEREUPON, THERE WAS A SIDE BAR THAT WAS NOT REPORTED.)

7    THE COURT: Ladies and gentlemen, step back to the

8  jury room.  I will call you back out.

9  (JURY OUT)

10    THE COURT: We will be in recess.

11    THE COURT: Bring the jury in.

12  (JURY PRESENT)

13    THE COURT: Call your next witness.

14    MS. BALDWIN: State calls Joseph Saloom.

15                    **JOSEPH SALOOM**

16        **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

17          **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

18                  **TESTIFIED AS FOLLOWS:**

19                  **DIRECT EXAMINATION**

20  BY MS. BALDWIN:

21  Q    Your name is Joe Saloom?

22  A    Yes, ma'am.

23  Q    Tell the jury your occupation, please.

24  A    I am a forensic scientist, specializing in firearms and

25  tool mark examination.

1    Q    And, how long have you been working in that capacity?

2    A    I have been with the Alabama Department of Forensic

3    Sciences for 23-and-a-half years.  I have actually been a

4    firearm examiner for 13 years.

5    Q    What qualifications do you have that qualify you as

6    expert?

7         MR. RADNEY: Judge, we will stipluate to all of his

8    qualifications.  We have dealth with him before, both

9    defendants.

10         THE COURT: Ladies and gentlemen of the jury, the

11    Defense has stipulated that this man is an expert and may

12    testify as an expert witness in this field.

13    MS. BALDWIN:

14    Q    Mr. Saloom, in this particular case, did you receive

15    some items of evidence, specifically some evidence from Emily

16    Ward of the Department of Forensic Sciences and also from

17    Donald Truitt with the Roanoke Police Department?

18    A    Yes, I did.

19    **(WHEREUPON, ITEMS WERE MARKED AS STATE EXHIBITS 1 THROUGH**

20    **FOUR FOR IDENTIFICATION.)**

21    MS. BALDWIN:

22    Q    I'm going to show you what has been marked, previously

23    marked, as State exhibits 1 through 4.  If you can, identify

24    what they are, starting with State Exhibit 1.

25    A    State's Exhibit 1 is a small sealed manilla envelope

1    that came from the medical examiner.  Inside are two items or

2    actually three items.  One I lumped together as an item.

3    Fifty-six small lead shot pellets and the other item I lumped

4    together are two felt or cardboard wads and another shot cup,

5    cardboard shot cup.

6        State's 2 is a sealed manilla envelope which contains

7    two index cards that have tape lifts on them.

8    Q    Do they indicate where those tape lifts were taken

9    from?

10   A    They are identified to be from the subject, Jermicah

11   Foster.

12       State Exhibit 3 is a sealed manilla envelope also

13   containing two tape lifts, and let me clarify State's Exhibit

14   2 are tape lifts identified to be from the right hand and

15   State's Exhibit 3 are tape lifts identified to be from the

16   left hand, and State Exhibit 4 is a sealed manilla envelope

17   that contains a tape lift which is identified to be from the

18   wound.

19   Q    Okay.  Now, as a firearm examiner do you also receive

20   evidence, sometimes, from gun powder residue testing and that

21   sort of thing?

22   A    Yes, ma'am.

23   Q    And in this particular case, by the way since we are

24   taking you out of order, can you just explain for the jury

25   what tape lifts are?

1    A      These are lifts that are done by the pathologist as he

2    or she is preparing to finish the autopsy.  Before anything

3    else is done, they take a piece of clear tape, that looks a

4    lot like this tape right here, and puts it on the hand or the

5    wound, or whatever part of the body they are actually lifting

6    from, and then they'll take that and put it on a piece of

7    white index card or another item that is carrier.  And, the

8    purpose of that is to determine if there is any gun powder

9    particles present.

10   Q      And, in this particular case, you did say, I believe

11   you identified State's 2, 3, and 4 as tape lifts; is that

12   correct?

13   A      Tape lifts.  Yes, ma'am.

14   Q      And, you received those, I believe, you actually

15   received those from someone in your office name Catherine

16   Richart; is that correct?

17   A      Yes, I did.

18   Q      Who received them from J. P. Sparrow?

19   A      Yes, ma'am.

20   Q      He delivered them to your office from Emily Ward; is

21   that correct?

22   A      That's correct.

23   Q      Now, from the time you received those, to the time that

24   you looked at those exhibits, were they in the same or

25   substantially the same condition as when you received them?

*** Frances L. Roark ***

1    A    Yes, ma'am, they were.

2    Q    Have they been in your care, custody and control the

3    entire time from the time that you got them from Richart to

4    the time you looked at them to determine whether or not there

5    was gun powder residue?

6    A    Yes, ma'am, they were.

7    Q    And, as to State's Exhibit 2, the tape lift identified

8    from the right hand of Jermicah Foster, what, if anything,

9    did you do with that particular exhibit?

10   A    I examined it to see if I could find any gun powder

11   particles on that tape lift.  And, after I finished my

12   examination, I sealed it up and we eventually returned all

13   this evidence.

14   Q    Did you find, observe, or see any gun powder residue on

15   that tape lift?

16   A    I did not.

17   Q    As to State Exhibits 3, that is identified as being a

18   tape lift from left hand of Jermicah Foster, did you do any

19   examination of that particular exhibit?

20   A    Yes, I did.

21   Q    And what, if anything, did your examination reveal?

22   A    After examination of these two tape lifts, I did not

23   find any gun powder particles on them either.

24   Q    As to State Exhibit 4 identified as a wound tape lift.

25   A    I didn't find any gun powder particles on the wound

1  tape lift either.

2  Q      By not finding any gun powder residue on any of those

3  tape lifts, what, if any, significance does that have in your

4  examination?

5  A      Basically, it means that the muzzle of the fire arm was

6  not close enough when it was fired to deposit gun powder

7  particles so that they could be removed.

8  Q      As to State Exhibit 1, the small lead shot pellets.  I

9  believe, you said there were 56 small lead shot pellets.

10 A      Yes, ma'am.

11 Q      Were you able to identify, or can you, from your

12 expertise identify, what sort of weapon, or what sort of

13 ammunition that particular wadding and shot pellets came

14 from?

15 A      Partially.

16 Q      If you would, just explain that to the jury.

17 A      All right.  The wadding here, which is placed inside a

18 shotgun shell to -- some of the wadding is put in there to

19 separate the powder from the shot charge.  The shot charge is

20 made up of small lead pellets.  And, they can vary in size,

21 depending upon what type of load is loaded into the shot

22 shell.  Wadding can come in different types.  It can be

23 cardboard, or felt, or it can be plastic.  The wadding has

24 got to fit inside the shot shell and the shot shell itself

25 has to have the right circumference to go into the shotgun so

*** Frances L. Roark ***

1   it will work correctly.  So, we can measure the size of the

2   wadding and determine what the gauge of that shotgun was or

3   shot shell, and I can also measure the shot pellets and

4   determine what size shot they are.

5   Q     And, were you able to do that with either of the

6   cardboard wads or what was identified as shot shell wadding

7   in this case?

8   A     Yes, ma'am.  I was able to determine that this

9   cardboard wadding is consistent with 16 gauge shot shell

10  wadding.

11  **(WHEREUPON, ITEMS WERE MARKED AS STATE EXHIBITS 5 AND 6 FOR**

12  **IDENTIFICATION.)**

13  MS. BALDWIN:

14  Q     I am showing you what has been marked State Exhibit 5

15  and State Exhibit 6, and ask if you can identify those two

16  exhibits.

17  A     Yes, ma'am, I can.

18  Q     Okay.  And, what is State Exhibit 6?

19  A     State's Exhibit 6 is a fired Federal brand shot shell

20  that is 16 gauge.

21  Q     And, have you -- at some point in time, did you receive

22  that item of evidence?

23  A     Yes, I did.

24  Q     And, did you receive that from Catherine Richart?

25  A     Yes, ma'am, I did.

*** Frances L. Roark ***

1    Q      And, that is in this same office?

2    A      Yes, ma'am.

3    Q      Now as State Exhibit 6, what is State Exhibit 6, if you

4    can identify it?

5    A      That was State's Exhibit 6 that I identified.  State's

6    Exhibit 5?

7    Q      Yes.

8    A      State's Exhibit 5 is a Winchester brand fired shot

9    shell, and it is also 16-gauge.

10   Q      One is a Federal?

11   A      Yes, ma'am.  State's Exhibit 6 is Federal and State's

12   Exhibit 5 is Winchester.

13   Q      At some point in time you received both of those in

14   your office; is that correct?

15   A      Yes, ma'am.

16   Q      And, for what purpose did you receive those items of

17   evidence?

18   A      They were submitted so I could compare the two.

19   Q      And, when you compare shotgun shells, what do you

20   compare?  What are you attempting to compare at that point?

21   A      We are looking for microscopic characteristics that are

22   placed upon the shot shell when -- after it is fired, it

23   reacts with the mechanism of the shotgun.  Firearms examiners

24   operate under the scientific principle that no two man-made

25   items are microscopically identical.  So, when a firearm is

*** Frances L. Roark ***

```
 1   manufactured, small microscopic marks are left during the

 2   manufacturing process.  When a shot shell is fired, or a

 3   cartridge case is fired, or a bullet, for that matter goes

 4   through a barrel, all these items are marked by the mechanism

 5   of the firearm, and those markings are unique to that

 6   firearm.  Just like fingerprints are unique to each

 7   individual.

 8   Q     In this particular case, did you examine State Exhibit

 9   5, the Winchester 16-gauge spent shotgun shell and number 6

10   the Federal shotgun shell, and do a comparison with regards

11   to the marks on both those shells?

12   A     Yes, ma'am, I did.

13   Q     What, if anything, did you conclude after examining

14   both of those shells?

15   A     I found that both of these shot shells were fired in

16   the chamber of the same shotgun.

17          MS. BALDWIN: Your Honor, we move to admit State's

18   Exhibits 1, 2, 3, 4, 5, and 6 at this time.

19          THE COURT: Admitted.

20   (WHEREUPON, EXHIBITS MARKED AS STATES 1-6 WERE ADMITTED.)

21          MS. BALDWIN: Nothing further.

22          THE COURT: Cross-examination.

23                      CROSS EXAMINATION

24   BY MR. RADNEY:

25   Q     You didn't go out to the scene.  You are relying on
```

*** Frances L. Roark ***

1   what was brought to you by way of the Department of Forensic

2   Sciences or by way of officers; correct?  By way of the

3   medical examiner or by way of officers; is that correct?

4   A       That is correct.

5   Q       And, in this particular case you were never provided

6   with a weapon to compare these shots with; correct?

7   A       That is correct.

8   Q       And, what you can tell us for sure today is that,

9   number one, that the subject, Mr. Foster, did not fire a

10  weapon, is that correct, based upon your analysis of residue

11  on the prints that you were given; correct?

12  A       No, sir.  That is not correct.

13  Q       Can you testify today with a certainty whether

14  Mr. Foster on that day fired a weapon?

15  A       I cannot.

16  Q       He could have?

17  A       Yes, sir.

18  Q       And, he most certainly could have had one in his hands

19  that never got fired.

20  A       Yes, sir.

21  Q       Correct?  And, what you you can also tell us with a --

22  this with a certainty, is that you found no residue around

23  the wound of the victim; correct?

24  A       I found no gun powder particles.

25  Q       Meaning that the shot was not fired at close range?

1   A      Unless there was an intermediate target; yes, sir,

2   that's correct.

3   Q      Meaning an intermediate target that could have absorbed

4   residue and then sent the projectiles on through.

5   A      Yes, sir.  That's correct.

6   Q      You have no knowledge of any such thing as that being

7   at issue in this case; correct?

8   A      No, sir, I do not.

9   Q      And, you rely on the expertise of the medical examiner

10  to make these tape lifts.  You had nothing to do with that;

11  correct?

12  A      That's correct.

13  Q      Sixteen-gauge is a relatively common hunting

14  ammunition; correct?

15  A      Not as common as 12 or 20-gauge.

16  Q      But they are all three readily available at local

17  stores; correct?

18  A      That's correct.

19         MR. RADNEY: Nothing further, Judge.

20         THE COURT: Mr. Owens anything?

21                     **CROSS EXAMINATION**

22  BY MR. OWENS:

23  Q      Did you have occasion to examine the body?

24  A      No, sir, I did not.

25  Q      Did you have occasion to have a report, or have you a

1   report, that spoke to the distance from the body that any

2   shots that were fired may have been fired?

3   A     I am not sure I understand your question.

4   Q     Was there any effort to determine whether or not the

5   entry point of the wound on this subject was made at any

6   particular angle or not?

7   A     I have no knowledge of that.  You'll have to ask

8   Dr. Ward.

9          MR. OWENS: Thank you.

10         THE COURT: Anything else?

11         MS. BALDWIN: Nothing further of this witness.

12         THE COURT: Step down.  This witness is excused.

13  (WHEREUPON, THE WITNESS WAS EXCUSED.)

14         THE COURT: Call your next witness.

15  (WHEREUPON, A SIDE BAR WAS HELD OFF THE RECORD.)

16         THE COURT: Ladies and gentlemen, as I understand

17  it, the next witness may be a rather lengthy witness as far

18  as time of testimony.  It is getting rather late in the

19  afternoon.  You have had a rather busy day, starting out from

20  organization this morning to being well into a trial by this

21  afternoon.  Follow the same instructions that I have already

22  given you:  Don't discuss this case with anyone, not even

23  amongst yourselves; do not allow anyone to try and draw you

24  into conversation about the case, and don't put yourself in a

25  position of overhearing conversations that others may be

1    having about the case; do not try to find out anything about

2    this case; and don't let anyone tell you about the case.

3    Should there be media coverage of this case, or any other

4    case during these two weeks, you must turn away from it.

5    Don't't read it; don't listen to it, don't look at it.  If

6    any member of the media contacts you, immediately inform them

7    that you are under a court order not to discuss this case

8    with anyone.  Follow these instructions.  Be back in the jury

9    room by 9:00 in the morning and we'll begin the trial and

10   push on through.  Thank you.  Everyone remain in here while

11   the jury exits.

12   (JURY ADJOURNED FOR THE NIGHT)

13           THE COURT: All right.  We will be in recess.

14   (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED UNTIL 9:00 A.M.,

15   29 OCTOBER, 2002.)

16                                    *****

17

18

19

20

21

22

23

24

25

```
 1

 2                         IN THE CIRCUIT COURT
 3                FIFTH JUDICIAL CIRCUIT OF ALABAMA
 4                         RANDOLPH COUNTY
 5
 6   STATE OF ALABAMA,          *   CR-02-0954
 7                              *   CRIMINAL NO.
 8   versus                     *   CC-2001-000115, CC-2001-000114
 9                              *   Wedowee, Alabama
10                              *   28 October, 2002
11   ANDREW PHILLIP BURDEN      *
12   ANTHONY EUGENE BURDEN,     *
13        Defendants.           *
14   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
15
16                    TRANSCRIPT OF TRIAL BEFORE
17
18              THE HONORABLE RAY D. MARTIN,
19
20              CIRCUIT JUDGE, AND A JURY.
21
22   A P P E A R A N C E S
23   FOR THE STATE OF ALABAMA:   REA S. CLARK, DISTRICT ATTORNEY
24                               FIFTH JUDICIAL CIRCUIT
25                               CHAMBERS COUNTY COURTHOUSE
26                               COUNTY OFFICE BUILDING
27                               LAFAYETTE, ALABAMA 36862
28
29                               BY: REA S. CLARK, DA
30                                   MELODY BALDWIN, ADA
31
32   FOR THE DEFENDANT:          RADNEY, RADNEY & BROWN
33   (Phillip Burden)            ATTORNEYS AT LAW
34                               56 COURT SQUARE
35                               ALEXANDER CITY, AL 35010
36
37                               BY: THOMAS A. RADNEY, ESQUIRE
38
39   FOR THE DEFENDANT:          NATHANIEL D. OWENS, ESQUIRE
40   (Anthony Burden)            ATTORNEY AT LAW
41                               POST OFFICE BOX 3641
42                               ANNISTON, AL 36202
43
44
45                               FRANCES L. ROARK, CSR
46                               OFFICIAL COURT REPORTER
47                               fr2w487
48
49
```

1   PROCEEDINGS: In Open Court.

2   (JURY PRESENT)

3        THE COURT: The record will reflect all jurors

4   present, all parties present, you may call your next witness.

5        MS. BALDWIN: State calls Jeanette Baker.

6                      **JEANETTE BAKER**

7        **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

8           **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

9                   **TESTIFIED AS FOLLOWS:**

10                  **DIRECT EXAMINATION**

11  **BY MS. BALDWIN:**

12  Q    State your name, please.

13  A    Jeanette Baker.

14  Q    And, Ms. Baker, where do you live?

15  A    I live on 330 Avenue A, Roanoke, Alabama.

16  Q    Okay.  Now, do you know Jermicah Foster, who is the

17  victim in this case?

18  A    Yes.

19  Q    How is it that you know him?

20  A    He's my nephew.

21  Q    Do you also know Phillip Burden?

22  A    Yes.

23  Q    And Anthony Burden?

24  A    Yes.

25  Q    Are they here in this courtroom?

1    A    Yes.

2    Q    If you would, point them out for the Court.

3    A    That's Phillip and that's Anthony.

4    Q    Okay.  And, Phillip, I believe, is the one you pointed

5    to in the blue jacket?

6         THE COURT:  If you would, ma'am, please describe

7    what each of the gentlemen are wearing right now.

8         THE WITNESS:  Phillip has on this blue sweater, I

9    mean, whatever.  Anthony has on a striped shirt.

10        THE COURT: That's just for the jury's

11   identification.

12   MS. BALDWIN:

13   Q    Now, back on June 17th of 2001, were you in the area of

14   Government Street and Riley Street?

15   A    Yes.

16   Q    And, what day was this if you recall?

17   A    It was on a Sunday, Father's Day.

18   Q    Okay.  Now, where do you live in conjunction to

19   Government and Riley?  How far do you live from that area?

20   A    Just probably about a block.

21   Q    Okay.  Now, on that particular day, what, if anything,

22   took you to Riley Street and Government Street?  What were

23   you doing over in that area?

24   A    I was on my way to my sister's house that lives down

25   across on Border Street, and I was stopped by Terita Hendrix

*** Frances L. Roark ***

1   right down on Government Street and I was standing down there

2   talking to her.

3   Q     Were you at her house?

4   A     I was stopped in the street.  I was standing right

5   there on the street, yes, at the house.

6   Q     And, as you were talking to her what, if anything,

7   occurred at that point?

8   A     As I was talking to her, then a few minutes, I guess, I

9   stood there about 30 minutes, and as we were talking, Tina

10  McNeal went up to -- was on her way up between the hall there

11  and Tag's house.

12  Q     You have referred to the diagram, so why don't we just

13  go and introduce that.

14  A     Okay.

15  **(WHEREUPON, A DIAGRAM/POSTER WAS MARKED AS STATE EXHIBIT 7**

16  **FOR IDENTIFICATION.)**

17  MS. BALDWIN:

18  Q     Now, I have marked as State Exhibit 7, can you identify

19  or have you looked at this diagram previously?  Have you

20  looked at this diagram previously, Ms. Baker?

21  A     Yes.

22  Q     Are you familiar with that area, Government and Riley

23  Streets?

24  A     Yes.

25  Q     Aside from one thing that I'll point out before I ask

1   you this.  Do you know what this was to depict?  Right here?

2   A    The trailer of James Burden.

3   Q    Is it actually in that area or is it further up?

4   A    It's in that area, because there's a vacant lot here.

5   Q    There's a vacant lot here?

6   A    A vacant lot where the hall used to be and James'

7   trailer is sitting next to it.

8   Q    Is it right up on the road, though?  My question is, is

9   his trailer right up on the road?

10  A    No.

11  Q    Is something between?

12  A    No, there's just a vacant right lot right between.

13  Q    There's a vacant lot here?

14  A    And, in front of his trailer.

15  Q    And in front of his trailer?  So, there's actually a

16  vacant lot here and then his trailer is actually further

17  back?

18  A    Yes, about from there from the street, because it used

19  to be -- a hall used to be there and it burned down.

20  Q    A hall?

21  A    Like that lodge hall used to be there and it burned

22  down and a cafe used to be there.

23  Q    A lodge?  I see.  Aside from the trailer being a little

24  bit further back, does this diagram fairly and accurately

25  show the layout of the street and houses there?

```
 1    A    Yes.

 2              MS. BALDWIN:  Your Honor, we move to admit State

 3    Exhibit 7.

 4              MR. RADNEY:  Your Honor, I object.  At this point

 5    there's not been near the proper predicate as it relates to

 6    what these boxes are supposed to be and that sort of stuff.

 7    She may get there, but she's not there yet.

 8              THE COURT: At this point, is it used as an exhibit?

 9              MS. BALDWIN: Yes, just to help her in her

10    testimony.

11              THE COURT: I'll reserve ruling on admission.  You

12    may use it as an exhibit.

13              MS. BALDWIN: All right.

14    MS. BALDWIN:

15    Q    Now, Ms. Baker, would it help you in describing where

16    you were and what you saw in using this diagram?

17    A    Yes.

18    Q    Can you ....

19              MS. BALDWIN:  Judge, may the witness approach the

20    diagram?

21              THE COURT:  Yes.

22    MS. BALDWIN:

23    Q    Come over here.  You may want to stand where I am at.

24    I'll give you this pointer.  The jury needs to see so don't

25    stand in front of it.  All right.
```

1        THE COURT: Can you see?

2    MS. BALDWIN:

3    Q    Where is Terita Hendrix's residence in proximity to

4    this diagram?

5    A    Back of the hall.

6    Q    Okay.  When you say hall, can you show us where that

7    would be on this diagram?

8    A    That would be the hall.

9    Q    Is that like -- isn't that an old mason lodge?

10   A    Yes.

11   Q    Now, Tag Taylor's house somewhere around in there?

12   A    That would be Tag's house.

13   Q    It is next to what you refer to as the hall?

14   A    Yes.

15   Q    And, what else is that next to Tag Taylor's house if

16   you know?

17   A    There are two old houses there and they're growed up

18   and then a vacant lot.

19   Q    Does anybody live in the vacant house?

20   A    No.

21   Q    They are abandoned?

22   A    Abandoned.

23   Q    When you say vacant, they are grown up and that sort of

24   thing; is that right?

25   A    Yes.

*** Frances L. Roark ***

1    Q     Now, on past Government Street, on this side of Wilkie

2    Clark Drive, can you describe for us what is shown there in

3    that diagram?

4    A     Okay.  We've got a vacant lot here.  That's where a

5    house was that burned down.  And, a house here.  Nobody was

6    living in it at that time.  And, then we've got the Watkins'

7    house and they have got a trailer and another trailer there.

8    Q     Okay.  Now, what about across the street?

9    A     Across the street?  My mother's house -- this would

10   have been my mother's house and that would be the Noland's

11   house and there was a trailer there and another doublewide

12   trailer.

13   Q     Okay.  Why don't I -- do you want to identify whose

14   those houses are?

15   A     This would my mother's house.  This would be the

16   Noland's.  And this would be a vacant trailer, because it is

17   vacant.  And, this would be -- I don't know what KK's last

18   name is, but I'll just say KK.

19   Q     Okay.  All right.  Now, if you would label on the other

20   side of the street the ones you have described as being the

21   lodge and Ernest Taylor's and then the two empty houses.

22   A     Tag, vacant, vacant, and James.

23   Q     You put a J on James; is that right?

24   A     Um-hmmm.

25   Q     All right.  Now, on the other side of Wilkie Clark

*** Frances L. Roark ***

*** Frances L. Roark ***

1   Drive you described as a vacant lot.

2   A    Yes, sir.

3   Q    No house is there now?

4   A    No, it is burned down.

5   Q    All right.  The next house you said -- I believe, you

6   said ....

7   A    It is vacant.

8   Q    All right.

9   A    Then you've got the Watkins' house.  Then you've got a

10  trailer there and a trailer there.

11  Q    All right.  Now, when you were -- for right now, that's

12  fine.  We'll come back.  You can go sit back down for a

13  minute.

14       Now, you pointed out that you were behind -- you were at

15  Terita Hendrix house and that is behind the lodge or the

16  hall.

17  A    Yes.

18  Q    And then what did you say happened as you were talking

19  to Terita?

20  A    I was talking to Terita and Tina McNeal she left

21  Terita's house and went between the lodge hall and Tag's

22  house.  There's a little path that goes up from the back.

23  And, she got, I guess, almost up there and then after a few

24  minutes she ran back and she said, "They are fighting.  They

25  are fighting."  She came back and said, "They are fighting."

*** Frances L. Roark ***