COURT OF CRIMINAL APPEALS NO._____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF ___RANDOLPH___ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC 2001-114, 115__

CIRCUIT JUDGE __HON HON RAY D MARTIN__

Type of Conviction / Order Appealed From: __MURDER__

Sentence Imposed: __ANTHONY BURDEN-30 YEARS   ANDREW BURDEN-LIFF__

Defendant Indigent: ☒ YES   ☐ NO

ANTHONY EUGENE BURDEN AND ANDREW PHILLIP BURDEN

| | | |
|---|---|---|
| HON NATHANIEL OWENS | 256-236-0111 | **NAME OF APPELLANT** |
| (Appellant's Attorney) | (Telephone No.) | 256-354-5464 |
| P O BOX 2641 | | HON GREG VARNER |
| (Address) | | P O BOX 338 |
| ANNISTON       AL       36202 | | ASHLAND AL 36251 |
| (City)       (State)       (Zip Code) | | |

V.

## STATE OF ALABAMA

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

**NAME OF APPELLEE**

_____

_____

(For Court of Criminal Appeals Use Only)



EXHIBIT
A

1    calm the situation down to see what had happened.  And, I was

2    approached by -- I had -- I saw Ms. Jeanette Baker and asked

3    her what had went on, and she told me ....

4            MR. RADNEY:  Your Honor, object to anything

5    Ms. Baker said.

6    MS. BALDWIN:

7    Q    You talked to Ms. Baker; is that correct?

8    A    Yes, I talked to Ms. Baker.

9    Q    After you talked to Ms. Baker; what, if anything, did

10   you do?

11   A    Once basically we got the scene secured, I began taking

12   photographs of the scene.

13   Q    Did you retrieve evidence from the scene as well?

14   A    Yes.  Once we worked the scene, I retrieved a shotgun

15   shell also.

16   Q    Okay.  And do you know what sort of shotgun shell that

17   was?

18   A    It was a 16 gauge, number two shot shell.

19   Q    Where was that located?

20   A    On Wilkie Clark Drive about 94 feet from the body.

21           MS. BALDWIN:  Judge, can this witness come down

22   from the bench?

23           THE COURT:  Yes.

24   MS. BALDWIN:

25   Q    Investigator Heard, I believe there's a pointer up

*** Frances L. Roark ***

1    there on that easel.  If you'd take that pointer and stand

2    over to the right of that diagram so the whole jury can see.

3    As far back this way as you can.

4        Show us where the body was laying whenever you got

5    there?

6    A    The body was laying right there, face down, behind the

7    car there.

8    Q    Was there only that one car?

9    A    In the street; yes.

10   Q    Now, where was the shotgun shell that you say you

11   recovered?

12   A    Right there at that dot.  Going back toward Government

13   Street.

14   Q    That was a 16 gauge shell?

15   A    Yes.

16   Q    And, when you saw that item, did you photograph that

17   item as well?

18   A    Yes.

19   Q    Okay.  Now, you said it was approximately 94 feet from

20   the body.

21   A    Ninety-four feet seven inches.

22   Q    And, did you retrieve any other evidence there at the

23   scene other than taking photographs of the body and of the

24   shotgun shell?

25   A    No, ma'am.

1    Q    You can have a seat.  Thank you.

2    **(WHEREUPON, PHOTOGRAPHS WERE MARKED AS STATE EXHIBITS 16**

3    **THROUGH 19 FOR IDENTIFICATION.)**

4    MS. BALDWIN:

5        I want to show you in bulk what's been marked State's

6    Exhibits 13 through 19, and ask if you can look at each one

7    of those and tell me if you could identify what is in each

8    one?

9            MR. RADNEY:  Your Honor, for the record, I renew my

10   objection to the photographs.

11           THE COURT:  Overruled.

12           THE WITNESS:  Number 13 is a photo of the vehicle,

13   this orange vehicle, that is drawed in the diagram and the

14   body of Jermicah Foster laying face down.

15   MS. BALDWIN:

16   Q    In proximity to the car.

17   A    Yes.

18   Q    Number 14.

19   A    It is the body of Jermicah Foster and I'm standing

20   behind the car facing back toward the back of the car.

21   Q    Now, the angle at which it is taken, the car would be

22   in the corner?

23   A    Yes.

24   Q    Upper corner.

25   A    Yes, ma'am.

*** Frances L. Roark ***

```
 1   Q      All right.  Fifteen?

 2   A      I am standing over the body of Jermicah Foster.

 3   Q      Did you show his hands or one of his hands?

 4   A      Yes, ma'am.  His right hand.

 5   Q      All right.  Sixteen?

 6   A      Sixteen is I am standing with Government Street to my

 7   back, showing the relation to where the shotgun shell was

 8   found, shooting back up toward the body.

 9   Q      Okay.  You're on Government Street.  All right.

10   A      And 17, I'm standing over the shell, the shotgun shell,

11   that was found.

12          Eighteen, I'm standing facing toward Government Street

13   and took a picture of the shotgun shell.

14          And, the last one, 19, I'm standing in front of the

15   vehicle, shooting down toward Government Street.

16   Q      Down to the intersection?

17   A      Yes, ma'am.

18   Q      Could you see the intersection in that photograph?

19   A      Yes, ma'am.

20   Q      And, do all those photographs, 13 through 19,

21   fairly and accurately the scene as you observed it on June

22   17th?

23   A      Yes, ma'am.

24          MS. BALDWIN:  We move to admit 13 through 19.

25          THE COURT:  Admitted.
```

*** Frances L. Roark ***

1  (WHEREUPON, PHOTOGRAPHS MARKED AS STATE EXHIBITS 13 THROUGH

2  19 WERE ADMITTED.)

3  MS. BALDWIN:

4  Q    Now, that they are admitted, if you would, start from

5  the back here, if you can, hold it up where the jury can see

6  it.  All right.  You say that's a picture from in front of

7  the vehicle; is that correct?

8  A    Yes, ma'am, facing toward Government Street.

9         MS. BALDWIN:  Judge, can the witness come down so

10 they can see it?  They are kind of small.

11        THE COURT: Yes.  Jonathan go around toward the

12 center of the jury.

13 MS. BALDWIN:

14 Q    All right.  You say that -- if you would just show them

15 where that is, the photograph in conjunction with the

16 diagram.

17 A    This photograph here, I am standing right here, facing

18 that way, taking the picture that way.

19 Q    And, where is the intersection of Government and Riley

20 Street?

21 A    Right here.  And, it is at the very bottom, bottom of

22 this picture, because it is kind of a downward grade.

23 Q    And, that was State's Exhibit 19?

24 A    Yes, ma'am.

25 Q    All right.  Now, State's Exhibit 18.

*** Frances L. Roark ***

1   A      Shotgun shell here.  This is the picture of the shotgun

2   shell.  I'm standing right in here, facing Government Street.

3   Q      All right.  I'm going to lay these right here and you

4   can pick them up.

5   A      Okay.

6   Q      That's State's Exhibit?

7   A      Seventeen.  I'm just a little closer, basically,

8   standing over him, still facing toward Government Street.

9          Sixteen.  I have moved around.  I'm standing right in

10  here.  This direction.  Shooting back up that way.

11  Q      So, you are shooting up Wilkie Clark Drive?

12  A      Yes.  Of the shotgun shell in relation also you can see

13  the body and the car in the back.  You can see all of that.

14  Q      Do you recall where you were standing when you took

15  that?

16  A      Right here.  Basically standing over the body right in

17  here, facing the side.

18  Q      And  ....

19  A      That is 15.

20         Fourteen, I basically moved around the body to this

21  side.  That's fourteen.

22         Thirteen, I'm standing besides the car.  Shooting toward

23  Government Street.

24  Q      Thank you, Investigator Heard.

25         Whenever you -- or after you photographed the scene and

1    had everything secured, at any point in time, did you check

2    for any weapons on the victim himself?

3    A    Yes.  Before the body was removed from the scene, we

4    checked for a gun or any type of weapon.  Patted him down for

5    a gun.

6    Q    Did you feel anything when you did that?

7    A    Not a gun; no.

8    Q    You didn't take anything out of his pockets?

9    A    No.

10    Q    All right.  Now, and you seized the shell; is that

11    correct?

12    A    Yes.

13    Q    I'm going to show you, what's already admitted as

14    State's Exhibit 5, and ask if you can identify what that is?

15    A    This is the shell on the diagram that was found on

16    Wilkie Clark Drive from the body, around 94 feet 7 inches

17    from the body.

18    Q    Okay.  And, State's Exhibit 6 that has already been

19    admitted. Can you identify what that is?

20    A    This is the spent shell that was taken off James

21    Burden.

22    Q    Okay.  And, that was actually taken off Mr. James

23    Burden?

24    A    Yes.  Taken off of James Burden by Officer Chris May.

25    Q    And, you sent those to the lab, or had them sent to the

*** Frances L. Roark ***

1   lab; is that correct?

2   A      Yes, ma'am.

3   Q      Joseph Saloom did a tool mark test on those; is that

4   correct?

5   A      Yes, ma'am.

6   Q      And, he has already testified, and I believe you got a

7   report back that the tool marks on both of those matched.

8           MR. RADNEY:  Object to the leading questions.

9           MR. OWENS:  It is her witness.

10          THE COURT: Sustained.

11          MS. BALDWIN:  Withdraw the question.

12  MS. BALDWIN:

13  Q      Now, Investigator Heard, you didn't find any more spent

14  16-gauge shells; is that correct?

15  A      No, ma'am.  No more.  Just these two.

16  **(WHEREUPON, ITEMS WERE MARKED AS STATE EXHIBITS 21 AND 22 FOR**

17  **IDENTIFICATION.)**

18  MS. BALDWIN:

19  Q      I will show you what has been marked State's Exhibits

20  21 and 22, and ask if you can identify what each of those

21  are?

22  A      Twenty-one is three 16-gauge shells that were recovered

23  in James Burden's residence.  They were found in a bowel that

24  was in the bedroom, just sitting in bowel.

25  Q      You found those yourself?

*** Frances L. Roark ***

1    A    Yes.

2    Q    And, they are not spent, meaning they have not been

3    fired.

4    A    They have not been fired.

5    Q    Were they similar to any of the others that you

6    retrieved?

7    A    Similar to the one that was found in Mr. Burden's

8    pocket.

9    Q    Now, from the time they were seized there to the time

10   -- well, until now, have they been in your care, custody, and

11   control the entire time?

12   A    Yes.

13   Q    And are they in the same or substantially the same

14   condition?

15   A    Yes, they are.

16        MS. BALDWIN:    Your Honor, we move to admit State's

17   Exhibit 21.

18        THE COURT:    Admitted.

19   **(WHEREUPON, AN ITEM MARKED AS STATE EXHIBIT 21 WAS ADMITTED.)**

20   MS. BALDWIN:

21   Q    As to State's Exhibit 22, do you know what that is?

22   A    This is the pistol that was turned over to me by Lt.

23   Sheppard that was found in Mr. Burden's residence, James

24   Burden's residence.

25   Q    And, do you know where that was recovered from?

*** Frances L. Roark ***

1    A    Closet, in the little closet there, inside the house.

2    Q    Okay.  Has it been in the same or, substantially the

3    same, condition as when you received it there at the scene,

4    well, at Mr. Burden's residence?

5    A    When it was turned over to me; yes, ma'am.

6    Q    Has it been in your care, custody and control the

7    entire time?

8    A    Yes, ma'am.

9         MS. BALDWIN:  Your Honor, we move to admit State's

10   Exhibit 22.

11        THE COURT:  Admitted.

12   **(WHEREUPON, AN ITEM MARKED AS STATE EXHIBIT 22 WAS ADMITTED.)**

13   **(WHEREUPON, AN ITEM WAS MARKED AS STATE EXHIBIT 23 FOR**

14   **IDENTIFICATION.)**

15   MS. BALDWIN:

16   Q    Let me show you what's been marked as State's 23 and

17   ask if you can identify that what is?

18   A    This was sent back from the lab.  This is a razor

19   cutter from the lab.

20   Q    And, that was since you have received it from the lab,

21   you have kept it in your care, custody and control the entire

22   time?

23   A    Yes, ma'am.

24   Q    Is it in the same or, substantially the same,

25   condition?

1    A    As I received it from the lab; yes, ma'am.

2         MS. BALDWIN: Your Honor, we move to admit State's

3    Exhibit 23.

4         THE COURT Admitted.

5    **(WHEREUPON, AN ITEM MARKED AS STATE EXHIBIT 23 WAS ADMITTED.)**

6    MS. BALDWIN:

7    Q    Do you understand that was found in the pocket of

8    Jermicah Foster?

9    A    Yes, ma'am.

10   Q    There at the lab when they were doing the autopsy?

11   A    Yes, ma'am.

12   Q    I want to show you what was previously marked as

13   State's 9, 10, 11, and 12, and ask if you can identify for

14   the jury what each of those are.

15   A    State's Exhibit 9 is basically the clothes and some

16   items that were taken off of Jermicah Foster, the victim.

17   Q    Does it show the box cutter?

18   A    Yes.

19   Q    And, that was taken at the lab?

20   A    Yes, ma'am.

21   Q    State's Exhibit 10?

22   A    Ten is an X-ray of Jermicah Foster's skull area with

23   pellets, shots in it.

24        State's Exhibit 11 is a picture of Jermicah Foster and

25   the entrance wound on the left cheek area taken at the lab.

*** Frances L. Roark ***

1   Q    All right.  State's Exhibit 12.

2   A    Is the report from the Department of Forensic Sciences

3   with the cause of death and the manner of death.

4         MS. BALDWIN: Your Honor, for the record, now, we

5   move to admit State's Exhibits  9, 10, 11 and 12.

6         THE COURT:  Admitted.

7         MR. RADNEY:  Admitted previously by stipulation.

8   MS. BALDWIN:

9   Q    Now, Investigator Heard, you actually had that diagram

10  drawn out there at the police department; is that correct?

11  A    Yes, ma'am.

12  Q    All right.  Now, I'll ask you, it has already been

13  identified, certain parts have already been identified, you

14  might need to come down again, but I would ask you to do it

15  again for us, to show us where things are in relation to one

16  another since you actually had it drawn.

17        MR. RADNEY:  Your Honor, neither defendant has an

18  objection to its admissibility.

19        MR. OWENS:  We do not object. No objection.

20        MS. BALDWIN: Okay.  We move to admit the diagram.

21        THE COURT:  Admitted.

22        MS. BALDWIN: That was State's Exhibit 7.

23  **(WHEREUPON, A DIAGRAM/POSTER MARKED AS STATE EXHIBIT 7 WAS**

24  **ADMITTED.)**

25        MS. BALDWIN: I don't have anything further at this

*** Frances L. Roark ***

```
 1    point.

 2              MR. RADNEY:  Judge, I have just a few questions.

 3                      CROSS EXAMINATION

 4    BY MR. RADNEY:

 5    Q       Jonathan, this pistol found on James Burden ain't got

 6    nothing to do with the death of Jermicah Foster, does it?

 7    A       No, sir.

 8    Q       In previous testimony, Jonathan, I asked you on two

 9    different occasions, did you locate a weapon on Jermicah

10    Foster and your answer was no.

11    A       No.  No, sir.

12    Q       You were in error.  There was a weapon on Jermicah

13    Foster.

14    A       The box cutter?

15    Q       There was a box cutter found on him that you didn't

16    find.

17    A       Yes, sir.

18    Q       That was found by the Department of Forensic Sciences;

19    correct?

20    A       Yes, sir.

21    Q       And, you are also aware the marijuana was found in the

22    system of Jermicah Foster; correct?

23    A       Yes, sir.

24    Q       THC metabolite found here in the urine.  That means

25    marijuana; correct?
```

*** Frances L. Roark ***

1    A    Yes, sir.

2    Q    Mr. Foster had actually been under investigation by

3    your department for drugs; correct?

4        MS. BALDWIN: I am going to object to that.

5        THE COURT: Sustained.

6    MR. RADNEY:

7    Q    You are very familiar with the area out there; aren't

8    you, Jonathan?

9    A    Yes, sir.

10   Q    How long have you worked for Roanoke?

11   A    Since September of 1994.

12   Q    Since '94?

13   A    Yes, sir.

14   Q    That is an area of -- high-crime area; isn't it?

15   A    Yes, sir.

16   Q    Your department spends a lot of time, not only

17   patrolling the area but investigating crime in that area;

18   correct?

19   A    Yes, sir.

20   Q    When you got out there that night, or that late

21   afternoon, is the word chaos a good word for what was going

22   on out there?

23   A    Yes, sir.

24   Q    Mob scene?

25   A    Yes, sir.

*** Frances L. Roark ***

1    Q    When you got there very soon after the other officers,

2    Officer May and Officer --

3    A    Laney.

4    Q    -- Laney.

5    A    Yes, sir.

6    Q    You got there soon after them, and you had started

7    helping secure the scene.  It was not secure when you got

8    there; is that correct?

9    A    No, sir.

10   Q    There were -- how many folks:  Ten, 20, 30 -- how many

11   people?

12   A    Officers or ....

13   Q    No, not officers.

14   A    Between ten to 20 I would say.

15   Q    Ten to 20?

16   A    Yes, sir.

17   Q    Had a lot of them been drinking?

18   A    Some.  I don't know.  I won't say a lot.

19   Q    You had the opportunity to interview a good many

20   witnesses out there; correct?

21   A    Yes.

22   Q    Wouldn't you agree that the majority of them had been

23   drinking?

24   A    Yes, sir.

25   Q    Had Ms. Jeanette Baker been drinking?

*** Frances L. Roark ***

```
1    A      No, sir.

2    Q      Not to your knowledge.

3    A      When I talked to her; no, sir.

4    Q      You didn't perform a test, but you don't think she had

5    been drinking.

6    A      Right.

7    Q      Were you called out there or involved in any of the

8    reports on Friday night and Saturday night involving Rat?

9    A      No, sir.

10   Q      It is your understanding some folks from your

11   department had been called out there, but you were not one of

12   them; correct?

13   A      Yes, sir.

14   Q      You do not have in your possession, and you have not

15   recovered, the gun that fired the shot; correct?

16   A      No, sir.

17   Q      Did the basis for making the arrests that were made in

18   this case were reports made to you by eye witnesses; correct?

19   A      Yes, sir.

20   Q      This is what I would call an eyewitness case; correct?

21   A      Yes, sir.

22   Q      Not a fingerprint case, not a forensic case, but an

23   eyewitness case; correct?

24   A      Yes, sir.

25          MR. RADNEY:  That's all I have of this
```

*** Frances L. Roark ***

```
 1    witness.

 2              MR. OWENS:  I'll just ask a couple of questions.

 3                        CROSS EXAMINATION

 4    BY MR. OWENS.

 5    Q    You say you did this drawing; right?

 6    A    Sir?

 7    Q    You did this drawing for the District Attorney.

 8    A    No, sir, I had it done.

 9    Q    You had it done.  Okay.  When it was done, it was at

10    your direction.

11    A    Yes, sir.

12    Q    Okay.  And, you have indicated the shell that you have

13    marked as one of the exhibits in this case, was found

14    somewhere below this third house; is that --

15    A    Yes, sir.

16    Q    -- is that where you said to put it?

17    A    Yes, sir.

18    Q    When you arrived at the scene, did it appear that the

19    body was where it had fallen?

20    A    Yes, sir.

21    Q    And, it is your testimony that 94 feet away was this

22    shell.

23    A    Yes, sir.

24    Q    You have had occasion to fire a 16-gauge shotgun?

25    A    Yes, sir.
```

*** Frances L. Roark ***

1   Q    Would you tell the ladies and gentlemen of the jury in

2   your opinion how far the shell would go once the shot is

3   fired?

4   A    Do you want single shot, double barrel, or automatic?

5   Q    Let's just deal with one -- we don't know what this

6   weapon was, do we?

7   A    Right.  Correct.  If it was an automatic, it would be

8   just a few feet.

9   Q    All right.

10  A    And, if it breeched double barrel, single barrel

11  wherever it was broken, I mean, basically still a few feet.

12  Basically a single barrel or a double barrel when you break

13  it open, it ejects.

14  Q    It ejects at that point.

15  A    At that point. Now, an automatic when you shoot it,

16  will eject at that point that you pull the trigger.

17  Q    In your opinion would either an automatic or a double

18  barrel go 94 feet away from the point of impact on its own?

19  A    No, no, sir.

20  Q    Where is Tag's house in relation to your drawing?

21  A    (Witness points)

22  Q    Would you have had occasion to go to Ms. Hendrix's

23  house while you were out there?

24  A    No.

25  Q    Is it on your drawing or do you know where the Hendrix

*** Frances L. Roark ***

```
 1  residence ....

 2  A     It would be sitting over in here.  It is not on my

 3  drawing; no, ma'am -- no, sir, excuse me.

 4  Q     How much of an incline is there from where the body is

 5  laying to the intersection of Government and Wilkie Clark?  I

 6  say incline -- decline or incline?

 7  A     It is declining this way.

 8  Q     That way.  So, you have a photograph, I think I saw it.

 9  A     It is basically going down hill.

10  Q     There's the one.  Is that the one you took?  Does

11  that --

12  A     Yes, sir.

13  Q     -- does that reflect the -- how far from the

14  intersection of Government and Wilkie would you say that body

15  is?

16  A     A little over 150, 160 feet.

17  Q     A hundred and sixty?

18  A     Yeah, maybe.  I guess.  I didn't measure that.

19  Q     Didn't measure that?

20  A     No.

21  Q     Approximate -- let's use the courtroom to help us all

22  in terms of giving us a sense of where the body is in

23  relation to the intersection of Wilkie Clark.  Is it enough

24  -- I'm going to go back here.

25  A     The body from Wilkie -- the body from Government
```

1    Street?

2    Q    Yes.

3    A    It's a good ways.

4    Q    A lot farther than -- this courtroom wouldn't hold it;

5    right?

6    A    Right.

7    Q    So, we're talking about maybe twice the length of where

8    we are here?

9    A    Yes, sir, or more.

10   Q    Okay.  You can have a seat back up there.

11   A    All right.

12   Q    You have been an investigator since '94?

13   A    No, sir, since 1998.

14   Q    Ninety-eight.  Have you had occasion to, in your

15   experience as a police officer, find a bar of soap on people

16   before?

17   A    Yes, sir.  What does that general ....

18            MS. BALDWIN: I object.

19            THE COURT:  Sustained.

20            MR. RADNEY:  Your Honor may we approach?

21            MR. OWENS:  May we approach, Judge?

22   (WHEREUPON,  A SIDE BAR WAS HELD OFF THE RECORD.)

23            THE COURT:  Sustained.

24            MR. RADNEY:  Reserve our objection, Your Honor.

25            MR. OWENS:  No further questions.

*** Frances L. Roark ***

```
 1          THE COURT: Anything further from the State?

 2          MS. BALDWIN: Yes one other question.

 3                    REDIRECT EXAMINATION

 4   BY MS. BALDWIN:

 5   Q     Investigator Heard, assuming this is not an automatic

 6   16-gauge that you are talking about, how -- what would be

 7   your explanation as to why you found that where you did, the

 8   shell, shot shell, in relation to your investigation?

 9          MR. RADNEY:  Your Honor, that calls for a big time

10   speculation.

11          THE COURT:  Sustained.

12          MS. BALDWIN: Judge, may we approach?

13   (WHEREUPON a SIDE BAR WAS HELD OFF THE RECORD.)

14          MR. CLARK: We'll rephrase it.

15   MS. BALDWIN:

16   Q     Investigator Heard, how do you eject a shell from a

17   breeched loaded shotgun?

18   A     You will break it open and it ejects when you break it

19   open.

20   Q     If someone is firing from a breech loaded shotgun, do

21   they have to breech it open where they fire the shot?

22   A     No, ma'am.

23          MR. RADNEY:  Your Honor, object to the leading

24   question.

25          THE COURT:  Overruled.
```

*** Frances L. Roark ***

1          THE WITNESS:  No, ma'am, just wherever it is

2    breeched.

3          MR. RADNEY:  Your Honor, object.  She's laid no

4    predicate.

5          THE COURT: Overruled.

6    MS. BALDWIN:

7    Q     Investigator Heard, if this pump shotgun, how does one

8    eject a shell after a pump shotgun is fired?

9          MR. RADNEY:  Calling for speculation.

10          THE COURT: Officer, are you familiar with different

11    types of weapons called shotguns?

12          THE WITNESS:  Yes, sir.

13          THE COURT: Are you familiar with the different ways

14    that those weapons operate?

15          THE WITNESS:  Yes, sir.

16          THE COURT:  Are you familiar with the way they

17    discharge and the way that you would either load or unload or

18    discharge spent shells?

19          THE WITNESS:  Yes, sir.

20    MS. BALDWIN:

21    Q     Officer Heard, Investigator Heard, if this is a pump

22    shotgun, how is it that the shot would be ejected from a pump

23    shotgun?  How would one do that?

24    A     You would have to pump it after firing, or to eject it,

25    even if you didn't fire it, the pumping action would eject

*** Frances L. Roark ***

```
 1   the shell.

 2   Q     So, with a breech weapon, you breech it.  You have to

 3   break it.

 4   Q     Yes, ma'am.

 5   A     With a pump, you pump it.

 6   A     Pump it.  And an automatic it self does it.

 7   Q     So, if one shoots an automatic shotgun, the shell

 8   automatically ejects itself; is that what you are saying?

 9   A     From the time it is fired; yes, ma'am.

10   Q     But not with the other two?

11   A     No, ma'am.

12   Q     Okay.  Investigator Heard, does the place where you

13   found the spent shell mean the gun was fired at or near that

14   location, if the shotgun was a breech loading or pump

15   shotgun?

16   A     No, ma'am.

17              MS. BALDWIN: Nothing further.

18              THE COURT: Anything further?

19                    RECROSS EXAMINATION

20   BY MR. RADNEY:

21   Q     Based on the location, it could have been; correct?

22   A     Yes, sir.

23   Q     Could have been moved by the mob scene.  You don't

24   know; correct?

25   A     Yes, sir.
```

*** Frances L. Roark ***

1    Q    You are aware that earlier in the day there had been a

2    fight between Phillip and Shawn; correct?

3    A    Yes, sir.

4    Q    You had the opportunity to interview Shawn later on

5    that night; correct?

6    A    Yes, sir.

7         MS. BALDWIN: I'm going to object.  Well, never

8    mind.  Withdraw it.

9         THE COURT:  Overruled.

10   MR. RADNEY:

11   Q    Shawn had been drinking?

12   A    Yes, sir.

13        MR. RADNEY:  Nothing further.

14        MS. BALDWIN: Nothing further of this witness.

15        THE COURT: You may step down.  You are free to go.

16   Thank you, sir.

17   (WHEREUPON, THE WITNESS WAS EXCUSED.)

18        THE COURT:  Call your next witness.

19        MR. RADNEY:  We want a recess to discuss a few

20   things with the Court.

21        THE COURT:  Ladies and gentlemen, you need to step

22   back to the jury room.

23   (WHEREUPON, A SIDE BAR COMMENCES.)

24        MR. RADNEY:  I want on the record she was

25   attempting to recall a witness that we've concluded the

*** Frances L. Roark ***

\*\*\* Frances L. Roark \*\*\*

1    testimony with.  We didn't offer -- she asked the last

2    question.  We didn't offer another question.  She can't

3    reopen.

4            MS. BALDWIN: I can call another witness.

5            MR. RADNEY:  Not the same one.

6            MS. BALDWIN: I have not rested.

7            THE COURT: Has the State rested?

8            MS. BALDWIN: No, I have not.

9            MR. RADNEY:  That witness ....

10           MR. OWENS:  That's all we're talking about.

11           THE COURT:  She can ask.  When he's gone, he's

12   gone.

13   (WHEREUPON, THE SIDE BAR CONCLUDES.)

14                   **FURTHER REDIRECT EXAMINATION**

15   **BY MS. BALDWIN:**

16   Q    Investigator Heard, did this occur in Randolph County?

17   A    Yes, ma'am.

18           MS. BALDWIN: Nothing further.

19           MR. RADNEY:  No questions.

20           MR. OWENS:  No questions, Your Honor.  I will

21   stipulate Wilkie Clark Drive is in Randolph County.

22           THE COURT: You were too busy objecting.

23       You may step down, Jonathan.  You are free to go.  Thank

24   you.

25           MS. BALDWIN: State rests.

*** Frances L. Roark ***

1          MR. RADNEY:  Your Honor, we ask for a recess to

2     discuss a few things with the Court.

3          THE COURT:  Ladies and gentlemen you need to step

4     back here for a few minutes and I'll call you back in.

5     (Jury out)

6          MR. OWENS:  Judge, I want to go on ....

7          MR. RADNEY:  Let me do a couple of things and then

8     we'll both do that.

9          Judge.  Obviously, you have not intended in your case in

10    chief to introduce the statement made by Mr. Burden.

11    However, I intend most likely to call Mr. Burden.  That being

12    the case, I want to clarify that she doesn't intend to

13    introduce it at all or if she does at that point then we need

14    to go ahead and have a motion to suppress it.

15         MS. BALDWIN: Well, certainly I can use it to

16    impeach.

17         MR. RADNEY:  That's why we've got to have the

18    motion to suppress.

19         THE COURT:  Not on impeachment.

20         MR. RADNEY:  Yes you do, Judge.  If it's in

21    violation of his Miranda Rights, she can't use it at all.

22         MR. OWENS:  She's got it in the wrong place.  She

23    can't get it.

24         MR. RADNEY:  It is a poisonous tree of some type

25    whatever that means.

1    MS. BALDWIN:  I don't think he can take ....

2    THE COURT: Wait a minute, gentlemen.  Let's back

3    up.  What is Miranda about?

4    MR. RADNEY:  Whether it is voluntarily.  Know your

5    right to counsel and all that sort of stuff.

6    MR. OWENS:  If you say you do not want to make a

7    statement, then you want a lawyer present, it is supposed to

8    stop everything, I think.

9    THE COURT:  I think it is going to be a different

10   level if it is propounded by the State as impeachment.  Are

11   we going to get around to that point today?

12   MR. RADNEY:  No.  You know, it may be best saved

13   until we make a decision whether to call Mr. Burden.

14   THE COURT:  I don't think so ....

15   MR. CLARK:  I think the Court is correct.  I can't

16   cite the case, but there is law that says a statement that

17   would otherwise be inadmissible is admissible for impeachment

18   purposes.

19   THE COURT:  It goes under violation of

20   self-incrimination.  If he's on the witness stand, he's got

21   no right.  He has waived his right to remain silent.

22   MR. RADNEY:  Two separate balls of wax, Your Honor.

23   The question is was he adequately informed of his rights and

24   that he properly waived them at the time the extrajudicial

25   statement was made back in July of 2001.  That is what you

*** Frances L. Roark ***

1   have to decide.

2         THE COURT: I'll agree with one-half.  The Miranda

3   Warnings will not apply while he's on the witness stand.

4   There will be a question as far as coerced statement which

5   actually ....

6         MR. RADNEY:  Judge, we're talking about two

7   different things.  The question is -- the only question is:

8   Whether this statement made back in July of 2001, was made

9   after a knowing waiver of rights.  If it was, they can use it

10  for any purpose they want to use it for; if it wasn't, they

11  can't use it.

12        THE COURT: What are those rights?

13     You have a right to remain silent.

14     Anything you say, can and will be used against you in

15  court.

16     You have the right to an attorney.

17        MR. OWENS:  If you can't afford one, one will be

18  appointed for you.

19        THE COURT:  .... appointed for you.

20     Any time that you wish, the questioning will cease.

21     Well, if you are sitting up here with your lawyer

22  sitting over there, you are in court, you have an attorney.

23        MR. RADNEY:  She can ask anything in the world she

24  wants to ask him while he's in court.

25        THE COURT: You have given up your right to remain

*** Frances L. Roark ***

```
 1   silent.

 2              MR. RADNEY:  In court at that time.

 3              MR. OWENS:  We are talking about last year, Judge.

 4              MR. RADNEY:  Tomorrow if he chooses to take the

 5   stand that doesn't mean he waived his right to counsel and

 6   right remain silent back a year ago.

 7              THE COURT:  It will be offered for the purpose of

 8   impeachment if his testimony is different on the stand from

 9   what it is in the statement.

10              MR. RADNEY:  That may be exactly what they are

11   trying to offer it for, but it is still inadmissible if it

12   was taken a year ago in violation of his constitutional

13   rights.

14              THE COURT: Let's put it this way:  If he gets on

15   the witness stand and testifies, and it is different in the

16   statement, I'm going to send the jury out and we'll go

17   through all that, and then, based on what happens at that

18   hearing, outside the presence of the jury, I may allow the

19   entire statement in.

20              MR. RADNEY:  If you want to wait and address it

21   tomorrow, that's no problem.

22              THE COURT:  Well, I am just saying, lot of what

23   we're talking about right now is speculation.

24              MR. RADNEY:  Sure.

25              THE COURT:  He may not take the stand.  If he does
```

*** Frances L. Roark ***

1   take the stand, I don't know what he's going to say. If he

2   does say this and they say, well, here's where in the

3   statement he says something else ....

4        MR. OWENS:  Judge, we are just trying to say, if

5   the statement they have in their presence was taken from him

6   without him having adequate waiver, then they can't use it.

7        MR. RADNEY:  At all.

8        MR. OWENS:  At all.  If they do use it, then they

9   have been allowed to do something they cannot do any other

10  way.

11       THE COURT:  What's that?

12       MR. RADNEY:  Use the statement.

13       THE COURT: Wait a minute.  Wait a minute.  But, to

14  do what?

15       MR. OWENS:  Doesn't matter what they want to do

16  with it.

17       MR. CLARK:  I think it does.

18       THE COURT:  Yes, it does.  Miranda goes to the

19  privilege of against self-incrimination.

20       MR. RADNEY:  On the day and time in issue.

21       MR. OWENS:  Yes, sir.

22       MR. RADNEY:  And the day and time in issue is July

23  of 2001.

24       MR. CLARK: That sounds like a case cite, but, I

25  know it is really you talking, Thomas.

*** Frances L. Roark ***

1            MR. RADNEY:  It is the truth.  It is the truth.

2     You can't, a year later, give up rights you had a year ago.

3            MR. OWENS:  Because you can't go back.  What would

4     make it correct?  What would change the ruling?

5            MR. RADNEY:  If he gets up here tomorrow and says,

6     "I was on vacation in Miami, they can't bring out the

7     statement to the contrary if that previous statement was made

8     in violation of his constitutional rights."

9            THE COURT:  Well, what we'll do is take this up

10    tomorrow.

11           MR. RADNEY:  The other issue, Judge, that need to

12    take up prior to that is:  What previous convictions that

13    Mr. Burden has will be admissible against him if he were to

14    take the stand.  I would just make a Motion in Limine on the

15    purpose of saying that all except one are too old, and I

16    would ask the Court to review that.

17           THE COURT: McElroy has a pretty good list.

18           MR. RADNEY:  Very specifically, Judge, Melody, I

19    think this is your notes, we can agree to the dates.  He was

20    convicted of receiving stolen property in 1987, theft in

21    1986, and burglary on the 4th day of -- 14th day of April of

22    '92.  The three of those, Judge, are older than ten years.

23    We would ask that those not be used.  That the only one be

24    used is an assault case of 1995.  And, here are the exact

25    dates, Judge, as provided by Melody.

*** Frances L. Roark ***

```
 1              THE COURT: Mark those if you want to and you can

 2    have them admitted for purposes.

 3              MR. RADNEY:  So, I just want the Court to rule that

 4    the only ones she can use for the purpose of impeachment is

 5    the '95 case, because the others are -- the '95 conviction,

 6    because the others are too old.

 7              THE COURT:  Where is our rule on remoteness?

 8              MR. RADNEY:  The Rule very specifically says ten

 9    years, Your Honor.

10              MS. BALDWIN: I don't know that that is a hard and

11    fast ....

12              THE COURT:  Is that in the Rules of Evidence?

13              MR. RADNEY:  It is in the Rules of Evidence and it

14    very specifically says ten years, unless you have given prior

15    notice of an attempt to use one for impeachment purposes.

16    Your prior notice very specifically says for the purpose of

17    Alabama Habitual Offender Act and very specifically says,

18    right here, Alabama Habitual Offender Act.

19              MS. BALDWIN: I don't think that's what the rules

20    say.

21              THE COURT: My, oh, my, it seems like we have two

22    legal questions to study over during the night.

23              MR. OWENS:  Let's add one more.

24              MR. RADNEY:  Judge, I request that you rule on this

25    one today, because it is going to make a big impact upon our
```

*** Frances L. Roark ***

1    preparation for our testimony tomorrow.

2            THE COURT:  Grant your Motion in Limine as to the

3    offenses past ten years.  Those offenses being over ten years

4    from date of conviction.

5            MR. RADNEY:  If Defendant Burden chooses to

6    testify, the only conviction that can be brought out to

7    impeach is a 1995 conviction for assault; correct?

8            THE COURT:  This is strictly limited to the purpose

9    of impeachment.  What they've done in that paper is put you

10   on notice of Habitual Offender.

11           MR. RADNEY:  Sure.  We are not talking about that

12   today.  Hope that never matters.

13           THE COURT:  Should there be a conviction, they are

14   there.

15           MR. RADNEY:  That's for hearing on another day, but

16   as for impeachment it is simply the '95 assault; correct?

17           MR. OWENS:  Judge, I've got one motion.  The State

18   has rested.

19       We would ask the Court, as a matter of law, to direct a

20   verdict in favor of Mr. Anthony Burden, that the State has

21   failed to meet its burden in regard to a charge of murder in

22   this case.  Judge, we have heard everything they have got,

23   and they have failed to meet their burden.

24           MR. RADNEY:  Your Honor, I make the same motion on

25   behalf of Defendant Phillip Burden.

1    THE COURT:  Your motion is denied, Mr. Radney.

2  After reviewing the State's evidence in the light I am

3  required to do so by law, I find there is a basis for

4  submission, and your motion is likewise denied.

5    MR. RADNEY:  Judge, I realize it is early, but are

6  we going to go ahead and stop until tomorrow?

7    THE COURT: Well, I had told you that.  I am not

8  going to back out on it.

9    MR. RADNEY:  Thank you.

10    THE COURT:  Bring the jury in.

11  (JURY PRESENT)

12    THE COURT:  Ladies and gentlemen, I'm going to

13  share something with you at this point.  We are going to be

14  in recess for today.  And, I somewhat regret that we have got

15  several more hours we could be going on, but in all honesty

16  and candor, I did not expect for us to be moving along quite

17  as well as we are.  I had allotted time for the State to

18  finish today, and they have finished today.  I had basically

19  told the Defense that they would begin tomorrow, and they

20  will begin tomorrow.  So, I'm not going back on what I told

21  the attorneys on both sides.  Even if you have been doing it

22  over 20 years, sometimes things just happen a little bit

23  differently than you think.  This is not court TV.  This is

24  the way it really is, and this is the way we do it here, and

25  it is not Hollywood, it is not actors.  This is very real for

*** Frances L. Roark ***

1  both sides.  In light of the way this has progressed, I will

2  tell you that we are doing well.  I had hoped that we would

3  be able to finish the case tomorrow, and we may well be able

4  to do so.  And, if that is the situation, then we couldn't

5  have done any better.  So, we are going to go in recess and

6  y'all think about something else.  Okay?  Watch television,

7  read a book, talk with your family, as long as you are not

8  talking about this case, it is okay.

9      The same instructions that I have given you, you have

10 got to follow now.  You cannot discuss this case with anyone,

11 not even amongst yourselves.  Don't allow anyone to try to

12 draw you into a conversation about what you are doing up

13 here, and tell anyone that you are under a court order that

14 you cannot discuss the case.  The same rule applies to the

15 media.  You will have to inform any member of the media that

16 you cannot talk with them.

17     As far as coverage, I do not know that there will be

18 any, but tell every jury that I have:  If there is media

19 coverage, do not read it, don't listen to it, do not look at

20 it.  Turn away from it.  In short, don't put yourself in any

21 position that would possibly jeopardize the status of this

22 case.

23     With that there are there any additional instructions

24 requested?

25          MR. RADNEY:  No, sir.

*** Frances L. Roark ***

1          MR. OWENS:  No.

2          MS. BALDWIN: No, sir.

3          THE COURT:  Everyone remain in.  The jury is

4    released for the night.  Be back here at 9:00 in the morning

5    and we'll start again.

6    (WHEREUPON, THE JURY WAS ADJOURNED OVER NIGHT.)

7    (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED UNTIL 9:00 A.M.,

8    30 AUGUST, 2002.)

9                              *****

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COPY

IN THE CIRCUIT COURT

FIFTH JUDICIAL CIRCUIT OF ALABAMA
RANDOLPH COUNTY

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | **CR-02-0954** |
| | * | CRIMINAL NO. |
| versus | * | CC-2001-000115, CC-2001-000114 |
| | * | Wedowee, Alabama |
| | * | 29 October, 2002 |
| ANDREW PHILLIP BURDEN | * | |
| ANTHONY EUGENE BURDEN, | * | |
|   Defendants. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF TRIAL BEFORE

THE HONORABLE RAY D. MARTIN,

CIRCUIT JUDGE, AND A JURY.

A P P E A R A N C E S

FOR THE STATE OF ALABAMA:  REA S. CLARK, DISTRICT ATTORNEY
                                    FIFTH JUDICIAL CIRCUIT
                                    CHAMBERS COUNTY COURTHOUSE
                                    COUNTY OFFICE BUILDING
                                    LAFAYETTE, ALABAMA 36862

                                    BY: REA S. CLARK, DA
                                        MELODY BALDWIN, ADA

FOR THE DEFENDANT:          RADNEY, RADNEY & BROWN
(Phillip Burden)            ATTORNEYS AT LAW
                                    56 COURT SQUARE
                                    ALEXANDER CITY, AL 35010

                                    BY: TOM RADNEY, ESQUIRE

FOR THE DEFENDANT:          NATHANIEL D. OWENS, ESQUIRE
(Anthony Burden)          ATTORNEY AT LAW
                                    POST OFFICE BOX 2641
                                    ANNISTON, AL 36202

                                    FRANCES L. ROARK, CSR
                                    OFFICIAL COURT REPORTER
                                    fr2w487

PROCEEDINGS: In Open Court.

*** Frances L. Roark ***

 1    (Jury Present)

 2             THE COURT:  All right.  The record will reflect all

 3    jurors are present, counsel present, parties present.

 4        State has rested at this point and Defense may proceed.

 5             MR. RADNEY:  Your Honor, with the Court's

 6    permission, we are going to sort of flip back and forth with

 7    which defendant calls witnesses if that is okay with the

 8    Court.

 9        Defendant Phillip Burden will call Officer Farr.

10                           **DEREK FARR**

11         **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

12          **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

13                      **TESTIFIED AS FOLLOWS:**

14                      **DIRECT EXAMINATION**

15    BY MR. RADNEY:

16    Q    State your name please.

17    A    Derek Farr.

18    Q    Where are you employed?

19    A    City of Roanoke Police Department.

20    Q    How long have you been employed there?

21    A    Off and on since 1990.  This past employment, since

22    November of 2000.

23    Q    And back on June 15th, 2001, were you so employed?

24    A    Yes, sir, I was.

25    Q    What were general duties for the City of Roanoke as a

*** Frances L. Roark ***

1   police officer back in June of 2001?

2   A     I was general patrol officer.

3   Q     And as a general patrol officer, what would your duties

4   be on a daily basis?

5   A     Routine patrol, to answer any calls that come through

6   dispatch, work traffic, things like that.  Anything that

7   would come through.

8   Q     And, were you dispatched to a complaint on June the

9   15th of 2001, reported by Rita Hendrix -- to Rita Hendrix?

10  A     Yes, sir I was.

11  Q     Was that near Government Street and Wilkie Clark Drive?

12  A     Yes, sir, it was.

13  Q     And, did you arrive on the scene alone or did someone

14  else, another officer go with you?

15  A     I don't remember exactly who was working that night.

16  Any time we go to a scene, if possible, other officers

17  arrive.  I know there were other officers there.  Three other

18  officers work on my shift including a sergeant.  So, ....

19  Q     And I will, for the record, tell you that June 15th,

20  2001, was a Friday.

21  A     Okay.

22  Q     Does that refresh your recollection?

23        Do you recall what you saw when you arrived on the scene

24  there at Government Street and Wilkie Clark Drive on June

25  15th, 2001?

```
 1   A      When I arrived, I remember there were a lot of people

 2   there, a lot of people out on the street, which is not

 3   unusual.  Any point in time of the night there's people that

 4   walk that street.  It is pretty populated.  There was a

 5   pretty hefty number of people.

 6   Q      Was this an area that you patrol frequently?

 7   A      Yes, sir.

 8   Q      A high-crime area as it relates to the City of Roanoke

 9   in your patrols?

10   A      It is close to a high-crime areas.  It can be.  I'm not

11   going to say that right there in that particular area we have

12   a lot of problems.  There have been other calls there; yes,

13   sir.

14   Q      On this particular night when you arrived, how many

15   people are you saying were out there?

16   A      Oh, I can give you a ballpark figure nothing specific.

17   Probably 30, maybe.

18   Q      And, did it come to your attention that night that

19   folks were out there with weapons?

20          MS. BALDWIN: Judge, I'm going to object unless he

21   was there and saw it.  He can't testify to any hearsay.

22          MR. RADNEY:  Judge, I'm not asking him to give any

23   hearsay.  I'm asking him if it came to his attention that

24   there people were out there with weapons.

25          MS. BALDWIN: He's asking him to testify with
```

1   hearsay.

2              THE COURT: Mr. Farr, you'll have to limit it to

3   your observation at that time.  So sustained in part;

4   overruled in part.  Go ahead.

5              THE WITNESS:  No, sir, I didn't see any weapons.

6   MR. RADNEY:

7   Q      You didn't see any weapons.

8       Did you take action based upon the complaints you

9   received?

10  A      I done a report; yes, sir.

11  Q      Besides taking a report, did you take any other action

12  in response to the complaints made to you?

13  A      As far as that complaint is concerned; no, sir.  I took

14  no action on the complaint part.

15  Q      Based upon the complaint, based upon what you saw,

16  based upon what was going on there that night, what action,

17  if any, did you take, other than make a report?

18  A      Okay.  There was a lot of heated discussion between

19  several people there and we broke the crowd up.  Any time we

20  go to a scene and -- it doesn't matter how heated it is -- if

21  we feel like it may escalate into something, we do prevention

22  policing:  Break it up and send people home.

23  Q      Did you pat people down?

24  A      No, sir.  Not to my rememberance.  I don't remember

25  patting anybody down.

*** Frances L. Roark ***

1   Q       Did you make searches of the area for contraband or

2   weapons?

3   A       Visual.  I always visually look around.  I mean, I am

4   always conscious of people's demeanor.  Any kind of bulges or

5   things like that in people's clothing.  That is just for my

6   own protection.  As far as making a search of the area, I

7   dealt with the people at hand, and they began to disperse,

8   and the threat started dying down as far as my safety and the

9   safety of the people around me.

10  Q       You did not make any arrests that night; correct?

11  A       No, sir.  Not due to that scene; no, sir.

12  Q       Did you make any arrests in that area that night?

13  A       I don't remember.  I could have.  It has been a pretty

14  good while ago.  As far as pertaining to that call, I can

15  just about positively say, no, I did not make an arrest due

16  to that.

17  Q       There was another call for that same area on Saturday

18  night, the next night; did you respond to that?

19  A       I can't remember.  I know that during that time.  It

20  has been a pretty good while ago.  I don't remember exactly

21  what happened on which nights.  I know that there were some

22  other, some other problems around that area.  But as far as

23  knowing what night it was on or if I responded, I am sorry, I

24  can't remember.

25  Q       Do you remember who the complainants were on either of

*** Frances L. Roark ***

```
 1   the nights, whichever night you were out there?

 2   A     The complaint -- the lady that you stated.

 3   Q     Ms. Hendrix?

 4   A     Ms. Hendrix, her son, I cannot recall his name.

 5   Q     Wendell?

 6   A     He was a ninth grader, the young man that I spoke with,

 7   the reason we got her involved in the report is, any time we

 8   have a juvenile that wants to make a report, we always make

 9   sure that there is a guardian or somebody there.  We don't

10   take a statement from a juvenile unless a parent is there

11   present, whether they are a victim or ....

12   Q     Do you know who the complaint was against?  Who the

13   alleged perpetrator was?

14             MS. BALDWIN:  I am going to object, Your Honor.

15             MR. RADNEY:  Judge, that is very relevant.

16             THE COURT:  Overruled.

17   MR. RADNEY:

18   Q     Who the perpetrator was?

19   A     Jermicah Foster.

20             MR. RADNEY:  Thank you, Your Honor.  That's all I

21   have.

22                       CROSS EXAMINATION

23   BY MR. OWENS:

24   Q     Officer Farr, my name is Nathaniel Owens.  I represent

25   Tony Burden.  I want to get you to  ....
```

*** Frances L. Roark ***

1    MR. OWENS:  First of all, will you mark these as

2  Defendant ....

3  **(WHEREUPON, DOCUMENTS WERE MARKED AS DEFENDANT EXHIBITS 3 AND**

4  **4 FOR IDENTIFICATION.)**

5    MS. BALDWIN:  Judge, can we approach.

6  (WHEREUPON,  A SIDE BAR WAS HELD OFF THE RECORD.)

7    THE COURT:  Ladies and gentlemen, I will need you

8  to step outside for a minute.

9  (JURY OUT)

10    MS. BALDWIN: Judge, when Nathaniel asked the court

11  reporter to mark the reports, the Incident/Offense Reports

12  made on the 15th and 16th, I objected to the admissibility of

13  those reports when he was having them marked as evidence,

14  because they are never admissible.  I can't.  They can't.  I

15  can't put in the one from the deal on Sunday.  I&O Reports

16  are never admissible.  They can't get around that Rule of

17  Evidence by getting this police officer, or any other police

18  officer, whether it is to my benefit or not, to testify about

19  all the contents of that report, to get around that.  I think

20  that's what they are attempting to do.

21    MR. OWENS:  Judge, this man just said he doesn't

22  remember what was going on.  It was a long time ago.  And,

23  there are some specific facts that relate, not just to this

24  report, but to the incidents that happened afterwards that he

25  has got, I believe, the right to refresh his memory with the

*** Frances L. Roark ***

*** Frances L. Roark ***

1   document that he created.  All I want to know is that he can

2   see it; that he tells me whether or not it is.

3           THE COURT:  How is it going to be relevant?

4           MR. OWENS: I was not asking to admit it.  I was

5   asking to use it.

6           MS. BALDWIN: If there are witnesses that they want

7   to put on to testify to something relevant, if there are,

8   then he should try that and not try to get it in through this

9   officer and try to avoid our opportunity to cross-examine

10  some witness, and try to get in a bunch of hearsay that

11  somebody else said.  That's what they are doing.

12          MR. RADNEY:  They?  I did right.  You didn't object

13  to anything I said.

14          MS. BALDWIN:  I'm sorry.  Nathaniel.

15          MR. OWENS: I'm the bad guy.

16          MS. BALDWIN: Furthermore, Judge, this officer did

17  not make the report on Saturday.  Another officer did.  Not

18  this officer.  So, that's not his document to refresh his

19  recollection with.

20          THE COURT:  Are you making an objection?

21          MS. BALDWIN: Yes, sir.

22          THE COURT:  Sustained.

23          MR. RADNEY:  Are you sustaining that he can't look

24  at it?

25          THE COURT:  Um-hmmm.

*** Frances L. Roark ***

*** Frances L. Roark ***

1      MS. BALDWIN: Well, he can't use them if he looked

2   at them.

3          MR. OWENS:  There's one name on one and not a name

4   on the other, Judge.  I don't know who the other officer is.

5   That's my problem.

6          MS. BALDWIN: Stacy Brooks.

7          THE COURT:  It is not admissible.

8          MR. RADNEY:  No one is asking to admit it.

9          THE COURT:  Why ask him if it is a report ....

10         MR. RADNEY:  He can sure look at it to refresh his

11  recollection. That'll give Court of Criminal Appeals

12  something else to look at.

13         MR. CLARK:  The problem is you want to ask this

14  officer -- let's just get to the point.  You want to ask this

15  officer what you think Jermiah Foster was doing on Friday

16  and Saturday night, and this officer can't testify to that.

17  If you want to put on some other witnesses about that, that

18  may or may not be admissible.  But, this officer can't

19  testify to what other people told him happened on Friday or

20  Saturday that he or some other officer wrote in an I&O

21  Report.  He can't testify to that.

22         MR. RADNEY:  Well, that's fine when the

23  question ....

24         MR. OWENS: When I ask that question, you can object

25  to it, but I have not asked that question.

*** Frances L. Roark ***

```
 1              MR. RADNEY:  He can look at his report.

 2              THE COURT: You are doing it right now.  I take it

 3    you are offering it.

 4              MR. RADNEY:  No.

 5              MR. OWENS:  No, I never offered it.

 6              THE COURT: You have had it marked.

 7              MR. OWENS: I had it marked.

 8              THE COURT:  What is the purpose of marking it, if

 9    you are not going to offer it?

10              MR. OWENS: To ask him did he do it?

11              THE COURT:  In front of the jury.

12              MR. OWENS: Which I think I've got a right to do.

13              THE COURT:  You can do it now.  Not in front of the

14    jury.

15              MR. OWENS: All right.

16    MR. OWENS:

17    Q     Did you -- Officer Farr, this is much a do about

18    nothing, but that's fine.  That's part of our job here.

19         You say you were there Friday.  Are you certain you were

20    not there Saturday?

21    A     I'm not certain.

22    Q     If you could look at this, you could tell whether or

23    not ....

24              MR. OWENS:  Can he do that?

25              THE COURT: Sure.
```

*** Frances L. Roark ***

1          THE WITNESS:  This is my report.  All I can say for

2    sure is:  Stacy Brooks is my sergeant and we work on shift

3    together.  As far as nothing whether or not I responded to

4    the call with him, I'm not for certain.  But, I know I was

5    there for this one.

6    MR. OWENS:

7    Q     Friday.

8    A     Right.

9          MR. OWENS:  I mean, am I supposed to question him

10   now?

11         THE COURT: You can.

12         MR. RADNEY:  Just let him read it and question him

13   when the jury gets back out here.

14   MR. OWENS:

15   Q     Read through your document.

16   A     Yes, sir.

17         MS. BALDWIN: Judge, he already testified to

18   everything he can testify about Friday night in his report.

19   Thomas asked all those questions.  And he has already gotten

20   as far as he can go on that.

21         MR. OWENS:  Wow, when the District Attorney makes a

22   decision about what I can ask about my case, since we are two

23   different cases ....

24         THE COURT:  We are out of the presence of the jury,

25   and I am allowing ....

```
1              MR. OWENS:  That's why I am saying what I am
2    saying.  I needed to get that out of me.
3              THE COURT:  I am allowing the Defense to go
4    anywhere they want to right now.  Okay.  Are you ready?
5              MR. OWENS:  Yes, sir.
6              THE COURT:  Go ahead.
7              MR. RADNEY:  We don't have any questions for him
8    outside the presence of the jury.
9              THE COURT:  You are not going to have any questions
10   for him in the presence of the jury then.
11             MR. RADNEY:  I have rested as it relates to ....
12   You want to approve our questions here and then tell us
13   whether we can reask them when the jury gets out?  Is that
14   what you are doing?
15             THE COURT:  Yes.
16             MR. RADNEY:  Okay.
17             MR. OWENS: Okay.
18   MR. OWENS:
19   Q    Officer, did you have occasion to go back to the area
20   in regard to Wilkie Clark where you had been that Friday
21   night where you made the initial report after you left that
22   first time?
23   A    Yes, sir.  I know I went back.
24   Q    Do you remember what time of night that was?
25   A    No, sir.  I know it was --
```

313

*** Frances L. Roark ***

1    Q    Late?

2    A    -- late, but I don't remember what time.

3    Q    When you went back that time, was there a large crowd

4    there?

5    A    Like I stated earlier, there is always a pretty good

6    number of people there.  At any point of time at night you

7    are going to see at least one person around that area.  There

8    is always people there.  It was not -- I can say this.  It

9    was not as large a crowd as it was when I done the initial

10   report.  I can say that.

11   Q    When you did the initial report, was the focus of the

12   place where the crowd was, the Hendrix residence?

13   A    That was one of the focuses.

14   Q    Where was the other?

15   A    The intersection of Wilkie Clark and Government Street.

16   Q    How far is the Hendrix house from that intersection?

17   A    Ballpark figure?  Probably, let's see, ....

18   Q    Here is a drawing you can look at.  Here is the

19   intersection of Government and Wilkie Clark.  Where would the

20   Hendrix house be in relation to this intersection?

21   A    Okay.  See where Government Street is written on the

22   top part of that?  Okay.  If you would, --

23   Q    Back here?

24   A    -- come over on this side of the street.  There's a

25   building there on the corner, which is what I know as the old

*** Frances L. Roark ***

1    Mason building.  There is a residence.  There's a big space.

2    There's a driveway that leads to this residence next door to

3    that building and then the next residence is the Hendrix.

4    But there is a pretty good gap between those two.

5    Q    Can you see the four-way stop from their residence?

6    A    Yes, sir.

7    Q    Can you hear people yelling from the four-way stop to

8    that residence?

9    A    Yelling?  Yes, sir.

10   Q    Okay.  Do you recall having come -- you say, you know

11   you came back, you just don't know exactly what time.

12   A    Yes, sir.  I don't know exactly what time.  I can even

13   tell you where I parked.

14   Q    Where did you park?

15   A    Wilkie Clark Drive.  Right there.  Right at the corner

16   of Wilkie Clark and Government Street on this side of the

17   road.

18   Q    This side?

19   A    If you'll back your finger up.  Right there.  That's

20   where I parked my vehicle.

21   Q    Why did you come back?  That's all I want to know?

22   A    I'm not for certain.  I know whenever we get a call and

23   we have a large crowd, it is always my routine to go back

24   through, make sure that we took care of the problem.  That is

25   not just with this case, that is with any case that I ever

*** Frances L. Roark ***

1    work.  If we ever have a problem, I always go back through to

2    make sure the crowd is gone any time I make a crowd leave.

3    When I came back, there was a group of people there.

4    Q    Were they yelling when you came back?

5    A    No, sir.  I don't remember them yelling.  Because if

6    they were yelling, I would have -- I am sorry.  I take that

7    back.  Yes, they were.  There was some yelling.  There was

8    some yelling.  And, we made some more people go home at that

9    point.  But, there were some people standing there that were

10   not involved in the yelling.  I don't -- I try not to play

11   favorites.  When I tell them they have to leave, they have to

12   leave.

13   Q    Do you remember names of any of the people that you saw

14   there?  Let me be specific.  Did you see Jermicah Foster when

15   you went back?

16           MR. RADNEY:  First time or second time.

17   MR. OWENS:

18   Q    Yeah, both.  Either time.

19   A    To be honest at that point I didn't know who Jermicah

20   Foster was.  I didn't know him.

21           MR. RADNEY:  What about either of the defendants?

22           THE WITNESS:  I don't recall seeing either one of

23   those.

24   MR. OWENS:

25   Q    Neither time?

*** Frances L. Roark ***

1    A      Neither time.  There were a lot of people, but I don't

2    recall seeing them.

3              MR. RADNEY:  I think, obviously, Judge, you've got

4    to tell us what Nathaniel can ask, but I think as to which

5    persons were there, it is very relevant.

6              MS. BALDWIN:  Well, Judge, I would say, now, under

7    the circumstances, he can't identify any of these parties as

8    being there so the whole thing is irrelevant.

9              MR. OWENS:  Judge, he can say whether my client was

10   there or not.  He's been out there.

11             THE COURT: He can't say that.  As I understand it,

12   he didn't see -- wait a minute.  As I understand his

13   testimony,  he simply doesn't remember seeing him.  That

14   doesn't mean he was there or not.

15             MR. RADNEY:  I thought you said, you didn't

16   remember seeing him?

17             THE WITNESS:  Like I said, there were a lot of

18   people there.  I don't remember seeing either one of those.

19   I didn't know Jermiach Foster at the time.  As far as being

20   able to point him out and say, yeah, okay, I know who he is.

21             MR. RADNEY:  Judge, maybe we are arguing over

22   words, but when he says I don't remember seeing them.  That

23   means I don't seeing them.  He's not saying that they could

24   have been there or they could not have been there.

25             THE WITNESS:  Can I make a statement, Your Honor?

*** Frances L. Roark ***

```
 1              THE COURT: That means he doesn't remember seeing

 2     them.

 3              MR. RADNEY:  That's very relevant.

 4              THE COURT: That doesn't mean they are there or not.

 5              MS. BALDWIN: Judge, may I ask him a couple of

 6     questions?

 7                          CROSS EXAMINATION

 8     BY MS. BALDWIN:

 9     Q    Investigator Farr, Patrolman Farr, you said you don't

10     remember seeing them?  What does that mean?

11     A     The only person that I knew that night to be able to

12     walk up and say I know who you are out of the three people

13     that you have asked me, is Mr. Phillip Burden.  He is the

14     only person I know by sight.

15              MR. RADNEY:  Was he there?

16              THE WITNESS:  I did not see him.

17              MS. BALDWIN: Judge, I would say the entire thing is

18     irrelevant.  If they are not there.

19              MR. RADNEY:  He just said Phillip was not there.

20     That's very relevant.

21              THE COURT:  No.  Wait a minute, Mr. Radney.  He

22     didn't say wasn't there.

23          What was your testimony, sir?

24              THE WITNESS:  I did not see him.

25              THE COURT: Could he have been there?
```

*** Frances L. Roark ***

```
 1              THE WITNESS:  Yes, sir.  It's very possible he

 2    could have been there.  There were a lot of people, a lot of

 3    people.

 4              MS. BALDWIN: I just don't see how it is relevant,

 5    Judge.

 6              THE COURT: I am going to suppress all of it.  I

 7    don't know how we are here, really.

 8              MR. OWENS: Judge, let's just take him out of here

 9    and forget it.

10              MR. RADNEY:  He can go.

11              THE COURT: Do you have any more questions?

12              MS. BALDWIN: No, sir.

13              THE COURT: Thank you, sir.

14    (WHEREUPON, THE WITNESS WAS EXCUSED.)

15              THE COURT:  Call your next witness.

16              MR. RADNEY:  When we get through with this witness,

17    I would like to take up Truitt.  He is here and we can

18    address that, because my next witness will be Mr. Burden.

19    (JURY PRESENT)

20              THE COURT:  Call your next witness.

21              MR. RADNEY:  Eddy Gibson, Your Honor.

22                            EDDY GIBSON

23         HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

24            THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

25                       TESTIFIED AS FOLLOWS:
```

| | |
|---|---|
| 1 | **DIRECT EXAMINATION** |
| 2 | **BY MR. RADNEY:** |
| 3 | Q    State your name, please. |
| 4 | A    Eddy Gibson. |
| 5 | Q    Eddy, speak up so me and the jury and everybody can |
| 6 | hear you. |
| 7 | A    Yes. |
| 8 | Q    Have you got? |
| 9 | A    Nickname. |
| 10 | A    Jim Dandy. |
| 11 | Q    Jim Dandy.  Is that what your friends call you? |
| 12 | A    Yes. |
| 13 | Q    Do you remember back on Sunday June 17, 2001? |
| 14 | A    Yes, sir. |
| 15 | Q    Where were you living back then? |
| 16 | A    Avenue A with my mother. |
| 17 | Q    Avenue A with your mother.  What's your mother name? |
| 18 | A    Annette Gibson. |
| 19 | Q    This drawing has come up to show where Wilkie Clark |
| 20 | Drive is and Government Street.  There's been some testimony |
| 21 | that Avenue A is right down here.  Does that ring true to |
| 22 | you?  One block off Wilkie Clark. |
| 23 | A    Yes, it's on the other side of the hill. |
| 24 | Q    On the other side of the hill. |
| 25 | Where is -- wake me up on Sunday morning the 17th.  Tell |

1   me where you were when you woke up.  What did you do that

2   day?

3   A     That morning I got with Phillip Burden and we were

4   riding around.

5   Q     Did you end up over at Tag Taylor's house at one point?

6   A     Yes, sir.

7   Q     Had a little to drink over there?

8   A     Yes, sir.

9   Q     Do you remember seeing a fight between Phillip Burden

10   and Shawn Baker?

11   A     I seen a tussle.  They didn't really fight.  They were

12   arguing.  Then one of them -- Shawn pushed Phillip back and

13   he fell between the hedges.

14   Q     Do you remember seeing, I believe it was, Shawn's

15   girlfriend sort of get in there with a shoe and get Phillip

16   in the eye?

17   A     Hit him on the forehead; right.

18   Q     Do you remember seeing that?  After that fight broke

19   up, what happened next that you remember seeing?

20   A     Phillip, he, left and went down the road.  I went back

21   on Tag's porch standing, talking to some guys up there about

22   a football game.

23   Q     Did Phillip show back up?  Did you see him a little

24   later?

25   A     Wasn't later.  He popped right back up.

*** Frances L. Roark ***

1   Q      He had gun.

2   A      Yes, sir.

3   Q      Where was Shawn?

4   A      He was up there, up Wilkie Clark Drive, jumping on a

5   car.

6   Q      What was Shawn doing?

7   A      Well, he was telling Mr. Burden he thought it was

8   bigger than him.  He thought he could handle him.

9   Q      Was Shawn cussing at him?

10  A      Yes, sir.

11  Q      Was Shawn threatening at him?

12  A      Yes, sir.

13  Q      How did Phillip feel toward Shawn?  What did Phillip

14  say to you or say out loud about Shawn?

15  A      Didn't say nothing to him.

16  Q      Well, did Phillip make it clear to you he was still mad

17  at Shawn?

18  A      He was crying going across the road.

19  Q      At some point, did you see Phillip and Ms. Baker

20  together talking?

21  A      She was talking to him.

22  Q      And, he'd had actually picked up the weapon at

23  Ms. Baker; is that right?

24  A      I can't say that.

25  Q      You do not know one way or another?

```
 1   A     No.

 2               MS. BALDWIN: Judge, I am going to object to leading

 3   his witness.  He's was called ....

 4               THE COURT: Sustained.

 5   MR. RADNEY.

 6   Q     After you see Phillip and Ms. Baker near each other,

 7   where are you?

 8   A     Over behind them.

 9   Q     How close?

10   A     About from here to you.

11   Q     Do you then get -- where is Phillip going?

12   Q     Up the hill.

13   Q     Toward who?

14   A     Shawn.

15   Q     Toward Shawn?

16   A     Yes.

17   Q     Where was Shawn?

18   A     Standing behind an old car parked beside the road.

19   Q     Is Shawn still talking?

20   A     Yes.

21   Q     What's he saying?

22   A     You thought you was better than me.

23               MS. BALDWIN: I am going to object:  It's hearsay.

24               MR. RADNEY:  Judge, I'm not asking him for the

25   truth of the matter asserted.  I'm asking for his state of
```

```
 1    mind as well the defendants.

 2              THE COURT: Sustained.

 3    MR. RADNEY:

 4    Q    Don't tell us what Shawn was saying.  Did you hear

 5    Shawn?

 6    A    All I heard him say ....

 7              MS. BALDWIN: Judge, I object.

 8    MR. RADNEY:

 9    Q    You can't say what he says.  My question is:  Did you

10    hear it?

11    A    Yes.

12    Q    Was he talking loud?

13    A    Yes.

14    Q    At some point does Phillip head on up that way some

15    more?

16    A    Walking on up the road.

17    Q    Who is beside and near Phillip as he heads up the road?

18    A    Well, I seen Ms. Baker and Pokey.  He was walking up

19    further.

20    Q    Pokey, Ms. Baker, you, ....

21    A    Yes.

22    Q    How close are you to him?

23    A    About from here to you.

24    Q    Do you get closer than that to him as you get on up the

25    road?
```

1   A      No.

2   Q      Who is real close to him?

3   A      Ms. Baker.

4   Q      Ms. Baker.  Do you then see Rat?

5   A      Yes, I seen him standing up the road, up on the side of

6   the road.

7   Q      Do you see Phillip and Rat talking?

8   A      No, I didn't see them talking.

9   Q      You didn't see them talking? Did you hear them talking?

10  A      I didn't really hear them.  You know, I was well off.

11  I didn't hear them saying too much.

12  Q      Did you see or hear a shot fired?

13  A      I heard the shot.

14  Q      Did you see one?

15  A      Yes, I seen a shot.

16  Q      Tell the jury what you saw.  What happened?

17  A      All I know is Rat was standing on the side.  All I know

18  I saw him walk across in front of him and that is when the

19  gun went off.

20  Q      Did you see Phillip point it at him and pull the

21  trigger at him?

22  A      No.

23  Q      Was Ms. Baker standing real near Phillip when this

24  happened?

25  A      Yes.

*** Frances L. Roark ***

1   Q    Where was Pokey?

2   A    He was standing on the left-hand side and kind of in

3   front of him.

4   Q    Real near Phillip.  Are we talking close enough to

5   touch both of them; is that right?

6   A    Yes.

7   Q    And, you're about as far as me and you; is that what

8   you are telling me?

9        Is Shawn inside at this point?

10  A    I seen him pulling back in the yard.

11  Q    Pulled back up toward his momma's house?

12  A    Granny's house.

13  Q    Auntie's house.  You are right.  Did Phillip have a

14  problem with Rat?

15  A    No.

16  Q    No?

17  A    No, sir.

18       MS. BALDWIN: I'm going to object to any further

19  questions long that line.

20       THE COURT:  Already answered.

21       MR. RADNEY:  Nothing further, Judge.

22                    **CROSS EXAMINATION**

23  BY MR. OWENS:

24  Q    Jim Dandy, were you out on the street on Friday night

25  near this area?

*** Frances L. Roark ***

```
 1   A      No, sir.

 2   Q      Were you out on the street on Saturday night near this

 3   area?

 4   A      Saturday night about 1:00 or 12:00, I was walking up to

 5   see what was going on.  Mr. Farr told me to go on up the

 6   road.  I didn't have no ....

 7          MS. BALDWIN: I'm going to object to what anybody

 8   else said, Judge.

 9          MR. RADNEY: Officer Farr already said he told

10   everybody to get up the road, Judge.

11          MS. BALDWIN: I can hardly hear him, too, back here.

12          THE COURT:  Move on.

13          MR. OWENS:  Did you sustain her objection, Judge?

14          THE COURT:  He's already answered the question.

15   MR. OWENS:

16   Q      You say there was a group of people out there about

17   1:00?

18   A      About 1:00.

19   Q      Where were they?

20   A      Standing at the four-way stop on Government and Wilkie

21   Clark Drive.

22   Q      What was there -- can you name any of the people that

23   you saw?

24   A      I really wasn't paying no attention.  I went on up the

25   road.  I see the Bakers.  They were standing out there
```

*** Frances L. Roark ***

```
 1   arguing.  Shawn and them.  I went on up the road.  He told me

 2   to go on up the road.

 3   Q    You saw Shawn.

 4   A    Yes.

 5   Q    Did you see anybody else that you recognized?

 6   A    Yes, I seen Lenny, Ginny, all of them standing out

 7   there that night.

 8   Q    Jeanette Baker was out there then?

 9   A    Yes.

10   Q    This was around 1:00 in the morning?  After you went on

11   home, is it your testimony that you came back later that next

12   day or  ....

13        MS. BALDWIN: I object.  He has not testified to

14   that.  I object to the form of the question.

15        MR. OWENS:  He did say he came back over there the

16   next morning.

17        THE COURT:  Overruled.  Go ahead.

18        MR. OWENS:  Thank you.

19   MR. OWENS:

20   Q    I didn't get your answer.  I am sorry.

21   A    No, I didn't go back.

22   Q    You didn't go back.  You said earlier that you were

23   there at Tag's at some time on Sunday; is that right?

24   A    That Sunday morning.

25   Q    Sunday morning.  Okay.  When the shot was fired, was
```

*** Frances L. Roark ***

1  Tony Burden standing there?

2  A    No, sir.

3  Q    Had you seen Tony?

4  A    I seen him there earlier.  Him and I was walking across

5  the road and him and Rat had got into it.  Rat had ran down

6  the road and hit him and they got into it.

7           MS. BALDWIN: I can't hear him, Judge, back here.

8           THE COURT:  Speak up, please, sir.

9           THE WITNESS:  I seen Rat had ran down the road past

10  me and Phillip.  We was walking up the road.  Him and Tony

11  got in to it.  After that, Tony went back down to his

12  mother-in-law's house.

13  MR. OWENS:

14  Q    Did you ever see Phillip talking to Tony --

15  A    No, I didn't.

16  Q    -- that Sunday?

17           MR. OWENS: I don't have anything else.

18           THE COURT:  State.

19           MS. BALDWIN: Thank you.

20                    **CROSS EXAMINATION**

21  **BY MS. BALDWIN:**

22  Q    Mr. Gibson, are you the same Eddy Lee Gibson that's

23  convicted of trafficking in cocaine here in Randolph County

24  in 1994?

25  A    Yes.

*** Frances L. Roark ***

```
 1   Q     Now, what was it you said earlier about Tony?  I
 2   couldn't hear you back here.  Sunday, what did you say you
 3   saw Tony do?
 4   A     Coming up the road behind us there right at the
 5   four-way stop ....
 6   Q     Coming up the road behind who?
 7   A     Coming up Government Street where Ms. Hendrix house,
 8   Katie Hendrix.
 9   Q     Okay.  You saw him coming up the road behind Katie
10   Hendrixes house.
11   A     Coming from her house.
12   Q     From Ms. Hendrix house.
13   A     That is right.
14   Q     All right.  And, that's all you saw?
15   A     I seen when he come up to the four-way stop, Rat ran
16   down to the end of the road and him and Rat got into it.
17   Q     Him and Rat got into it?
18   A     Yes, ma'am.
19   Q     This is before the shooting.
20   A     That was before the shooting.
21   Q     That was before.  A good while before, wasn't it?
22   A     That is right.
23   Q     Okay.  Now, you say you were up at the -- where did you
24   say you were located when the shooting occurred?
25   A     Right behind Phillip and them going up Wilkie Clark
```

*** Frances L. Roark ***

```
 1    Drive.
 2    Q    All right.  Now, you also say you saw the fight down at
 3    Tag's; is that right?
 4    A    Yes, ma'am.
 5    Q    Okay.  I believe you said you saw Shawn push Phillip
 6    into the hedges?
 7    A    Hedges.
 8    Q    That's all you said you saw?
 9    A    Yes.  I said the girlfriend hit him on the forehead
10    with her shoe, a stacked heal shoe.
11    Q    Did you ever see -- all right.
12         Whenever you got to Tag's, isn't it true that Phillip
13    got out and said something to Shawn first?
14    A    No.
15    Q    That's not true.  Is that what you are saying?  You
16    didn't see that or it didn't happen?
17    A    I didn't see that.
18    Q    Okay.  Isn't it true that Phillip and Shawn started
19    talking and the next thing you saw was they started fighting.
20    A    All I seen is they pushed.  Shawn pushed Phillip and
21    he, Phillip, slipped over the culvert and fell in between the
22    hedge bushes.
23    Q    Okay.  Did you see Phillip come back with a gun in his
24    hand?
25    A    Yes.
```

*** Frances L. Roark ***

1    Q     All right.  Now, you say you didn't see Phillip get out

2    and say something to Shawn; is that right?

3    A     That is right.

4    Q     He didn't get out of the car and say something to

5    Shawn?

6    A     He was already out of the car.

7    Q     I am sorry.

8    A     We were already out of the car standing on the porch.

9    Q     Well, isn't it true that when you got out there, Pokey

10   pointed at Jermicah Foster and said, "That's the one who --"

11             MR. RADNEY:  Your Honor, object.

12             MS. BALDWIN:  "-- jumped on your brother last

13   night"?

14             THE COURT:  Sustained.

15             MR. RADNEY:  Your Honor, move to strike.

16             THE COURT: Sustained.  Stricken.

17   MS. BALDWIN:

18   Q     That's not true?

19   A     That's not true.

20             MR. RADNEY:  Your Honor, she's asking the same

21   question.

22             MR. OWENS: Again.

23   MS. BALDWIN:

24   Q     Did you make a statement to the police back on June the

25   17th right after this happened?   You signed this statement,

*** Frances L. Roark ***

1    did you not?  This says this is true and correct to the best

2    of my knowledge Eddy Gibson?

3    A    Yes.

4    Q    All right.  Did you tell the police when you gave this

5    statement that Phillip got out and said, "He wanted to ask

6    Shawn something"?

7    A    No, we were already out of the car.

8    Q    So, Phillip didn't say that?

9    A    I know I was drinking.

10   Q    You were drinking?

11   A    Yes.

12   Q    Your recollection is not too clear because you were so

13   drunk, you don't remember that Phillip got out of the car and

14   said something to Shawn.

15   A    We were already out of the car.

16   Q    But you said in your statement to the police, "Phillip

17   got out ..."

18        MR. RADNEY:  I'm going to object.  It doesn't

19   mention anything about a car in this statement no matter how

20   many times Melody wants to say it does, it doesn't.

21        THE COURT:  Sustained.

22   MS. BALDWIN:

23   Q    Phillip got out.  What did he get out of?

24   A    We were already at Tag's.

25   Q    All right.  So, that statement, "Phillip got out and

1   said he wanted to ask Shawn something," did he say that?

2   A    No.

3   Q    He didn't say he wanted to ask Shawn something?  Not to

4   your knowledge.  Today not your knowledge.  But it was your

5   knowledge back on June 17th.

6   A    I was drinking.  I don't remember saying that.

7   Q    You don't remember saying that.

8        All right.  Now, you said you were close to Ms. Baker,

9   or yes that you saw Ms. Baker up close to where Jermicah was

10  shot; is that right?

11  A    That is right.

12  Q    How close was she to where Jermicah was shot?  Was she

13  pretty close?

14  A    Yes.  About from here to the jury right there.

15  Q    All right.  So, she was in a pretty good position to

16  hear and see what was going on, wasn't she?

17  A    Yes, ma'am.

18  Q    She wasn't drinking was she?

19  A    Not as I know of.

20  Q    You were, weren't you?

21  A    Yes.

22  Q    Your recollection is not real clear today; is that

23  right?

24  A    Right.

25  Q    It is not?

1    A    That is right.

2            MS. BALDWIN:  Nothing further.

3            MR. RADNEY:  Nothing further of this witness, Your

4    Honor.

5            THE COURT:  You may step down.

6    (WHEREUPON, THE WITNESS WAS EXCUSED.)

7            THE COURT:  Call your next witness.

8            MR. RADNEY:  We need to take up a matter outside

9    the presence of the jury.

10           THE COURT: Ladies and gentlemen, I'll need for you

11   to step back to the jury room for a few minutes.

12   (JURY OUT)

13           THE COURT:  Okay.  We are outside the presence of

14   the jury.

15           MR. RADNEY:  Your Honor, I want to have an

16   evidentiary hearing with Investigator Truitt to determine if

17   you are going to allow the verbal statement of Phillip Burden

18   to come in in any form.

19           THE COURT:  Okay.

20   **(WHEREUPON, A DOCUMENT WAS MARKED AS STATE EXHIBIT 24 FOR**

21   **IDENTIFICATION.)**

22   (WHEREUPON, A SUPPRESSION HEARING WAS HELD OUTSIDE THE

23   PRESENCE OF THE JURY.)

24                        DONALD TRUITT

25       HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

*** Frances L. Roark ***

```
 1      THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

 2                 TESTIFIED AS FOLLOWS:

 3                 DIRECT EXAMINATION

 4   BY MS. BALDWIN:

 5   Q     State your name and occupation, please.

 6   A     My name is Donald Edward Truitt.  I am an investigator

 7   for the City of Roanoke Police Department.

 8   Q     Investigator Truitt, back on July 5th of 2001, did you

 9   have occasion to come up here and interview or talk with

10   Phillip Burden, the defendant in this case?

11   A     Yes.

12   Q     Why were you coming up here?

13   A     It is part of my job as investigator, plus the -- I had

14   been told that he had turned himself in to the county, and we

15   had the original felony warrant on him located in the Roanoke

16   Police Department, and they were asking for the original

17   warrant.

18   Q     Now, I am going to show you what's been marked as

19   State's Exhibit 24, and ask if you can identify what that is.

20   A     That is the Waiver of Counsel form that I read to

21   Phillip Burden at that date when I was meeting with him at

22   the Randolph County Jail on that date.

23   Q     I ask, if you would -- is that a fair and accurate copy

24   of your original by the way?

25   A     Yes, it is.
```

1    Q     Ask if you would, to read that for the record?

2    A     "Waiver of Counsel.  Place, Randolph County Jail.

3    Date, July 5th, 2001.  Time, 4:43 P.M.

4          "Before we ask you any questions, you must understand

5    your rights.

6          "You have the right to remain silent.  Anything you say

7    can and will be used against you in court.

8          "You have the right to talk to a lawyer for advice

9    before we ask you any questions and have him with you during

10   questioning.

11         "If you can't afford a lawyer, one will be appointed

12   without cost to you before any questions if you wish.

13         "If you decide to answer questions now without a lawyer

14   present, you will still have the right to stop answering at

15   any time you wish."

16         It has got a Waiver of Rights.

17         "I have read this statement of my rights, and I

18   understand what my rights are.  I am willing to make a

19   statement and answer questions.  I do not want a lawyer at

20   this time.  I understand and know what I am doing.  No

21   promises or threats have been made to me and no pressure or

22   coercion of any kind has been used against me."

23   Q     Now, after you read that to him, what, if anything, did

24   he say to you?

25   A     He basically said at that time he said he wanted to

1　first wait and talk to a lawyer, but then probably no more

2　than ten seconds, he turned around and said, "Well, I don't

3　really want to give a statement, but basically I kind of want

4　to tell what happened."  Then he started telling and I

5　started listening.

6　Q    At that point in time, did you threaten him in any way

7　to get him to give you a statement?

8　A    No, ma'am.

9　Q    Did you ever force him or coerce him in any way to give

10　you a statement?

11　A    No, ma'am, I did not.

12　Q    Did you promise him anything to get him to give you a

13　statement?

14　A    Did not.

15　Q    And, after you began to listen, if you would, tell us

16　what he said?

17　　　　MR. RADNEY:  Your Honor, I have got a copy of the

18　statement.  He does not have to go over all of it unless she

19　just wants to.  I have been provided a copy.

20　　　　THE COURT:  Go ahead.

21　　　　MS. BALDWIN: Judge, for purposes of this hearing,

22　I'll go ahead now and move to admit State's 24.

23　　　　THE COURT:  Admitted.

24　　　　MR. RADNEY:  Obviously, Judge, we have an

25　objection, but understand this is for admission for this

1    hearing.

2    (WHEREUPON, A DOCUMENT MARKED AS STATE EXHIBIT 24 WAS

3    ADMITTED.)

4         MS. BALDWIN: Nothing further at this time.

5                    CROSS EXAMINATION

6    BY MR. RADNEY:

7    Q    Investigator Truitt, you were called to go to the jail

8    on -- this was a holiday or a Sunday, wasn't it?

9    A    It was on July 5th.  I'm not.

10   Q    The day after Independence Day?

11   A    Yes.

12   Q    You were called for the purpose of serving this warrant

13   and meeting with Phillip Burden; correct?

14   A    Not to serve the warrant, because they had done

15   arrested him and had him up there, and they was asking for

16   our agency to bring the original warrant to the county.

17   Q    And, the additional purpose for your going was to talk

18   to him, to see about getting a statement?

19   A    Yes, that's my job.

20   Q    That's why you were going; correct?

21   A    I went to attempt to interview him; yes, I did.

22   Q    And, you, of course, have the rules and procedures

23   where you don't ask any substantive questions about the

24   incident until you first go over this Waiver of Rights;

25   correct?

*** Frances L. Roark ***

```
 1   A      Basically, when I'm interviewing with somebody,

 2   basically, I'll get them mirandized, Waiver of Counsel first

 3   thing.

 4   Q      He's in custody.  No doubt about it.  He's at this jail

 5   and he was not free to leave; correct?

 6   A      When I went back to interview him; yes, sir, he was

 7   behind bars.

 8   Q      He was behind bars and he was not free to go anywhere.

 9   A      No, sir, he was not.

10   Q      And, your policy is you are not going to ask one

11   question about the facts of what allegedly happened until you

12   go over this waiver form; correct?

13   A      Well, basically what I would probably do.  I wouldn't,

14   you know, start.

15   Q      You wouldn't dare walk in and start asking a defendant

16   what happened before you went over his rights with him, would

17   you?

18   A      No, sir, not really.  Not knowing he's a suspect.

19   Q      Knowing he's in jail and a suspect, you are going to

20   take every single precaution to go over line by line this

21   form before you ask any questions about the facts of the

22   case, aren't you?

23   A      Yes, sir, that's my guidelines I usually go by.

24   Q      That's your guidelines and that's exactly what you did

25   in this case.
```

*** Frances L. Roark ***

```
 1   A       Basically, when I went in there and brought him out;

 2   yes, sir, we started with the Miranda.

 3   Q       Line by line.  You didn't say, "Hey, Phillip, tell me

 4   what happened?"  And then say, "Oh, by the way, let's go over

 5   this."

 6   A       No, sir.

 7   Q       You waited until afterward; correct?

 8   A       After he told me, he didn't want to give a statement.

 9   He wanted to talk to a lawyer, he done most of the talking.

10   I didn't ask him any questions.

11   Q       Most of the talking.

12   A       One point in time, he asked me questions and I did

13   answer his questions.  It wasn't me asking him questions.  He

14   was asking how come Tony was charged and all.

15   Q       When you went through this, line by line, it was very

16   clear and he said to you, "I want a lawyer."  You even wrote

17   it on here.

18   A       Yes, sir.

19   Q       He advised you that he wanted to first wait and talk to

20   a lawyer.

21   A       That was what ....

22   Q       Correct?

23   A       He said he understood his rights and that's what he

24   repeated.  Basically, what I wrote there is what he told me,

25   sir.
```

*** Frances L. Roark ***

1   Q    And, then after that, it is your testimony that he just

2   then volunteered all this information.

3   A    Yes, sir.

4   Q    You deny you asked him any questions.

5   A    I can't remember any questions.  There were a lot of

6   questions I wanted to ask him, but I didn't question him.  I

7   just basically listened.  It seemed like to me, his actions

8   and all, that he wanted to kind of tell his side of it, and I

9   just sat there and listened, you know.  He voluntarily spoke

10  and I, you know, listened to him.

11  Q    He actually told you how threatened he had felt and how

12  scared he was of police presence, didn't he?

13  A    He mentioned the Roanoke Police Department.

14  Q    Being very fearful.

15  A    Yes, he did.

16  Q    He actually said that repeatedly that he was scared to

17  death of folks, M16s, and street sweepers.  He was scared.

18  Q    That's what he said; yes, sir, he did.

19       MR. RADNEY:  Nothing further, Judge.

20                   **CROSS EXAMINATION**

21  BY MR. OWENS:

22  Q    Why didn't he sign the waiver?

23  A    He said that he did not want -- really, he said he

24  didn't want to sign nothing or, you know, how -- a statement

25  at that time, when I was talking to him, because he wanted to

 1  talk to a lawyer.  At that time, you know, I don't, you know,

 2  ask them to sign or anything, you know.  After that --

 3  basically at that point in time, he told me that he didn't --

 4  he wanted a lawyer and that's his rights and I honored his

 5  rights, and at that point in time, I jotted down basically

 6  what he said on there.  It says, "Advised that he wanted to

 7  first wait and talk to a lawyer."

 8  Q    But, he went on and talked to you; right?

 9  A    Yes, sir, he basically said -- again, he said, "Well, I

10  don't want to give a statement, but I want to tell what

11  happened."

12  Q    Did he tell you that Tony Burden didn't have anything

13  to do with this?

14  Q    He was -- how his name come up, he was basically

15  wanting to know how come Tony was charged with it, because he

16  said he done most of -- you know, the bigger part in it, why

17  was he charged, you know.

18          MR. OWENS:  Okay.  That's all I have got.

19          MR. RADNEY:  Nothing further for Phillip Burden.

20          THE COURT:  Officer, it is your testimony that he

21  first told you he wanted to talk to a lawyer?

22          THE WITNESS:  Yes, sir.  That was his -- after I

23  read him his rights, that's exactly what he said, sir.

24          THE COURT:  Then you jotted that down on that form.

25          THE WITNESS:  Yes, sir.

1       THE COURT:  And then he, and let's be very clear

2    about this, did you ask him anything else about this

3    situation or did he simply start telling you things?

4       THE WITNESS:  Basically, he just simply started

5    telling me things.

6       MR. RADNEY:  Were you wearing a uniform?  Have your

7    badge on?  How were you dressed?

8       THE WITNESS:  I'd have been dressed similar to the

9    way I am now and would have had a badge on my waist.  I would

10   have had a gun.  Items like that.

11      MR. RADNEY:  You would have had your belt on with a

12   gun and badge on your waist?

13      THE WITNESS:  Yes, sir.  Well, in jail -- you are

14   not allowed in jail with your gun.  I would have secured my

15   gun out front to go in there, but going there that is what I

16   had on, sir.

17      THE COURT:  Did you use any sort of threat,

18   intimidation, harassment, or anything of that sort to get

19   him, after he said this about the lawyer, wanting a lawyer,

20   to talk to you?

21      THE WITNESS:  No, sir, I did not.  I did not.

22      THE COURT:  Was anyone else present, other than you

23   and him?

24      THE WITNESS:  There was a prisoner that was up in

25   the front holding cell, but as far as whether he could hear

*** Frances L. Roark ***

```
 1   what was being said, I do not know, you know.  He was not in

 2   the room.  In the room was just me and him.

 3             THE COURT:  He was not participating in whatever

 4   was going on between the two of you?

 5             THE WITNESS:  No, sir, he was not even paying

 6   attention to us.

 7             THE COURT:  He had his own problems.

 8        Anything else?

 9             MR. RADNEY:  Nothing further, Judge.

10             MS. BALDWIN: Nothing further.

11             THE COURT:  Well, we are now in the defendants'

12   case in chief.  Of course, the time for the State to proffer

13   a statement has passed.  But, ....

14             MR. RADNEY This is in the form of a Motion in

15   Limine, Judge, in that we are about to call Defendant Phillip

16   Burden, and I need to know if the statement is admissible for

17   impeachment purposes.

18             THE COURT:  It is admissible.

19             MR. RADNEY:  Reserve objection.

20             THE COURT Okay.

21             MR. RADNEY:  Could we take five minutes?

22   (WHEREUPON, THERE WAS A FIVE-MINUTE RECESS.)

23             THE COURT:  You may proceed.

24   (JURY PRESENT)

25             MR. RADNEY:  Call Phillip Burden.
```

*** Frances L. Roark ***

1      ANDREW PHILLIP BURDEN

2      HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,

3      THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

4      TESTIFIED AS FOLLOWS:

5      DIRECT EXAMINATION

6   BY MR. RADNEY:

7   Q      State your name, please.

8   A      Andrew Phillip Burden.

9   Q      You go by Phillip?

10  A      Yes.

11  Q      Phillip, where do you live?

12  A      809 Stanley Avenue, Roanoke, Alabama.

13  Q      That's in Roanoke?

14  A      Yes.

15  Q      Who do you live with there?

16  A      My father.

17  Q      Are you employed, Phillip?

18  A      Yes.  Roanoke Packing.

19  Q      Roanoke Packing.

20  A      A butcher company.

21  Q      And, Phillip, I call your attention back to June of

22  2001.  There's been some testimony about some fights on

23  Friday night, the 15th, and Saturday night, the 16th of 2001.

24  Were you involved in any of that?

25  A      No, I wasn't.

*** Frances L. Roark ***

*** Frances L. Roark ***

1    Q    Do you remember Sunday the 17th?

2    A    Yes.

3    Q    Were you over at Tag Taylor's house that morning?

4    A    Yes.

5    Q    What happened?  Did you know Calvin LeShawn Baker, who

6    I think we have called Shawn, that morning?

7    A    Yes.

8    Q    When did you see Shawn?

9    A    When I first went in Tag's, he was sitting to the right

10   on the couch.  Me and my brother, we, walked right past him.

11   We did not say nothing to him.

12   Q    Did you end up in some sort of fight?

13   A    Later that day.

14   Q    Later on.

15   A    Yes.

16   Q    Let's get to that.  Tell me about the fight with Shawn.

17   A    When I come out the door again that evening, Shawn and

18   Rat was standing at the back of Pokey's car.  And, I went to

19   -- Pokey said, "That's Rat and Shawn right there."

20        I went to Rat and I said, "I heard about the threats

21   y'all have been making about all the Burdens."

22   Q    Well, now, I want to hear about with Shawn first.

23   A    Okay.  I tried to shake Shawn's hand and tell him he

24   needed to let all them threats go.  He got to cussing and

25   called me all kinds of motherfucker names, I won't shake your

*** Frances L. Roark ***

1    hand, and we got into a fight.

2    Q    And, before that fight started, had you talked with

3    Rat?

4    A    Yes.

5    Q    And, did you and Rat -- tell me what you said to Rat.

6    A    I told Rat we needed to let all that threatening go.

7    Stop threatening my family.  Me and him shook hands.  We

8    didn't have nothing else to say.

9    Q    You and Rat were fine at that point?

10   A    Yes.

11   Q    No problem.

12   A    No problem.

13   Q    You have a problem with Shawn, though, and y'all end up

14   in a pretty good fist fight.

15   A    Right.

16   Q    Tell me about the fight.

17   A    Well, we fell off in the bushes and some -- his

18   girlfriend come around the hedges and started hitting me in

19   the head with a shoe.

20   Q    Let me show what I'll mark as Defendant's

21   exhibit.

22   **(WHEREUPON, A PHOTOGRAPH WAS MARKED AS DEFENDANT EXHIBIT 5**

23   **FOR IDENTIFICATION.)**

24   MR. RADNEY:

25   Q    With a shoe or something else, did your eye get

*** Frances L. Roark ***

1    injured?

2    A      Yes, it did.

3    Q      And, let me show you Defendant's Exhibit 5, is that a

4    picture that was taken a few days later?

5    A      Yes.

6    Q      Does it fairly and accurately represent the way your

7    eye looked a few days after it happened?

8    A      Yes.

9    Q      And, on that day, was it worse than that?

10   A      Yes, it was.

11   Q      Were you bleeding?

12   A      Yes.

13          MR. RADNEY:  Move to admit Defendant's Exhibit 5.

14          THE COURT:  Admitted.

15   **(WHEREUPON, A PHOTOGRAPH MARKED AS DEFENDANT EXHIBIT 5 WAS**

16   **ADMITTED.)**

17   MR. RADNEY:

18   Q      Now, Phillip, back in '95, you were convicted of

19   assault; correct?

20   A      Yes.

21   Q      On this day you have this fight, what happened after

22   the fight is over?  You have been beat up pretty good.

23   A      Yes.

24   Q      And, Shawn goes one way and you go the other; is that

25   right?

*** Frances L. Roark ***

```
 1   A     Yes, I went looking for a stick or something, you know,
 2   I just ....
 3   Q     Were you pretty upset?
 4   A     Yes.
 5   Q     Had you been drinking?
 6   A     Yes.
 7   Q     You ended up with gun, don't you, Phillip?
 8   A     Yes.
 9   Q     And, you come back in the same area, back toward Tag's
10   house?
11   A     Yes.
12   Q     Who are you mad at?
13   A     Shawn.
14   Q     Where are you going?
15   A     To get Shawn.
16   Q     Do you see or hear Shawn at this point?
17   A     Yes.
18   Q     Where is he?
19   A     He's jumping up and down on top of an old car up Wilkie
20   Clark Drive.
21   Q     There have been some folks that have testified about
22   this exhibit over here, which is State's Exhibit number 7
23   where they put the streets on here and such and put a car.
24   Is that about what you remember to be the car?
25   A     Yes.
```

*** Frances L. Roark ***

*** Frances L. Roark ***

1    Q     About that location?

2    A     Yes.

3    Q     And, that's where Shawn is?

4    A     Yes.

5    Q     What's he doing?  What's he saying?  What are you

6    hearing at this point?

7    A     He's telling me to come on up the road motherfucker.  I

8    got you.  Just cussing and raising sand, telling me to come

9    on up the road.

10   Q     He beat you up pretty good with the help of his

11   girlfriend's shoe, hadn't he, Phillip?

12   A     Yes.

13   Q     You are upset and mad at him.

14   A     Yes.

15   Q     What happened as you get up there?  Let me stop you.

16   Do you remember seeing Ms. Baker?

17   A     Yes.

18   Q     Did she stop you and confront you at some point?

19   A     Yes, she did.

20   Q     You don't deny that you had a confrontation with her;

21   correct?

22   A     Well, I didn't know who she was.  I couldn't see her

23   out of my eye.  I heard Lenny say that's my momma.  So, I

24   went and talked to her.

25   Q     And, when you and Ms. Baker talked, what happened?  Did

```
 1   you calm down?  There's been some testimony that you actually

 2   hugged her; is that right?

 3   A    Yes, sir.

 4   Q    Tell me what happened.

 5   A    She told me, she said, "Son, don't do that.  Let that

 6   go."  And, I was fixing to get ready to go back across the

 7   street, but Shawn got to jumping up and down on that car

 8   again so I took off and went back up the road.

 9   Q    At any point, do you see Rat up that way?  Are you

10   headed after Rat in any way?

11   A    No, I was not looking for Rat.

12   Q    You were looking for Shawn.

13   A    Right.

14   Q    Ms. Baker says you pointed the gun at her.  Do you

15   remember doing that?

16   A    Yes, but I didn't know who she was.

17   Q    You calmed down after talking with her.

18   A    Yes.

19   Q    Did she say to you or did she understand you were after

20   her son?

21   A    Yes.

22   Q    What happens next?

23   A    After Shawn got -- when I got through talking to

24   Ms. Baker, I was fixing to go.  Then Shawn got to jumping up

25   and down on that car.
```

1   Q    Who is near you at this point?  Who is around you?

2   A    Me, Ms. Baker --

3   Q    Is Jim Dandy around?

4   A    -- Jim Danny, and Pokey

5   Q    What's Pokey's real name?

6   A    Kenneth Houston.

7   Q    Houston.

8        Y'all -- are they going with you, trying to stop you,

9   what's going on at this point?

10  A    We were just standing there talking to Ms. Baker and

11  they were trying to keep me from going back across the road,

12  telling me let's go.

13  Q    Trying to keep you from going after Shawn.

14  A    Yes, they had me calmed down.

15  Q    What happened next?

16  A    Shawn got to jumping up and down on the car, telling me

17  to come on up the road.

18  Q    And, did you head toward him?

19  A    Yes, I took off going toward him.

20  Q    What happens next?

21  A    Some kind of way, Rat ran down.  I don't know if he was

22  trying to tell me to stay back or whatever, but we ran face

23  to face.  He said, "We ain't got no beef with each other."

24       I said, "You need to just go on."

25  Q    Did you say back to him, no problem with you, I ain't

*** Frances L. Roark ***

1  after you?

2  A    Yes.

3  Q    What happened next?

4  A    About that time the crowd surrounded us and I guess the

5  crowd thought we were fixing to fight or whatever, then

6  Ms. Baker come up to me telling me, "Son, don't do that.

7  Don't do that."

8  Q    Is Shawn still out there?

9  A    When I was headed up through there, he was, but when me

10  and Rat got face to face, my attention got off of him and I

11  didn't see him no more.

12  Q    And, at that point when you and Rat get face to face,

13  are you arguing at all?

14  A    No.

15  Q    You are getting along fine.

16  A    Yes.

17  Q    He says something about no problem and you say, "I

18  ain't got no problem with you."

19  A    Right.

20  Q    What happens next?

21  A    The crowd surrounded us and Ms. Baker ....

22  Q    Crowd:  You're talking about Ms. Baker, Pokey, Jim

23  Dandy.

24  A    Pokey, Ms. Baker, Jim Dandy those three.  If I'm not

25  mistaken, her sister.  I don't know her name.

*** Frances L. Roark ***

1    Q    What happened?

2    A    They was saying, "Let that go."

3        Ms. Baker got to my right side and she was hitting me on

4    the arm, "Son, don't do that.  Don't do that.  Don't do

5    that."

6        Something, just spur of the moment, somebody pulled me

7    and the gun went off.  When I turned back around, I looked at

8    my gun and I realized it was my gun that shot.  I backed up

9    and took off running.

10    Q    Were you aiming at Rat?

11    A    No, I did not.

12    Q    Were you mad at Rat?

13    A    No, I wasn't.

14    Q    Were you trying to shoot Rat?

15    A    No.

16    Q    Did you have any problem with Rat?

17    A    No, I didn't.

18    Q    Was your gun going off an accident?

19    A    Yes, it was.

20        MS. BALDWIN: Judge, I'm going to object to him

21    leading his witness.

22        THE COURT:  Overruled.

23    MR. RADNEY:

24    Q    Was it an accident?

25    A    Yes, it was.

*** Frances L. Roark ***

1   Q      What happened next?  You went back from where you came.

2   A      Right.

3   Q      What did you do with the gun?

4   A      I threw it back where it was in the area where somebody

5   gave it to me at.

6   Q      You didn't hang around.

7   A      No, I didn't.

8   Q      Are you sorry for what happened?

9   A      Yes, I am.

10  Q      Did you turn yourself in?  It was a couple of weeks

11  later, wasn't it, Phillip?

12  A      It happened the 17th and I turned myself in the 5th of

13  July.

14  Q      Why so long?

15  A      I was scared of the police.

16  Q      But you then came up to the jail on your own, is that

17  right?

18  A      I come to Wedowee.  Well, I got in touch with

19  Mr.  Dillard and had him come pick me up.

20  Q      You called him.  Did you get in touch with him?

21  A      Yes.

22  Q      If Shawn had been out there, you were still pretty mad

23  at him.

24  A      Yes, I was.

25  Q      But he was not out there.

*** Frances L. Roark ***

```
 1   A      No, he wasn't.  Not at the time the gun went off.

 2   Q      He was gone inside?

 3   A      I don't know where he was.

 4   Q      Have you seen Shawn since then?

 5   A      No.

 6          MR. RADNEY:  Nothing further, Judge.

 7                       CROSS EXAMINATION

 8   BY MR. OWENS:

 9   Q      On that Sunday, was it a lot of people out there in the

10   road?

11   A      Yes, it was.

12   Q      When you went looking for Shawn, was Anthony there?

13   A      No, he was not.

14   Q      When you went up the road and you saw Jeanette, was

15   Anthony there?

16   A      No, he wasn't.

17   Q      After you saw Jeanette, did you, at any time before

18   that shot, have any kind of conversation or say anything to

19   Tony Burden?

20   A      No, I hadn't.

21   Q      Did he say anything to you?

22   A      I have not seen him.

23          MR. OWENS:  That's all I've got, Judge.

24                       CROSS EXAMINATION

25   BY MS. BALDWIN:
```

*** Frances L. Roark ***

```
 1    Q     Mr. Burden.

 2    A     Yes.

 3    Q     You have said, when you arrived there at Tag's, Pokey

 4    actually pointed Jermicah Foster out to you.

 5    A     I didn't say pointed.  He said, "That's Rat and Shawn

 6    over there."

 7    Q     Well, all right.  And, you had some conversation with

 8    Pokey about Jermicah Foster, had you not?

 9    A     I had not.

10    Q     Well, then why is it that Pokey's out there pointing

11    him out to you or saying there's Rat right there?  Why would

12    he say that to you if you hadn't already had some sort of

13    conversation?

14    A     Because it was something said -- it was not Pokey.

15    Something was said about they had some kind of conflict the

16    night before.

17    Q     As a matter of fact, you were aware that there was some

18    sort of conflict?

19    A     No, I didn't know.

20    Q     So, you had no reason to know why Pokey said, "There's

21    Rat right there"?

22    A     No, I did not.

23    Q     But, he said that to you.  You testified Pokey said,

24    "There's Rat right there."

25    A     Yes.
```

1   Q    You don't know why he would have said that to you.  Out

2   of all the people standing out there -- how many people are

3   out there?

4   A    I don't know how many was out there.

5   Q    A lot of people were out there weren't there, at Tag's

6   when you got there.

7   A    I was on my way out the door.

8   Q    There was a lot of people there, weren't there?

9   A    Inside.  Wasn't nobody on the outside but Shawn and

10  Rat.

11  Q    Okay.  But he points specifically to Rat and said,

12  "There's Rat right there."

13  A    No.

14  Q    Well, you testified to that.

15  A    There go Shawn and Rat.

16  Q    Okay.  Now, it's Shawn and Rat.

17  A    Yes, now it is.

18  Q    Okay.  Now.  Now, you -- this photo that has been

19  submitted in evidence, that was taken a few days before; is

20  that correct or after this fight?

21  A    Yes.

22  Q    Now, that's before you turned yourself in, though; is

23  that right?

24  A    Yes.

25  Q    All right.  You didn't stick around for the police to

1   take a picture of your eye did you?

2   A     No.  After that gun went off, I left.

3   Q     And, you left because you knew you had committed a

4   murder; is that correct?

5   A     No.  I left because I was scared.  An accident had

6   happened.

7   Q     You didn't stick around to explain to the police that

8   day how it happened, did you?

9   A     I panicked.

10        MR. RADNEY:  Your Honor, object.  Whether he talked

11  to the police is very irrelevant.

12        THE COURT: Sustained.

13  MS. BALDWIN:

14  Q     You panicked.  Where did you get this gun, Phillip?

15  A     Someone threw it to me when I was looking for a stick.

16  Q     Someone threw it to you?

17  A     Yes.

18  Q     Where were you when somebody threw it to you?

19  A     About the house past Tag's.

20  Q     The house past Tag's is vacant; isn't it?

21  A     Yes, it is.

22  Q     Was somebody in that vacant house?

23  A     I don't know, but the streets was full that day from

24  the fight everybody was in the street because of that fight.

25  Q     You don't know who in the world threw you that gun?

1    A    No, I do not.

2    Q    What would your brother be doing with a 16-gauge shot

3    fired through that same gun?

4    A    I don't know nothing about that.

5    Q    Was he the one that handed you the gun?

6    A    No, he was not.

7    Q    You did not get it at his house?

8    A    No, I did not.

9    Q    Even though a witness says that you came out of his

10   house putting the shot in that gun?

11   A    No, I did not.

12   Q    That's not true; is that what you are saying?

13   A    That's what I am saying.

14   Q    And, you are saying that somebody gave it to you when

15   you got past Tag's?

16   A    Yes.

17   Q    Out of that vacant house.

18   A    I didn't say out of it.  I said about the time I got

19   past there.

20   Q    Somebody threw you a gun.

21   A    Yes.

22   Q    You have no idea.

23   A    Right.

24   Q    Even though 16-gauge shotgun shells were found in your

25   brother's house.  There's one in his pocket that was shot in

*** Frances L. Roark ***

1     that same gun, you don't know where that gun came from?

2     A      No, I do not.

3     Q      And, you said you threw it back where you got it from.

4     A      Right.

5     Q      So, you threw it back at that vacant house.

6     A      Yes.

7     Q      And, it wasn't there whenever the police came out?

8     A      I don't know.  I kept running.  I didn't get involved

9     with the police until I turned myself in July the 5th.

10    Q      You weren't afraid of Shawn that day, were you?

11    A      No, I wasn't.

12    Q      You were mad at Shawn, weren't you?

13    A      True.

14    Q      You were not afraid of Jermicah that day.

15    A      Me and Jermicah didn't have no beef against each other.

16    Q      You weren't afraid of nobody that day were you?  You

17    were just mad; weren't you?

18    A      Yes, I was pretty hot.

19    Q      You just went and got a gun and came back up the street

20    intending to shoot somebody.

21    A      No.

22    Q      You didn't intend to shoot anybody?

23    A      I wanted some revenge.  I wasn't indending to murder

24    nobody.

25    Q      I'm sorry, what was that?

*** Frances L. Roark ***

1  A    I was not intending to murder no one.

2  Q    Why does somebody carry a shotgun, 16-gauge shotgun up

3  the street knowing it's loaded and not intending to kill

4  anybody?

5  A    Because I had been beat pretty bad.

6  Q    Well, what were you going to do with that gun?

7  A    I was looking for Shawn.  I wanted some get back.

8  Q    You were going to what?

9  A    I wanted some get back.

10 Q    You wanted some get back.

11 A    I wanted to see Shawn.

12 Q    Now, you said you didn't see Tony there at all?

13 A    No, I did not.

14 Q    All right.  Now, Tony wasn't anywhere.  Tony wasn't

15 there.

16 A    I am saying I have not seen him.  To the best of my

17 knowledge, he was not there.

18 Q    Jeanette Baker said she saw him and he was telling you

19 at that time, "Shoot the MFer"--

20 A    That's what she said.

21 Q    -- on and on.  Bust him.  That's not true?

22 A    That's what she said.  I hadn't heard that.

23 Q    If Lenice Baker said that she heard Tony telling you as

24 they were going up the street, "Shoot the MF nigger;" that's

25 not true?