```
 1  A    I don't know what she said.  I say I didn't hear that.

 2  Q    That's not true?  That's my question.

 3  A    Evidently it's not true.

 4        MR. RADNEY:  Your Honor, I object. He said he

 5  doesn't know one way or the other whether it was said.  He

 6  said he didn't hear it.

 7        MS. BALDWIN: No, I'm saying is what she said true?

 8        THE COURT:  Overruled.

 9        MR. RADNEY: He doesn't know ....

10        THE COURT:  Sustained.

11        MR. RADNEY:  You don't have to answer, Phillip.

12  MS. BALDWIN:

13  Q    All right.  Now, if LaTarsha Winston said that she

14  heard Tony telling you to shoot the MF; is that true?

15  A    I don't know what she heard.  I have not seen Tony.

16  Q    Okay.  So, you don't know if all those other people

17  heard that or not?

18  A    I don't know what they heard.  I said, I haven't seen

19  Tony.  I hadn't heard Tony.

20  Q    Tony is your nephew; is that right?

21  A    That's true.

22  Q    And, you'd be upset if anybody -- if Tony was upset

23  with somebody and saying something to Tony, would you be

24  upset with that person?

25  A    No, I wouldn't.
```

1    Q    Well, isn't that what you were confronting Jermicah

2    about and Shawn about?

3    A    No, it wasn't.

4    Q    Isn't that what this was all about to begin with?

5    A    I just said, no, it wasn't.

6    Q    So, the only thing this was about, according to you, is

7    the fight you had with Shawn down at the hedges.

8    A    True.

9    Q    Isn't it true you hit Shawn first?

10    A    I don't know who hit who.  We just got into it.

11    Q    Now, you went and got a shotgun; that's correct?

12            MR. RADNEY:  Your Honor, object.  Asked and

13    answered.  He's testified to that three times.

14            THE COURT: Sustained.

15    MS. BALDWIN:

16    Q    You walked a little bit further up the street and you

17    pointed the shotgun at Ms. Baker; is that true?

18            MR. RADNEY:  Your Honor, object.  Asked and

19    answered.  She can't go back over the same questions just

20    because she likes them.

21            MS. BALDWIN:  That question has not been asked or

22    answered.

23            THE COURT:  Overruled.

24    MS. BALDWIN:

25    Q    You pointed the shotgun at Ms. Baker; is that true?

*** Frances L. Roark ***

```
 1    A      Yes, that's true.

 2    Q      You told her, I'll shoot you.  B, I'll shoot you?

 3    A      Yes.

 4           MR. RADNEY:  Judge, she's asked that.

 5           MS. BALDWIN: That has not been asked and answered,

 6    Judge.

 7           MR. RADNEY:  Frances can read it back.  It has

 8    been.

 9           THE COURT: Overruled.  Move on.

10    MS. BALDWIN:

11    Q      Did you say that?

12    A      Reask your question, please.

13    Q      Did you say to Ms. Baker, "Bitch, I'll shoot you"?

14    A      Yes, I didn't know who she was.

15    Q      You had one good eye, didn't you?  You could walk up

16    the street, couldn't you?

17    A      Yes, I did walk up the street.

18    Q      You could see Shawn, couldn't you?

19    A      If you ever hunted, you close one eye and look out of

20    one.  If I closed my eye, I couldn't see out of my right.

21    Q      You saw Shawn, didn't you?  Yes or no.

22    A      I heard Shawn.

23    Q      Well, you said he was on the car.

24    A      I heard him.  He was jumping up and down on the car.

25    Q      You couldn't see Shawn jumping up and down on the car,
```

*** Frances L. Roark ***

```
 1   you just heard him jumping up and down.

 2   A    I seen him.

 3   Q    You seen him.

 4   A    Yes.  When I pointed the gun, I couldn't see her

 5   because I had to close my left eye.

 6   Q    You pointed the gun.  You don't see him.

 7   A    Right.

 8   Q    Phillip, isn't it true that you and Tony ran from the

 9   scene together?

10   A    I don't know.  I have not seen Tony.

11   Q    You don't know?

12   A    I left by myself.

13        MS. BALDWIN: Nothing further.

14        MR. RADNEY:  Nothing further, Judge.

15        THE COURT:  Mr.  Burden, are you right-handed or

16   left-handed?

17        THE WITNESS:  I am right-handed.

18        THE COURT:  Anything else?  Thank you, sir.  You

19   can step down.

20   (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.)

21        MR. RADNEY:  I apologize, may I ask the Court for

22   another short recess?  Two minutes?  Five minutes?  For me

23   and Mr. Owens to discuss a couple of things?

24        THE COURT:  Folks, I'll ask you to step back one

25   more time.
```

```
 1   (JURY OUT)

 2   (WHEREUPON, THERE WAS A BRIEF RECESS)

 3   (JURY PRESENT)

 4             THE COURT:  All right.  Proceed.

 5             MR. OWENS: Defense calls Katie Hendrix.
```

## KATIE HENDRIX

**HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

**THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

**TESTIFIED AS FOLLOWS:**

**DIRECT EXAMINATION**

```
11   BY MR. OWENS:

12   Q     Ma'am, would you state your name, please.

13   A     I am Katie Ruth Chappell Hendrix.

14   Q     Ms. Hendrix, where do you live?

15   A     315 Government Street.

16             THE COURT: Speak up just a little bit.

17             THE WITNESS:  315 Government Street, Roanoke,

18   Alabama.

19   MR. OWENS:

20   Q     How long have you lived there?

21   A     About eight years.

22   Q     Are you originally from Randolph County?

23   A     Yes.

24   Q     Back on Friday, June the 15th of 2001, were you at your

25   house?
```

1   A      Yes.

2   Q      Do you recall the police coming to your house?

3   A      Yes.

4   Q      What time of the day or night was that?

5   A      About 7:30 or 8:00.

6   Q      And, do you recall why the police came to your house?

7   A      It was a commotion Friday night.

8   Q      Did you have people at your house?

9   A      Yes.

10  Q      Large group of folks.

11  A      Friday night we was cooking out.  We was eating,

12  everything.  My family was there and Rat.

13          MR. CLARK: Approach, Your Honor.

14  (WHEREUPON, A SIDE BAR COMMENCES.)

15          MR. CLARK: I just want to state that if the

16  testimony that is about the to be elicited is somehow

17  designed to support the argument of self-defense, we object

18  to that.  Because the defendant said on direct examination a

19  minute ago that he shot the victim by accident.  You have to

20  admit an intentional act before you can claim self-defense.

21  If that's what this is coming in for, we object to that.

22          MR. RADNEY: I don't know where we are going.  I

23  didn't call this witness.

24          MR. OWENS: He didn't call him.  I called him.  My

25  client is charged with murder.  He has not testified, dog

*** Frances L. Roark ***

```
 1    gone it.

 2              THE COURT:  Overruled.

 3   MR. OWENS:

 4   Q     So, you were telling us who you saw out there.

 5   A     Friday night it was a commotion up at the four-way

 6   stop.

 7   Q     How far is the four-way stop from your house?

 8   A     It is about a block.

 9   Q     A block.  Let me show you this drawing and help us to

10   try to make sure that we are looking at this correctly.  This

11   is a drawing by the State, State's Exhibit number 7.  They

12   have put Government and Riley intersection here.  Do you see

13   the drawing?

14   A     Yes.

15   Q     Where would your house be in relation to the

16   intersection of Riley or Wilkie Clark and Government Street?

17   A     Coming from what direction?

18   Q     That's a good question.  Coming down Government Street

19   toward Riley.

20   A     My house would be the second house in the corner.

21   Q     There's been some testimony that your house is back

22   here; is that -- the police officer, I believe, testified

23   your house would be somewhere in this vicinity.  Not on the

24   map.  Just a little beyond.  Is that ....

25   A     Behind the Lodge Hall.  That is right.
```

1    Q     Okay.  That's fine.  So, your house is next to a hall

2    or something --

3    A     Yes.

4    Q     -- that is there on the corner.

5    A     Yes.

6    Q     And they have got ....

7          MR. RADNEY:  Is it on the other side of the street.

8    MR. OWENS:

9    Q     On the other side of the street?  Help me.  All right.

10   If this has got an L on it that says lodge hall, would your

11   house be next to the lodge hall?

12   A     Yes.

13   Q     We just want to generally know.  So, it is somewhere in

14   this vicinity right here.

15   A     Yes.

16   Q     Can you hear statements made or people yelling from the

17   four-way stop at your house?

18   A     Yes, I can see the four-way stop from my house.

19   Q     And you can see -- okay.  That's mainly my concern.

20         On Saturday night, was there a crowd of people at the

21   four-way stop?

22   A     On Saturday night?

23   Q     Yes, ma'am.  The next night following after the Friday

24   night incident.

25   A     Yes.

*** Frances L. Roark ***

```
 1   Q     All right.  Did you have occasion to call the police to
 2   your house?
 3   A     Yes, I called the police.
 4   Q     What was the purpose of you calling the police?
 5   A     Because the family was there.
 6   Q     What family?
 7   A     The Baker and Winston family.
 8   Q     Baker and Winston. So is that Jeanette Baker?
 9   A     Yes.
10   Q     Was she there?
11   A     She was there.
12   Q     Were her children there?
13   A     Her children were there.
14   Q     Was a boy name Rat there?
15   A     Yes.
16   Q     Had he been there on Friday night as well?
17   A     Yes.
18   Q     All right.  When you called the police, did they come
19   to your house?
20   A     They came.
21   Q     What was going on?
22   A     The Bakers and Winstons came to my house because there
23   had been an incident concerning Rat.
24   Q     What was that?
25   A     Rat came from the four-way stop cursing and hollering
```

*** Frances L. Roark ***

```
 1   down to my house about he was coming down and kick

 2   everybody's you-know-what.

 3   Q     Did he have a weapon?

 4   A     He had a weapon, because we could hear the click like

 5   you're loading a gun.

 6              MS. BALDWIN: Judge, I'm going to object unless she

 7   saw it.

 8              THE COURT:  Overruled.

 9              MS. BALDWIN: She hasn't -- I don't think they have

10   laid the predicate for that.

11              THE COURT:  Overruled.

12   MR. OWENS:

13   Q     Go ahead.

14   A     He was hollering and cursing and saying he would come

15   down and kick everybody there.  And, he pulled off his shirt

16   and threw his hands up and started charging down toward my

17   house.

18   Q     Did you have the police called?

19   A     Yes.

20   Q     Did you ask Jeanette Baker to leave your house?

21   A     Yes, I did.

22   Q     Did she refuse?

23   A     She kept coming on closer and closer up in my yard.  I

24   said, "Jeanette, get your family and go home."  I said,

25   "Because as close as you come, they follow."  They were right
```

*** Frances L. Roark ***

1   behind her.  I said, " You are like a mother hen with

2   biddies.  If you come in, the biddies follow."  They just

3   kept on coming up in the yard.

4           MR. OWENS:  That's all.

5           THE WITNESS:  And I had to call the police.

6           MS. BALDWIN: Judge, I object to her continuing.

7           MR. RADNEY:  Nothing from Phillip Burden, Your

8   Honor.

9           THE COURT: State?

10                      **CROSS EXAMINATION**

11  **BY MS. BALDWIN:**

12  Q    Ms. Hendrix, you were not around there Sunday, on the

13  17th, were you?

14  A    Sunday?

15  Q    The 17th.

16  A    I was at home Sunday.

17  Q    You were at home?

18  A    Um-hmmm.

19  Q    You were not on the street.  You don't know the

20  circumstances of the shooting, do you?

21  A    I was at home and my daughter-in-law came running to

22  the house.

23  Q    I'm not asking you about your daughter-in-law.  I'm

24  asking you about you.  Did you see Rat get shot:  Yes or no?

25  A    No, I didn't see Rat get shot.  I heard it.

*** Frances L. Roark ***

```
1              MS. BALDWIN: Nothing further.

2              THE COURT:  Anything else?

3              MR. RADNEY:  Nothing further, Your Honor.

4              THE COURT:  You may step down.  Thank you, ma'am.

5    You are excused.

6    (WHEREUPON, THE WITNESS WAS EXCUSED.).

7              MR. RADNEY:  Defendant Phillip Burden rests, Your

8    Honor.

9              MR. OWENS:  Defendant Tony Burden rests, Judge.

10             THE COURT: Ladies and gentlemen at this point all

11   testimony in this case is at a close.  We are going to go

12   ahead and break until 12:00.  That will give me and the

13   attorneys time to go over some matters that we have to cover

14   outside of your presence.  Y'all go ahead and go to lunch.

15   Follow the same instructions that I have already given you.

16   Don't discuss this case with anyone, not even among

17   yourselves.  Don't let anyone try to talk with you about it.

18   Don't put yourself in a position of overhearing conversations

19   between attorneys or witnesses or parties that might tend to

20   be about this case.  Do not put yourself in any position that

21   would compromise your ability to be a fair and impartial

22   juror in this case.  With that we will be in recess until

23   12:00.

24        Everyone remain in while the jury exits.

25   (JURY RECESSED.)
```

*** Frances L. Roark ***

**CHARGE CONFERENCE**

MR. RADNEY:  Defendant Phillip Burden requests that the Court charge on the crime of criminally negligent homicide.  We have conducted an off-the-record discussion where Defendant Phillip Burden has specifically pointed to facts of his own testimony, as well as the testimony of other witnesses, that this was an act that was an accident, there was absolutely no intent to fire the gun at the time the gun was fired.  Additionally Phillip Burden points out that the surrounding circumstances of the area were a high-crime area. There was testimony presented from not only police officers, but from others that folks had guns in the area, drug area, other criminal activity in the area; and, it is the position of Defendant Phillip Burden that all of that together shows that this was an act of criminal negligence and that the jury should be given the opportunity to consider that.

THE COURT: I think part of Defendant's testimony was basically he set out to get even.

MR. RADNEY:  With someone other than the victim, and that at the time the shot was fired, the person that he was mad at was no where to be seen, and there was no intent to fire the weapon at the time it was fired, and if that's not criminal negligence, I'm Bozo the Clown.

MR. CLARK: Well, Bozo, that's not ....

MR. RADNEY:  I think it is.

1          MR. CLARK: At best that is awareness of the risk.

2    No offense, Thomas, just following up on your analogy.

3          MR. RADNEY:  I promise that's not the worst thing

4    you have called me.  So, that's okay.

5          THE COURT:  I don't see how the jury could find a

6    basis of negligence.  I mean, this is one of those age old

7    things that there was an ongoing problem.  Whether or not the

8    victim was included in that or not, it really doesn't matter.

9    I think we have it all on the record.  If there's not a

10   request for manslaughter, I will not give manslaughter.

11         MR. RADNEY:  Phillip, you and I had a discussion in

12   the back room as it related to possible charges for the jury,

13   and you and I talked about manslaughter, murder, and

14   criminally negligent homicide, and we made the decision that

15   our request was that the Judge give only murder and

16   criminally negligent homicide; correct?

17         THE DEFENDANT  True.

18         MR. RADNEY:  And, the Judge has now made a ruling

19   that I have objected to where he says he will not give

20   criminally negligent homicide.  Therefore, we need to decide

21   if we want to ask for the intermediate charge of

22   manslaughter.  In your particular case with the previous

23   felonies, the Court will have the opportunity to consider,

24   your range of punishment for manslaughter will be 20 to 99

25   years if you are convicted.  If it were murder, Judge has to

*** Frances L. Roark ***

1  consider between life and life without.  You I discussed it

2  and made the decision that we didn't think manslaughter

3  applied and we did not want to ask for it.  Is that still

4  what you think?

5        THE DEFENDANT: Yes.

6        MR. RADNEY:  Thank you.  We will not ask for

7  manslaughter.

8        THE COURT:  Very good.

9        MR. OWENS:  Judge, could I ask the Court in

10 relation to the charge -- to Anthony Burden's charge of

11 murder in this case, is the Court going to set out a jury

12 verdict that could, in essence, say that if they believe one

13 set of facts that they can find Mr. Burden, Anthony, not

14 guilty and Mr. Burden, Tony -- I mean, Mr. Burden, Phillip,

15 rather, guilty of murder?

16       THE COURT: Yes.

17       MR. RADNEY:  Judge, I don't want you to be that

18 specific.  But as for saying here is your jury form as it

19 relates to one, make a decision; here is the jury form as it

20 relates to the other, make a decision, and simply they are

21 not related.  You can do one to one or one as to the other,

22 but I think you do throw in ....

23       THE COURT: I am going to charge on aiding and

24 abetting.  That's the only theory that Anthony could be held

25 accountable for.

*** Frances L. Roark ***

 1              MR. RADNEY:  Sure.  Are you going to make the

 2    statement if you convict Tony, you must convict Phillip?

 3              THE COURT:  No.

 4              MR. RADNEY:  Are you going to make the flip side?

 5    If you convict Phillip, you must convict Tony?

 6              THE COURT:  No.

 7              MR. RADNEY:  Are you going to say you cannot

 8    convict Tony unless you convict Phillip?

 9              THE COURT: Yes.

10       Tony, in my opinion, cannot be legally guilty unless

11    Phillip is legally guilty.

12              MR. CLARK: I understand the point.  I think

13    technically that is not correct.  If we were doing separate

14    trials, the conviction of one does not require the conviction

15    of the other.  I think as this case has unfolded and that we

16    have defendants being tried at the same time, I think that's

17    probably correct.

18              THE COURT: Let's put it this way:  If the jury

19    comes back with a guilty against Tony and a not guilty

20    against Phillip, I would not let that stand.

21              MR. CLARK: I understand.  If both are guilty, they

22    are both guilty.

23              MR. RADNEY:  Prosecution requested charge number

24    four, Defendant Phillip Burden vehemently objects to the

25    giving of this charge unless it is given in the conjunction

*** Frances L. Roark ***

1    with the previously requested charge of criminally negligent

2    homicide.  They are intertwined and I guess the term

3    negligence as previously discussed before the Court.

4         MR. OWENS: Defendant Anthony Burden joins in that.

5         MR. CLARK: I just want to say for the record, that

6    Defense counsel is putting the Court in a box by asking the

7    Judge not to charge on manslaughter.  All right.  Now, that's

8    a decision they have made.  And, if the jury charge, you

9    know, becomes something that unpalatable because of the

10   choice they have made, that's the choice they have made.

11        THE COURT:  Well, we have got that on the record.

12        MR. RADNEY:  We haven't put the Court in a box.  We

13   are requesting the Court to address this jury with the law

14   that applies to this case.  We have discussed it with our

15   clients.  We have presented it to the Court.  We believe the

16   Court is making an error in the instructions that they are

17   giving and we have built a record to that effect.

18        MR. CLARK: Well, excuse me, for continuing on this,

19   but since Defense counsel is speaking to the record, what the

20   Defense counsel is asking the Court to do is charge on the

21   charge in the indictment because they don't have any choice

22   about that.  That's the charge in the indictment.  They are

23   asking the Court to skip over the lesser-included felony

24   because his client has a prior record, and they want you to

25   skip over the lesser-included felony and go to the

1    lesser-included misdemeanor, because if he gets convicted of

2    that, the Habitual Offender Act won't apply.  Now, that's

3    what's happening.

4          MR. RADNEY:  I am glad Mr. Clark thinks he knows

5    what's going on in my mind.

6          MR. OWENS:  I don't think that would apply to

7    Defendant Anthony Burden, Judge.

8          THE COURT: As to Anthony--

9          MR. OWENS: Yes, sir.

10         THE COURT:  -- I am going to basically tell the

11   jury if they find Phillip not guilty, they must find Anthony

12   not guilty.

13         MR. OWENS: Yes, sir.

14         THE COURT:  And that's the long and short of it.  I

15   think that would cover all aspects.  There will be two

16   separate verdict forms:  One guilty, one not guilty.

17         MR. OWENS:  Could I ask the Court to consider the

18   fact that they be allowed to consider that if they found

19   Anthony not guilty, that they can return a verdict of guilty

20   against Phillip, but not guilty against Anthony, because what

21   you just said was the reserve but not that.

22         THE COURT: I'll go that far with it.

23         MR. OWENS: If you would, because that says they can

24   find either two different ways in relation to Anthony.

25         THE COURT:  Right.

*** Frances L. Roark ***

1        MR. RADNEY:  Guilty or not guilty on each, but the

2    one proviso ....

3        THE COURT: If Phillip is found not guilty, Anthony

4    cannot be found guilty.  That's strictly under aiding and

5    abetting.

6        MR. RADNEY:  Sure.

7        THE COURT: Are you ready?

8        MR. RADNEY:  Yes, Your Honor.

9    (WHEREUPON, THE CHARGE CONFERENCE WAS CONCLUDED.)

10   (JURY PRESENT)

11       THE COURT:  You may state your case to the jury.

12   (WHEREUPON, CLOSING ARGUMENTS WERE HAD WITHOUT OBJECTION.)

13                       **JURY CHARGE**

14       THE COURT:  Ladies and gentlemen, at this point in

15   the trial it is my duty to instruct you on the law which

16   applies to this case.

17     Now, the charge may be fairly lengthy.  It may be

18   boring. But, the first thing I remind you is that what the

19   attorneys say is not evidence.

20     This case is brought to you by way of Grand Jury

21   indictment which reads as follows:  The Grand Jury of the

22   County charges that before the finding of this indictment

23   Anthony Eugene Burden and Andrew Phillip Burden, whose names

24   are otherwise unknown to the Grand Jury, did intentionally

25   cause the death of another person, to wit, Jermicah Foster,

1    by shooting him with a firearm, rifle, or shotgun, a further

2    description of which is otherwise unknown to the Grand Jury

3    in violation of Section 13A-6-2, the Code of Alabama against

4    the peace and dignity of the State of Alabama, signed Rea

5    Clark, District Attorney.

6        Ladies and gentlemen, what the indictment states and

7    what -- the indictment itself is not evidence.  It is a

8    formal method under our constitution by which an accused is

9    bought before you to stand trial for an alleged crime.  It

10    provides no proof, no presumption, and no inference that the

11    defendant is guilty of the offense charged.

12        When a judge and a jury sit together as court of law, it

13    is the duty of the judge to see that the trial progresses in

14    an orderly fashion, to rule upon all legal matters presented,

15    to instruct the jury as to the law which applies to the case.

16    It is your duty as jurors to follow the law that I charge

17    you.  You will, therefore, render a verdict in accordance

18    with the facts as you determine them to be from the evidence

19    and the law as I charge you.  You are the sole and exclusive

20    judges of the facts.  It is your duty to attempt to reconcile

21    the testimony of all witnesses so as to make them all speak

22    the truth if you can reasonably do so.  If you cannot

23    reasonably reconcile the testimony of all witnesses, it is

24    then your duty to consider the testimony with a view of

25    determining what the true facts are.  In doing so you may

*** Frances L. Roark ***

1    accept or reject any part of the testimony of any witness and

2    accept only the testimony you consider worthy of belief.

3         During the trial I have ruled on certain objections by

4    both the State and Defense.  Do not take any cue one way or

5    the other as to whether I have sustained or overruled

6    objections.  If I have sustained an objection and not allowed

7    an answer to a question, don't try to guess or speculate what

8    that answer might have been.  At the same time, if I have

9    overruled an objection and allowed a witness to answer a

10   question, don't place any greater weight on the answer to

11   that question than any other evidence.  My rulings are based

12   strickly on the law and Rules of Procedure and the Rules of

13   Evidence which apply to the trial of this case.  You are to

14   consider all of the evidence that is admitted in light of the

15   instructions that I give you.

16        In determining what the true facts are from the

17   evidence, you may take into consideration any natural

18   interest or bias a witness may have as a result of any

19   connection with the case.  You may take into consideration

20   the interest or bias a witness may have shown while

21   testifying.  You may take into consideration the demeanor of

22   any witness as to whether that witness has apparently

23   testified frankly or evasively.  You may take into

24   consideration any matter, which you would, in your everyday

25   affairs in passing upon the truthfulness and accuracy of the

 1   testimony.  Weigh the testimony in light of your common

 2   observation and experience, and reach a verdict that will be

 3   based upon the truth as you determine it to be from all of

 4   the evidence and law as I charge you.  If you believe that

 5   any material part of the evidence or testimony of any witness

 6   was willfully false, you may disregard all of the testimony

 7   of that witness.

 8       In arriving at a verdict in this case, you must not

 9   permit sympathy, prejudice, or emotion to influence you one

10   way or the other.

11       Evidence can be introduced in a case for the purpose of

12   impeaching a witness or to discredit their testimony.  The

13   law permits that a witness may be impeached in several ways.

14   For instance, a witness may be impeached by proof of

15   contradictory statements made by the witness while on the

16   witness stand in the case -- while on the stand in this case,

17   by contradictory statements made by a witness at other times

18   or places, whether under oath or not, by evidence of bad

19   character, or by showing of a conviction of a crime involving

20   moral turpitude.  The fact that a witness has been impeached

21   does not mean that you must necessarily discard all of that

22   witness' testimony either in whole or in part.  There may be

23   some other evidence in the case or other facts or

24   circumstances in the evidence which, in your judgment, may

25   tend to support or corroborate a witness' testimony, or some

1    part or parts of it.  As I have already charged you, you are

2    the sole and exclusive judges of the credibility of the

3    witnesses and of the weight that you will accord their

4    testimony.

5        In any criminal case a defendant has a right not to

6    testify.  You are instructed that if a defendant does not

7    testify in a case, you can draw no inference from that.  It

8    is not to be considered by you as a fact in the defendant's

9    favor, nor is it to be considered as a fact against the

10   defendant if he does not testify.  You may simply draw no

11   conclusion and no inference from a defendant's failure to

12   testify.  On the other hand, a defendant may testify as a

13   witness on his own behalf.  When he does so, you may consider

14   his testimony along with all other evidence in light of the

15   fact that he is the defendant and the interest he has in your

16   verdict.  This is to be taken into consideration together

17   with all over evidence or lack of evidence.

18       In determining the true facts in this case, you are

19   limited to the evidence that has been presented from the

20   witness stand as opposed to matters that have been stated or

21   argued to you by the attorneys in the course of the trial.

22   What the attorneys say, both for State and Defense, is not

23   evidence in the case.  And, what they have argued to you at

24   various points in the trial, is not evidence.  They have a

25   right, duty, and obligation at the appropriate time in the

*** Frances L. Roark ***

1   trial to comment on the evidence and to draw reasonable

2   inferences from the evidence as they argue their respective

3   positions to you.  But, what they say is not evidence and you

4   should put what they say in proper category in your thinking,

5   and it should not be in the evidence category.  Just as the

6   indictment is not in the evidence category.

7       Under the law in Alabama, it is the duty of the Judge to

8   set a penalty after due consideration presented at a

9   sentencing hearing.  It is improper for the jury to be

10   concerned with any penalty to be imposed upon any defendant

11   in these cases if there should be a verdict of guilty

12   returned as to any offense charged.

13       In coming before you, a jury of peers, upon pleas of not

14   guilty, these Defendants are presumed to be innocent of the

15   charges against them.  This presumption remains throughout

16   every stage of the trial and during your deliberation on the

17   verdict and is not overcome unless from all the evidence in

18   the case you are convinced beyond a reasonable doubt that the

19   defendants are guilty.

20       The presumption of innocence with which a defendant

21   enters into a trial is a fact in the case which must be

22   considered along with all other evidence in the case and is

23   not to be disregarded by you.

24       Burden of proof.  As I have already told you the burden

25   of proof is upon the State to prove the defendants guilty as

*** Frances L. Roark ***

1    charged.  Before a conviction can be had in this case, the

2    State must satisfy each and every member of the jury of the

3    defendants' guilt beyond a reasonable doubt.  Even if the

4    State demonstrates a probability of guilt, it does not

5    establish it beyond a reasonable doubt, and in that case you

6    must acquit the defendants.

7        The phrase reasonable doubt is self-explanatory.

8    Efforts to define it do not always clarify the term.  It is

9    not a mere possible doubt, because everything relating to

10   human affairs is open to some possible or imaginary doubt.

11       A reasonable doubt is a doubt of a fair-minded juror

12   honestly seeking the truth after careful and impartial

13   consideration have all evidence in the case.  It is a doubt

14   based upon reason and common sense.  It does not mean vague

15   or arbitrary notion, but it is an actual doubt based upon the

16   evidence, a lack of evidence, a conflict in evidence, or any

17   combination thereof.  It is a doubt that remains after going

18   over the entire case in your mind and giving consideration to

19   the testimony and to all the testimony.  It is distinguished

20   from a doubt arising from mere possibility, from bare

21   imagination, or from fanciful conjecture.

22       If after considering all of the evidence, you are

23   convinced of the defendants' guilt beyond a reasonable doubt,

24   it would then be your duty to convict the defendants.

25   However, if you still have a reasonable doubt, that

*** Frances L. Roark ***

1   Defendants are entitled to the benefit of that doubt, and the

2   defendants should be acquitted.

3       You may consider a person's flight to avoid arrest as

4   evidence of the consciousness of guilt.  However, it is for

5   you to determine, from the evidence, whether the defendant

6   did flee and the reason, if he did flee, for such flight.

7       This is a charge of murder against these two defendants.

8   A person commits the crime of murder if he causes the death

9   of another person and in performing the act or acts, which

10  caused the death of that person, he intends to kill that

11  person.

12      To convict the State must prove beyond a reasonable

13  doubt each of the following elements murder.  That the

14  deceased, Jermicah Foster, is dead.  That these Defendants

15  caused the death of Jermicah Foster by shooting him with a

16  firearm or a shotgun.  And, that in committing the act or

17  acts which caused the death of Jermicah Foster, the

18  Defendants acted with intent.

19      A person acts intentionally when it is his purpose to

20  cause the death of another person.

21      If you find from the evidence that the State has proved

22  beyond a reasonable doubt each of the above elements of

23  offense of murder as charged, then you shall find the

24  defendants guilty of murder.  If you find that the State has

25  failed to prove beyond a reasonable doubt any one or more of

*** Frances L. Roark ***

1    the elements of the offense of murder, then you cannot find

2    the defendants guilty of murder.

3        A homicide is not excusable on the ground of accident or

4    misadventure unless it appears that the act of the slayer was

5    lawful.

6        There is a body of law in our State, which at this time

7    the tilted, complicity.  In different states and in different

8    jurisdictions this is referred to by different names,

9    sometimes aiding and abetting is the phrase or name of this

10   body of law.

11       A person is legally accountable for the behavior of

12   another person constituting a crime if with intent to promote

13   or assist the commission of the crime, he either procures,

14   induces or causes such other person to commit the crime or he

15   aids or abets such other person in committing that crime.

16       The words aid and abet, comprehend all assistance

17   rendered by acts, word of encouragement or support, or

18   presence, actual or constructive, to render assistance should

19   it become necessary.

20       The common enterprise or adventure may have been entered

21   into on the spur of the moment without prearrangement or

22   preparation.

23       Ladies and gentlemen, all 12 of you, and soon it will be

24   12, must agree before you can reach any verdict in this case.

25   Your verdict must be the verdict of each and every juror.

1   You are the sole and exclusive judges as to the weight that

2   should be given all testimony in the case.  It is my duty to

3   decide the law; it is your duty to determine the facts.  I

4   have no opinion as to the facts of this case, I don't want

5   you to think from anything I have said or done in this charge

6   or otherwise, or any ruling that I have made, that I think

7   one way or the other about the facts of this case.  Take the

8   testimony of all witnesses together with all proper and

9   reasonable inferences which may be drawn therefrom and apply

10  your common sense.  In a fair, impartial, and honest way

11  determine what you believe to be the truth.  You should weigh

12  all of the evidence and reconcile it if you can reasonably do

13  so, but if you cannot so reconcile a conflict in evidence,

14  you ought to take that evidence, which you think is worthy of

15  credit and give it just such weight as you think it is

16  entitled to receive.

17       Now, this trial has involved two defendants.  It is in

18  legal effect two separate trials being tried at one time.  I

19  have two separate verdict forms.  The first reads as follows,

20  and, it is noted at the top, State versus Andrew Phillip

21  Burden.  If you find from the evidence and the law that I

22  have charged you that the State has proven beyond a

23  reasonable doubt that the defendant, Andrew Phillip Burden,

24  is guilty of murder, then your verdict should read as

25  follows:  "We, the jury, find the Defendant, Andrew Phillip

1    Burden, guilty of the offense of murder as charged."  Your

2    foreperson would need to sign on the top line.  If, on the

3    other hand, after considering all of the evidence in light of

4    the lawsuit that I have charged you, you have found that the

5    State has not met their burden of proof, then it would be

6    your duty to acquit the defendant, and your verdict form

7    would read as follows:  "We, the jury, find the Defendant,

8    Andrew Phillip Burden, not guilty."  Then your foreperson

9    would need to sign on that line.  At the very bottom is a

10   place for your foreperson to print his or her name.  Only one

11   of these top two forms can be signed.  On the very bottom

12   line, it must be printed.  This is the verdict form as

13   pertains to Andrew Phillip Burden.

14       The other verdict form is entitled State of Alabama

15   versus Anthony Eugene Burden.  If, after considering all of

16   the evidence in the case in light of the law that I have

17   charged you, you find that the State has met its burden of

18   proof and they have proven beyond a reasonable doubt that the

19   Defendant, Anthony Eugene Burden, is guilty, then it would be

20   your duty to find him guilty, and your verdict form would

21   read as follows:  "We, the jury, find the Defendant, Anthony

22   Eugene Burden, guilty of the offense of murder as charged."

23   Your foreperson would need to sign on the top verdict line.

24   If, on the other hand, after considering all evidence in

25   light of the law that I have charged, you find that the State

*** Frances L. Roark ***

1    has not met their burden of proof, then it would be your duty

2    to acquit this Defendant, and your verdict form would read as

3    follows:  "We, the jury, find the Defendant, Anthony Eugene

4    Burden not guilty."  Your foreperson would need to sign on

5    that line.  At the very bottom there is a place for the

6    foreperson to sign -- excuse me, print his or her name.

7         You may choose your foreperson by whatever means you

8    think is proper and your foreperson may act to moderate your

9    deliberations.

10         Last, and this is very important, if you find from the

11   evidence that the Defendant, Phillip Burden, is guilty, I

12   have already described what you would do.  It is a separate

13   case to decide as to whether Anthony Eugene Burden is to be

14   found guilty.  These two operate separate from each other in

15   that regard.  Both could be found not guilty, both can be

16   found guilty.  However, the one charge that I will make,

17   which is a little bit different from most, is that if you

18   find that the Defendant Phillip Burden is not guilty; you

19   must find the Defendant Anthony Burden not guilty.  Both can

20   be found not guilty, both can be found guilty, but in the

21   event that you find Phillip Burden not guilty, you must also

22   find Anthony Burden not guilty.

23         Anything further?

24         MR. CLARK: Yes, Your Honor.

25   (WHEREUPON,  A SIDE BAR COMMENCES.)

1          MR. CLARK: I think you got that last part right

2     except you didin't really say that Phillip could be found

3     guilty by himself.

4          MR. OWENS: Right.  You didn't say that.  You didn't

5     say they could find Phillip and him not guilty.

6          THE COURT:  I thought I did, but that's my mistake.

7          MR. RADNEY:  The only other thing is, Judge, I

8     would renew the objections I made during the charge

9     conference.

10          THE COURT:  Well, understood.  Thank you,

11     gentlemen.

12          MR. CLARK: We would like for you to give all those

13     examples over again and include the one.

14     (WHEREUPON, A SIDE BAR CONCLUDES.)

15          THE COURT:  I made one mistake in what I just told

16     you and it's been brought up by counsel.  Actually, I thought

17     I'd said it, but I didn't.

18          The Defendant, Phillip Burden, can be found guilty, and

19     the Defendant, Anthony Burden, can be found not guilty at the

20     same time.  Okay?  So, from top to bottom.  Let me try it

21     again.

22          Both Defendants can be found guilty.  Both Defendants

23     can be found not guilty.  Phillip Burden can be found guilty

24     at the same Anthony Burden is found not guilty.  But last, if

25     you find Phillip Burden not guilty, you must also find

1    Anthony Burden not guilty.

2        Second time got it?

3            MR. RADNEY:  That got it, Judge.

4            MR. OWENS: Got it, Judge.  Thank you.

5            THE COURT:  Glad to see you are awake Mr. Radney.

6            MR. RADNEY:  I've been awake the whole time.  It

7    was boring but I stayed awake.

8            THE COURT:  Counsel, approach and get together all

9    items of evidence that will be going back with the jury and I

10   will let the alternates go.

11       Ladies and gentlemen, I want you to understand that 12

12   of you will deliberate this case.  In the past, over this

13   three-day trial if any one of you had become sick or had a

14   sick child or family emergency, and you could not continue in

15   your service, we would have to declare mistrial.  The law was

16   changed so that we can have alternate jurors.  Now, you would

17   not believe in the past three years the number of times that

18   we have had to use alternate jurors.  As a matter of fact,

19   this is one of the few cases in recent history when we have

20   not had to use an alternate.

21       The alternates in this case, and attorneys consult your

22   lists, are Patricia Boykin and Yolanda Jones.  Patricia and

23   Yolanda, let me see your hands, you are free to go until 9:00

24   in the morning.  Thank you.

25   (WHEREUPON, THE ALTERNATES WERE RELEASED)

*** Frances L. Roark ***

1   THE COURT:  With that if everything is ready, you

2   may retire and deliberate your verdict.

3   (JURY OUT)

4   (WHEREUPON, AT 1:32 P.M., THE JURY RETIRED TO DELIBERATE AND

5   REACH A VERDICT.)

6   (WHEREUPON, THERE WAS A RECESS).

7   (WHEREUPON, AT 2:35 P.M. THE JURY KNOCKED AND ANNOUNCED THEY

8   HAD REACHED A VERDICT.)

9   THE COURT:  Ladies and gentlemen, I have absolutely

10   no idea what the verdict of this jury will be, but I'm going

11   to tell all of you on both sides of this that whatever is

12   their verdict, it is the verdict that we must live with, and

13   I want absolutely nothing said to this jury.  They did not

14   ask to hear this case.  They were summoned.  They were

15   struck.  They have come in here and they have done their best

16   with a very sad and serious situation.  So, I'll announce the

17   verdict, but as I said, out of all respect that they deserve,

18   I want absolutely nothing said one way or the other.

19   Bring the jury in.

20   (JURY PRESENT)

21   **VERDICT**

22   THE COURT:  Ladies and gentlemen, first have you

23   selected a foreperson?

24   MS. CAYPLESS:  Yes.

25   THE COURT:  And, that would be you.  If you will,

*** Frances L. Roark ***

*** Frances L. Roark ***

1    deliver the verdicts to me, please, ma'am.  Thank you.  And

2    have you reached verdicts in these cases?

3              MS. CAYPLESS:  Yes, sir.

4              THE COURT:  The first will be in regard to State of

5    Alabama versus Andrew Phillip Burden.  "We, the jury, find

6    the Defendant, Andrew Phillip Burden, guilty of the offense

7    of murder as charged."  Signed by the foreperson.

8         Next as to State of Alabama versus Anthony Eugene

9    Burden.  "We, the jury, find the Defendant, Anthony Eugene

10   Burden, guilty of the offense of murder as charged."  Is this

11   your verdict?

12             MS. CAYPLESS:  Yes, it is.

13             THE COURT:  Is there a request from anyone for a

14   polling of the jury?

15             MR. RADNEY:  Yes, sir.

16             MR. OWENS:  Please.

17             THE COURT:  I'll begin with the foreperson and what

18   I'm going to do is ask each of you in turn if this in fact is

19   your verdict.

20   (WHEREUPON, THE JURY WAS POLLED.)

21             THE COURT:  It is a unanimous poll of the jury that

22   this is the verdict of the jury.

23        With that, ladies and gentlemen, I appreciate your

24   service on this case.  I'm going to be in a position of

25   letting you be in recess until 9:00 in the morning.  So, if

```
 1   you would, be back in the same position 9:00 in the morning.

 2   Everyone wait in while the jury exits.  Thank you.

 3   (WHEREUPON, THE JURY WAS RELEASED)

 4           THE COURT:  Anthony Burden, Phillip Burden, come

 5   around.  Both of you have heard the verdict read here in open

 6   court and I accept the verdict of the jury that each of you

 7   have been found guilty at this point of the offense of

 8   murder.  At this time, I'm going to remand each of you to

 9   custody.  We will, I suppose have a presentence report

10   requested; is that correct?

11           MR. OWENS:  Please.

12           MR. RADNEY:  Yes, sir.

13           THE COURT:  I do not have my calendar.  I don't

14   know what formal sentencing date is.

15           THE CLERK: December 2nd.

16           THE COURT:  All right.  December 2nd will be

17   sentencing date.  It will be completed and submitted to me

18   before that time.  The probation officer will be in touch

19   with each of you as to an interview for the preparation of

20   the report.

21       Anything else?

22           MR. RADNEY:  Your Honor.

23           MR. OWENS: Bond?

24           MR. RADNEY:  Your Honor, I would ask for bond for

25   Phillip Burden.  He has been out on a hundred thousand dollar
```

*** Frances L. Roark ***

1    bond for the last seven or eight months with absolutely no

2    incident, without no problem.  He has appeared for every

3    court appearance he was supposed to appear at with no

4    conflict of any type, Judge.  The evidence was presented at

5    trial that he turned himself in on this offense.  He's not a

6    flight risk.  I would ask the Court to allow him to remain on

7    that hundred thousand dollar bond.

8         THE COURT: Well, I'll consider that, but I'll --

9    I'll hold a bond hearing within 72 hours.

10         MR. RADNEY:  Judge, I have to be back on Monday.

11    Would you have a bond hearing a little before court begins on

12    Monday?

13         THE COURT:  I think that's fair.

14         MR. OWENS:  Monday at 9:00?

15         THE COURT: Something like that.  Before we begin

16    with the other cases.  All right, gentlemen.

17    (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

18                         * * * * *

19

20

21

22

23

24

25



*** Frances L. Roark ***

```
 1              IN THE CIRCUIT COURT

 2         FIFTH JUDICIAL CIRCUIT OF ALABAMA
 3                 RANDOLPH COUNTY
 4
 5   STATE OF ALABAMA,          *
 6                              *   CRIMINAL NO.
 7   versus                     *   CC-2001-000115, CC-2001-000114
 8                              *   Wedowee, Alabama
 9                              *   31 October, 2002
10   ANDREW PHILLIP BURDEN      *
11   ANTHONY EUGENE BURDEN,     *
12       Defendants.            *
13   * * * * * * * * * * * * * * * * * * * * * * * * * * *
14
15         TRANSCRIPT OF IN CHAMBERS HEARING BEFORE
16
17            THE HONORABLE RAY D. MARTIN,
18
19                  CIRCUIT JUDGE.
20   A P P E A R A N C E S
21   FOR THE STATE OF ALABAMA:   REA S. CLARK, DISTRICT ATTORNEY
22                               FIFTH JUDICIAL CIRCUIT
23                               CHAMBERS COUNTY COURTHOUSE
24                               COUNTY OFFICE BUILDING
25                               LAFAYETTE, ALABAMA 36862
26
27                               BY: REA S. CLARK, DA
28                                   MELODY BALDWIN, ADA
29

30   FOR THE DEFENDANT:          RADNEY, RADNEY & BROWN
31   (Phillip Burden)            ATTORNEYS AT LAW
32                               56 COURT SQUARE
33                               ALEXANDER CITY, AL 35010
34
35                               BY: TOM RADNEY, ESQUIRE
36
37   FOR THE DEFENDANT:          NATHANIEL D. OWENS, ESQUIRE
38   (Anthony Burden)            ATTORNEY AT LAW
39                               POST OFFICE BOX 2641
40                               ANNISTON, AL 36202
41
42
43                               FRANCES L. ROARK, CSR
44                               OFFICIAL COURT REPORTER
45                               fr2w487
46
47
```

```
 1   PROCEEDINGS:  In Chambers.
 2          THE COURT: Mr. Owens, you can go ahead and put on
 3   the record that you've brought up with me.
 4                      PATRICIA BOYKIN
 5       HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,
 6         THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,
 7                   TESTIFIED AS FOLLOWS:
 8                        EXAMINATION
 9   BY MR. OWENS:
10   Q    First of all, ma'am, what is your name?
11   A    Patricia Boykin.
12   Q    Ms. Boykin, were you an alternate on this jury?
13   A    Yes.
14   Q    Yesterday after the judge had completed his remarks and
15   everybody was basically going home, I was zipping my things
16   up and Ms. Phillips came to me, and she said that she had,
17   during the lunch break, seen you talking to one of ladies
18   that had testified in this case, Ms. Jeanette Baker; do you
19   remember talking to her?
20   A     No.  I may have spoke to her coming by, but I had lunch
21   by myself in my vehicle.
22   Q    Do you know Jeanette Baker?
23   A    I have seen her in church, but that's -- but, now, she
24   was not the only one I spoke to.  You know, I, just going by,
25   and I would speak, you know.  Just say hello.  Just being
```

1  nice.

2  Q    You and Ms. Baker go to the same church?

3  A    No, sir.  The church that she attends in Roanoke, where

4  Bishop Wainwright, I believe is the pastor, my husband and I

5  have been there a few times, you know, just because we know

6  Tom Staples.  My husband and Tom Staples served in the Guard

7  together, and we would go there.  But on social basis; no,

8  sir, I do not know her.

9  Q    Were you one of the people that answered that you knew

10  Jeanette Baker?

11  A    No, I didn't know the name.  I did not realize that

12  might be who that was until y'all called her on the witness

13  stand, and that wouldn't have weighed my decision either way

14  anyway, you know.  Maybe I should have reported that I had

15  seen her at church.  I am sorry if I didn't.

16  Q    Sure.

17  A    But that's ....

18  Q    You said you had lunch where yesterday?

19  A    I was parked on the side of the courthouse in my van by

20  myself.  And, I believe a couple of the black ladies on the

21  jury, Yolanda and I don't know the other one's name, they

22  were in their vehicle on the opposite side of me, and they

23  could probably testify that I was there.

24  Q    So, you were not seated out there in the lobby at all

25  -- area?

1   A    No, sir.  I will swear on the Bible to it.

2   Q    I'm just -- you know, this is a very sensitive matter

3   and we are trying ...

4   A    Yes, sir.  Yes, sir.

5   Q    Did you see Ms. Baker for more than a minute or two?

6   Did she stop and talk to you?

7   A    No.  No.

8   Q    She never stopped and talked to you?

9   A    No, sir.  As a matter of fact, like, when we were

10  coming back in and I came up the far stairs, and I had to

11  walk down the hall to get down here, she was seated on one of

12  benches out there.

13  Q    She was?

14  A    Yes, sir.  And, when I went by, she looked at me, and I

15  just said hello, and that's it.

16  Q    Was anybody else sitting next to her?

17  A    I don't know to be honest with you.  I don't know, you

18  know.  There was always several people, you know, there.

19  And, there was another day when I came in, she was standing

20  up talking to somebody.  It was a black lady.  They were

21  standing ...

22  Q    She wasn't a juror, though.

23  A    I don't think so.

24  Q    When did you first realize you knew Ms. Baker?

25  A    When they called her --

```
 1    Q     Her on the first day.

 2    A     -- as a witness.  When they called her as a witness,

 3    when I saw her, I recognized her.

 4    Q     You recognized her. And this was on Monday.

 5    A     Was that the day?

 6    Q     I think the record will reflect ....

 7    A     I think so, because they had said that was probably

 8    going to be a lengthy witness.

 9              MS. BALDWIN:  Tuesday morning.

10              THE COURT:  Tuesday morning.

11              MS. BALDWIN:  She was the first witness Tuesday

12    morning, I believe.

13    MR. OWENS:

14    Q     So, this was Tuesday morning.  You didn't report it to

15    anybody at lunch time or anything?

16    A     No, sir.  I said nothing about it to anyone.  Maybe I

17    should have told y'all that I had seen her in church.  I am

18    sorry that I didn't, but ....

19    Q     You say you saw her seated on a bench as you walked by.

20    Did you ever see her talking to any other juror that you

21    happen to recognize?

22    A     No, sir, not to my knowledge.  But, there were always

23    several people, you know, on the benches when we came back in

24    and when we went out, too.

25    Q     And so, you did not sit down with her when you came by?
```

*** Frances L. Roark ***

1    A      No, sir.  I never sat down on the bench.

2    Q      All right.

3             MR. OWENS:  I need to bring this other lady in that

4    says what she says, Judge.  I don't how to -- I want to make

5    sure that she's not misidentifying this lady.  How do I do

6    that?  I want to make sure we are not talking about a

7    different person.

8             THE COURT: What we can do, you can simply call her

9    in, and we can see if they recognize each other, and then she

10   doesn't need to say anything.  At that the point, she can

11   step back out.

12            MR. OWENS:  I'll just go get her.

13            MR. RADNEY: Why don't you let the clerk.

14            THE COURT:  Ms. Boykin, we have to do this on the

15   record.  No one is making any accusation.

16            MS. BOYKIN: As a matter of fact, when y'all called

17   her as a witness, I had wondered if maybe I needed to tell

18   y'all that I had seen her in church.  But, you know, as far

19   as associating with her or anything, I knew none of the

20   people's names in this case.  And, as a matter of fact, she

21   actually is the only person that I did recognize.

22            THE COURT: Recognize -- well, we just -- this is

23   something we have to do.

24            MS. BOYKIN:  I understand.

25            THE COURT: Nobody is saying you have done anything

*** Frances L. Roark ***

1 | wrong.

2 |         MS. BOYKIN: I understand.

3 | (WHEREUPON, MS. PHILLIPS ENTERED AND THEN LEFT.)

4 | MR. OWENS:

5 | Q    Did you see that lady out there yesterday?

6 | A    If I did, I don't ....

7 | Q    You don't remember seeing her?

8 | A    You know, she could have been there and I just ....

9 |         MR. OWENS: Sure.  That's all.

10 |         THE COURT: We'll call her in next.

11 |     Is there anybody that has got any questions?  I have

12 | just a couple of things for Ms. Boykin, but not very many.

13 | Anybody else have anything?

14 |     Ms. Boykin, you were an alternate on the jury.

15 | A    Yes, sir.

16 | Q    And, I released you prior to the time that the other 12

17 | went back to deliberate.

18 | A    Yes, sir.

19 | Q    Did you ever make mention, to any of the other jurors,

20 | the fact that you knew Ms. Baker, or that you recognized her

21 | from church, or anything of that sort?

22 | A    No, sir.

23 | Q    Did you ever have any conversation with any other juror

24 | about Ms. Baker or anybody else?

25 | A    No, sir.

*** Frances L. Roark ***

1    Q      Okay.  And, I think it was your testimony, the fact

2    that you recognized her, would not have had any impact on

3    your ability to be a juror had you been called to actually

4    deliberate.

5    A      No, sir.

6               MR. RADNEY: May I ask one question?

7               THE COURT:  Yes.

8               MR. RADNEY:  I am here for my son Thomas.

9                          **EXAMINATION**

10   BY MR. RADNEY:

11   Q      During the time you jurors were together, before you

12   were released as the alternate, did you discuss this case?

13   A      Well, not -- just a few things, like, that we didn't

14   understand.

15   Q      You talked to each other about it.

16   A      We talked to each other.  We did not discuss it one way

17   or the other.

18   Q      I'm not talking about guilt or innocence, but issues

19   that came up in the trial, when you would have five or ten

20   minutes, like we usually do, while you were back there

21   waiting to be called back out, you did discuss aspects of the

22   testimony you heard.  You didn't know at that time you were

23   alternate; right?

24   A      No, sir.

25   Q      You did discuss those aspects during breaks.

*** Frances L. Roark ***

1    A      A few of them.  But, we didn't go into ....

2    Q      You didn't come to any conclusion.  I understand that.

3           THE COURT:  Would this have been if you didn't --

4    you used the word understand.  Would this have been like, you

5    didn't understand or hear a witness, or what exactly?  You

6    used the word we didn't understand.

7           THE WITNESS:  Pardon?

8           THE COURT:  Just a few minutes ago, you said

9    something about, they may have said something that you didn't

10   understand.  Do you mean like you didn't hear a witness?

11          THE WITNESS:  Yes.  There were a couple of

12   witnesses that weren't speaking up loud enough, you know.

13          THE COURT:  I remember that.

14          THE WITNESS:  And we were trying to figure out what

15   he might have been saying or she might have been saying, and

16   just a few things.

17          THE COURT:  But, you, and you just tell me one way

18   or the other, y'all didn't, in any way, discuss or deliberate

19   guilt or innocence --

20          THE WITNESS:  No, sir.

21          THE COURT:  -- during these times?

22          THE WITNESS:  No, sir, none of us did.

23          MR. OWENS: May I ask one

24   question?

25          THE COURT: Yes.

|    | EXAMINATION |
|----|----|

BY MR. OWENS:

Q    Do you remember the Court taking a recess for a period
of time for Ms. Baker to calm down --

A    Yes, sir.

Q    -- from being emotionally distraught?

A    Yes, sir.

Q    And the jurors were asked to leave.

A    Yes, sir.

Q    Is that correct?  And, you went back in the jury room.

A    Yes, sir.

Q    And, y'all stayed in there that whole time.

A    To my knowledge; yes, sir, I do believe we did.

Q    And that was on Tuesday some point in the morning.

A    Whatever day she was on the witness stand.

Q    Whatever day it was.  And, is it your position today
that you didn't talk about any of the things that went on in
relation to her?

A    No, sir.

Q    Her testimony, or her being upset, or anything like
that.

A    Well, they had -- some of them had just said, you know,
something about her being so upset.  You know, like you said,
women -- or Mr. Radney might have said it -- are more
emotional than men.  And, you know, but, no, sir, we didn't

*** Frances L. Roark ***

```
 1    -- we didn't.

 2    Q     And you heard the whole case up until the time the

 3    judge released you --

 4    A     Yes.

 5    Q     -- just before they went in to deliberate.

 6    A     Yes, sir.

 7    Q     One final question.  Did you have any conversation

 8    during the week with any of the other jurors that you have

 9    not told us about?

10    A     Not to my knowledge.  Not other than just, you know, us

11    being together and just, you know, all talking and

12    everything.

13    Q     Were you a smoker or not?

14    A     Yes, sir.  I was the only one on the jury that did

15    smoke.

16    Q     Okay.  Were you with the people that were standing

17    outside smoking yesterday?

18    A     No, sir.  I don't think we went outside yesterday.  We

19    went outside Tuesday.

20    Q     Tuesday.  Okay.

21    A     Because the bailiff, she asked if anyone smoked, and I

22    was the only one that said I do.  And, she said would every

23    one like to go outside.

24    Q     Was that group discussing it around you?

25    A     No, sir.  Because we were all out on the back, you
```

1  know, and the bailiff was right there with us.

2          MR. OWENS:  Okay.

3          THE COURT: Anything else?  Mr. Radney?  Mr.  Clark?

4          MR. RADNEY: No, sir.

5          MR. CLARK: No, sir.

6          THE COURT: Thank you, ma'am.  Tell you what, about

7  our little meeting back here, don't say anything to any of

8  the other jurors.

9          MS. BOYKIN:  Okay.

10          THE COURT:  It is just something that we had to

11  discuss.  You can go have a seat.  Like I said, no one has

12  said that you have done one single thing wrong.  Just when a

13  complaint -- well, not a complaint, but when a statement is

14  made in a case like that, we have to follow-up.

15          MS. BOYKIN:  If you want to swear me in again, I

16  will swear, I did not have any conversation with Ms. Baker.

17          THE COURT: You don't have to worry about that.

18  Thank you, ma'am.

19          MS. BOYKIN:  Thank you.

20  (WHEREUPON, MS. BOYKIN WAS EXCUSED FROM CHAMBERS.)

21          MR. OWENS: I call Ms. Phillips.

22                    **GWENDOLYN PHILLIPS**

23        **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

24         **THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,**

25                    **TESTIFIED AS FOLLOWS:**

*** Frances L. Roark ***

| 1 | **EXAMINATION** |
|---|---|

**BY MR. OWENS:**

2

3  Q    Ms. Phillips, will you state your name, please?

4  A    I am Gwendolyn Phillips.

5  Q    Ms. Phillips, were you at this trial all week long?

6  A    Yes, I was.

7  Q    Yesterday afternoon, after the judge's direction for

8  basically everybody to stand and let the jury go out, did you

9  have occasion to come to me?

10 A    Yes, I did.

11 Q    What, if anything, did you come and say to me?

12 A    I said to you that one of the alternative jurors was

13 sitting out there on the bench talking with Ms. Jeanette

14 during the break yesterday.

15 Q    Did you see that lady in here?

16 A    Yes, I did.

17 Q    Is it your sworn testimony that she was seated on one

18 of the benches talking to Jeanette Baker?

19 A    She was sitting on the bench.  I am up on this end;

20 they are on that end.  I don't know what they were talking

21 about, but mouths were moving.

22 Q    How long a period of time did you see them seated

23 together?

24 A    Five to ten minutes at least.

25 Q    Are you certain that that lady was seated next to

*** Frances L. Roark ***

*** Frances L. Roark ***

1  Jeanette Baker?  Do you know Jeanette Baker?

2  A    Yes, I do.

3  Q    After you told me what you did yesterday evening, did

4  you see me go directly to the judge's office?

5  A    Yes.

6  Q    What time of day was it that you say you saw them?

7  A    I am not for sure about the exact time, but I know it

8  was during the dinner break.  I went outside to smoke.  I

9  come back in and I stood at that first bench and looked down

10 and that lady was sitting down there and Ms. Jeanette Baker

11 was sitting down there.  I'm not for sure what time it were.

12 To guess at it, I would say maybe 12:20, 12:30.

13 Q    You don't have to guess.  It was the only lunch break

14 that we had.

15 A    Right.  The only lunch break that we had.  It was the

16 first break that we had yesterday.

17        MR. OWENS:  Mr. Radney, do you have any questions

18 for this lady?

19        MR. RADNEY:  I don't have any.

20        MR. CLARK: I have a couple of questions.

21                    EXAMINATION

22 BY MR. CLARK:

23 Q    What was your name again?

24 A    Gwendolyn Phillips.

25 Q    What is your relation to Phillip Burden?

*** Frances L. Roark ***

*** Frances L. Roark ***

```
 1   A     Phillip Burden is my brother.

 2   Q     And what is your relation to Anthony?

 3   A     Anthony is my son.

 4   Q     All right.  And, you spoke to Mr. Owens here when?

 5   A     Yesterday after court.

 6   Q     How long after you say you saw the juror next to

 7   Ms. Baker?

 8   A     It was probably three hours, four hours.  I mean, I

 9   don't know exactly how long it was.  When I come back in

10   court, when court got ready to start back, like 15 to 1, 10

11   minutes to 1, Mr. Owens was talking with the Judge.  They was

12   all talking with the Judge.  So I didn't say anything.  And

13   then I didn't have another opportunity to say anything to him

14   about it.

15   Q     All right.  So, it was three or four hours after you

16   saw this occur; is that what you said?

17   A     Right.  I guess that's how long it were.

18   Q     After the verdict came in.

19   A     Right.  Um-hmmm.  After court.

20         MR. CLARK:  That's all we have.

21         THE COURT: Mr. Owens, Mr. Radney, anything else?

22                        EXAMINATION

23   BY MR. OWENS:

24   Q     Was I still up here?  When you came to me, I was still

25   in the courtroom.
```

*** Frances L. Roark ***

```
 1   A     You were still in the courtroom.  You had not left out

 2   of the courtroom.  I didn't leave out of the courtroom.

 3             THE COURT: Mr. Owens, you came and immediately told

 4   me.  I think I had already moved all my things down to my

 5   office.  And, you came immediately.

 6             MR. OWENS:  I came immediately to you and then went

 7   over and saw Melody in the DAs office and told them.  After

 8   talking to you, telling you what she had told me, and you

 9   said, well, it is too late in the day for us to be able to do

10   anything about this, tell the District Attorney and we'll

11   take this matter up in the morning.

12             THE COURT:  I think at that point, all the jurors

13   had left; hadn't they?

14             MR. OWENS:  I saw one or two of them as I was going

15   outside and stuff, but that was probably because they may

16   have gone somewhere and come back.

17             THE COURT:  This lady, Ms. Boykin, she would have

18   already been gone for a couple of hours; wouldn't she?

19             MR. OWENS:  Right.  Because we released her before

20   the jury started their deliberations.

21             MR. CLARK: The jury deliberated for an hour, I

22   think.

23             THE COURT: Then sometime after we had gone through

24   the verdict on the record and all of that is when Mr. Owens

25   came down the hall and told me, related to me, what had been
```

*** Frances L. Roark ***

1   said.

2        Anything else from anyone?

3            MR. RADNEY: Not from me.

4            THE COURT: Thank you, ma'am.

5            MR. OWENS: Thank you, Ms. Phillips.

6   (WHEREUPON, MS. PHILLIPS WAS EXCUSED FROM CHAMBERS.)

7            MR. OWENS: Judge, we have a conflict in statements

8   here.  I don't know why Ms. Boykin would say that she was not

9   seated with her.  I don't know, what, if in fact you believe

10  both ladies.

11           THE COURT: Ms. Boykin acknowledged that she spoke

12  words to Ms. Baker.

13           MR. OWENS: She also acknowledged that she saw her

14  out there in the hall.

15           THE COURT: She did, seated on one of the benches.

16           MR. OWENS: Yes, sir.  She denied --

17           THE COURT:  Sitting down.

18           MR. OWENS: -- sitting and talking to her.

19           MR. RADNEY: If I might, Your Honor.  The only thing

20  I would add is the alternate juror did admit that they

21  discussed this case prior to her being released from the

22  jury, if I heard her correctly.  You follow what I am saying?

23           THE COURT: Well, that's what I questioned her

24  about.

25           MR. RADNEY: Misunderstanding.

*** Frances L. Roark ***

 1          THE COURT: The understanding language when she said

 2     that -- something they didn't understand.

 3          MR. RADNEY: I just wanted to add that Judge to what

 4     I heard.

 5          THE COURT: Okay.  First, is there any motion made

 6     by anyone.

 7          MR. OWENS: Yes, Judge, I make every motion -- I

 8     can't even think of all the motions I could possibly make.  I

 9     have a murder case.  I have verdict returned on a -- I'm just

10     in a bad situation here.  I don't know how much discussion

11     Ms. Boykin has had with the other jurors.  For whatever her

12     reasons, she has told us something that another person has

13     come in direct opposition to.  I don't know why.  Now, I

14     don't know what that does, but when a juror, and I realize

15     she's an alternate, but she has been here all week long with

16     these people, and they have had discussions. She's

17     participated the whole week.  She didn't know she was an

18     alternate until you told her.

19          And, this going to church -- I realize y'all may not

20     have integrated churches down here.  But, there are more and

21     more people who are going to churches, black and white

22     together.  And, I go to church that we have got both, all

23     kinds of people in it.  We are kind of different.  But, my

24     point is ....

25          THE COURT: He should come to our arbor service,

```
1   shouldn't he, Tom.  We have a different service.
2            MR. OWENS: Praise God for that.  All I'm saying is,
3   I move -- let me discuss something with  ....
4   (WHEREUPON, THERE WAS A BRIEF OFF-THE-RECORD DISCUSSION
5   BETWEEN COCOUNSEL.)
6            MR. OWENS: Just move for a mistrial.  I want to say
7   it as broad as I can without -- I don't want to miss any part
8   of it, is all I'm saying.  I want to try to do that.
9            MR. RADNEY: Our defendant joins in that motion.
10           MR. CLARK: I'll make a response if you want me to,
11   Judge.
12       I think this is another moment, and especially since
13   this was an alternate juror anyway, that's what we have
14   alternates for.  And, you know, the only part that I think
15   deserving really of any comment here is what Ms. Boykin said
16   about discussing the case.  And I know Mr. Radney, this
17   Mr. Radney, was not here when Ms. Baker testified, but -- and
18   he didn't see her testify.  This is a woman who wept openly
19   and sobbed openly throughout large segments of her testimony.
20   And, apparently, the jurors commented about that, I guess.
21   That's what I take it she was saying.  You had to break, you
22   had to take a break during the middle of her testimony, and
23   apparently a couple of them mentioned that, what was
24   happening, to each other when they went back to the jury
25   room.  I took that to be what she was referring to.
```

1    Now, whether that falls within the purview of discussing

2    the case or not, I certainly don't think so.  And, this woman

3    that's the focus of all of this, did not deliberate on this

4    case at all, and had been gone from the courthouse a couple

5    of hours before the verdict came down.  I mean, before

6    Mr. Owens reported this to the Court and to the District

7    Attorney's office.

8         MR. OWENS: May I respond to that, Judge?  First of

9    all, I agree with him.  Ms. Baker did require a great deal of

10   attention.  In fact, it was the most, of all the witnesses

11   that we had, and we had a number of them, she is the only

12   witness that the Court had to go and recess and make a point

13   which adds to my point of impact of what happened.  When his

14   son said yesterday that women are emotional, I didn't want

15   him to say it.  He said it.

16        MR. RADNEY: What did my son do wrong?

17        MR. OWENS: He said women are more emotional than

18   men.  Which may have -- I don't know.  There are women that

19   get upset with you today when you dare say that they are any

20   different than men.  Which is okay, but we are talking about

21   a murder case.  We are talking about that very woman being

22   the focal point now of a person who was in this jury group.

23   She spent the week with us.  She heard everything that

24   everybody else said.  She went in and she said to us on the

25   record that she had some discussion.

1    Now, this is the same lady who doesn't recall being

2    seated by or whatever, other than just speaking to Ms. Baker

3    and going on.  Now, she tells us she also has had occasion,

4    she and her husband, to go to church with Ms. Baker more than

5    once.  Now, all of that in combination makes what Mr. Rea

6    said ....

7         MR. CLARK: Clark.  Rea is my first name.

8         MR. OWENS:  Excuse me.  Forgive me.  I am emotional

9    right now.

10        MR. RADNEY: Most men are emotional.

11        THE COURT: I'm glad you have not been here all

12   week.

13        MR. RADNEY: You are glad I wasn't here all week.

14        MR. OWENS:  Emotional as I am, I think we've got

15   something that I believe our court of appeals is going to

16   have to look strongly at, because it has got the whole thing

17   in it.  It has got a lot -- it crosses over the board.  This

18   lady did not leave on Tuesday.  She was here on Wednesday and

19   heard all of the Defense's case.  And, she sat there with the

20   people and talked to whoever she may have talked to in this

21   jury venire.

22        THE COURT: Couple of points then I'm going to sort

23   of consider what, if anything, can be done.  First, Juror

24   Boykin was an alternate.  I'm not going to speculate on what

25   action I would be taking if she had actually deliberated on

1    the case.  No need speculating, because she did not.

2         What's the lady's name that came in after Ms. Boykin?

3              MR. OWENS: Ms. Gwendolyn Phillips.

4              THE COURT: Ms. Phillips is the sister of one of the

5    defendants and the mother of the other defendant.  It

6    concerns me somewhat that she did not immediately report what

7    she saw, what she related to us this morning, until after the

8    jury had returned its verdicts of guilty as to both

9    defendants.  And, I have no doubt that Mr. Owens would have

10   immediately notified me as soon as the lady told him.  So,

11   you couldn't have got to me any quicker, but she could have

12   gotten to you quicker.

13             MR. OWENS: Judge, she said we were in conference.

14   You and we went from there into the trial.  I didn't have any

15   other time that I know of that she could have gotten to me.

16             THE COURT: If you'd known it, you would have taken

17   care of it.  I'm putting that on the record.  If she had been

18   on the jury of 12, I would consider an individual interview

19   of each juror, but I don't think I'm going to do that.  We've

20   got it on the record.  If the -- I guess what I am saying in

21   short is, I fully understand your concern, Mr. Owens, but I

22   don't think this, under the particular facts and

23   circumstances, arises to the level of granting a mistrial.

24   We've got it on the record.

25             MR. RADNEY: We reserve an exception.

*** Frances L. Roark ***

1              MR. OWENS: I was just going to ....

2              THE COURT: We'll take it from there and yesterday I

3    did not enter adjudication of guilt.  I simply accepted the

4    verdicts.  So, the time for appeal would run from date of

5    sentencing.

6              MR. OWENS: December 2nd.

7              THE COURT: December 2nd.

8    (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

9                              *****

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*** Frances L. Roark ***

COPY

IN THE CIRCUIT COURT
FIFTH JUDICIAL CIRCUIT OF ALABAMA
RANDOLPH COUNTY

STATE OF ALABAMA,              *
                              *   CRIMINAL NO.
versus                        *   CC-2001-000115, CC-2001-000114
                              *   Wedowee, Alabama
                              *   4 November, 2002
ANDREW PHILLIP BURDEN         *
ANTHONY EUGENE BURDEN,        *
     Defendants.              *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF MOTION FOR MISTRIAL BEFORE

THE HONORABLE RAY D. MARTIN,

CIRCUIT JUDGE

A P P E A R A N C E S
FOR THE STATE OF ALABAMA:    REA S. CLARK, DISTRICT ATTORNEY
                             FIFTH JUDICIAL CIRCUIT
                             CHAMBERS COUNTY COURTHOUSE
                             COUNTY OFFICE BUILDING
                             LAFAYETTE, ALABAMA 36862

                             BY: REA S. CLARK, DA
                                 MELODY BALDWIN, ADA


FOR THE DEFENDANT:           RADNEY, RADNEY & BROWN
(Phillip Burden)             ATTORNEYS AT LAW
                             56 COURT SQUARE
                             ALEXANDER CITY, AL 35010

                             BY: THOMAS A. RADNEY, ESQUIRE

FOR THE DEFENDANT:           NATHANIEL D. OWENS, ESQUIRE
(Anthony Burden)             ATTORNEY AT LAW
                             POST OFFICE BOX 2641
                             ANNISTON, AL 36202


                             FRANCES L. ROARK, CSR
                             OFFICIAL COURT REPORTER
                             fr2w487

*** Frances L. Roark ***

1    PROCEEDINGS:  In Open Court.

2         THE COURT: The Court first calls the motion in the

3    matter *State versus Burden and Burden*.  Mr. Radney.

4         MR. RADNEY:  Judge, do you want -- I know there

5    are some issues that Mr. Owens is going to raise that I join

6    in as it relates to jury selection and probable improper

7    contact or improper failure to disclose by jurors; and, then,

8    there is the issue of bonds.  Which one do you want to take

9    up first?

10        THE COURT: Let's go ahead and do the issue of the

11   bonds first.

12        MR. RADNEY: Judge, as I stated to you at the close

13   of the case last week, as you know, I represent Phillip

14   Burden.  Phillip Burden posted -- approximately four months

15   after the offense, which would have been sometime in October

16   or November of last year.  Phillip Burden posted a bond, a

17   $100,000 bond, and was out on that $100,000 bond for a period

18   of a 11, 11-1/2 months with absolutely no problems

19   whatsoever.  He attended every court appearance he was

20   supposed to attend and kept in contact with me perfectly.

21   He's employed there at the stockyard in Roanoke and has been

22   since his release.  He has enormous family ties to the

23   community and has been from this area all of his life.  He

24   has absolutely nowhere else to go.  He's not going anywhere.

25        At the same time, Judge, he has, like I said, presented

```
 1   no problem to any of the victim's family, created no ruckus,
 2   no contact, no problem with the law during that 11 months.
 3   And, I would ask the Court to give him the opportunity to get
 4   back out on that same bond until sentencing day to get his
 5   affairs in order, because it is no doubt, he's going to
 6   prison.  No way around that.  However, I would like you to
 7   give him the opportunity to get his affairs in order on that
 8   bond.
 9            THE COURT: Mr. Owens, what as to your defendant?
10            MR. OWENS: Judge, I represent, of course, Anthony
11   Burden.  Mr. Burden was immediately released on bond.  I
12   think it was a $100,000.  A $100,000.  I think he was
13   arrested within hours, maybe, of the events of June, and he
14   has been out on that bond.  He has made every court
15   appearance.  He has never created a problem since the date of
16   that bond.  There's been no report, that I know of, of his
17   failure to appear at any proceeding.  And, he's going to have
18   to get his affairs in order.  And, we ask that he be allowed
19   to be released on the same bond that he is on currently.
20            THE COURT: From the State, first, I would like to
21   know what the prior felony record of each defendant may
22   consist of.
23            MR. RADNEY: We will stipulate that Phillip Burden
24   has three property offenses that happened in '87 and earlier.
25   And, then there is the assault that was in '95.
```

1          MS. BALDWIN: That's correct.

2          THE COURT: Four felony offenses.  Are any one of

3    the four felony offenses, class A felonies?

4          MS. BALDWIN: No, sir.  No.

5          MR. RADNEY:  The assault second is a C and the

6    burglary and thefts were all Cs.

7          THE COURT: All class C felonies.  As to Anthony

8    Burden?

9          MS. BALDWIN: We don't have any prior felonies.

10          MR. OWENS: I don't have any knowledge of any.

11          THE COURT: Okay.  Is it the understanding or --

12    well, it is not the understanding.  The jury returned a

13    verdicts of guilty for murder --

14          MR. RADNEY:  Yes, sir.

15          THE COURT: -- which is a class A felony.  And,

16    under the circumstances, and the facts of this case, it

17    involved the use of a deadly weapon, that being a shotgun.

18          MR. RADNEY: Yes, sir.

19          THE COURT: So, the range of punishment would be

20    from 20 years to 99 years or life without consideration of

21    the Habitual Offender Act.

22          MR. RADNEY: Correct.

23          THE COURT: Okay.  You have heard what Defense has

24    had to say in regard to requests for bond, what's the State's

25    position?

```
 1            MS. BALDWIN: Well, Judge, we, of course, based on
 2    the facts of the case, and the kind of sentences they are
 3    looking at, would oppose there being a bond at this point.
 4    And, the situation as it was out there with regard to the
 5    facts in this.  A lot of people were out there.  A lot of
 6    people from that community have testified.  And, under the
 7    circumstances, Judge, we don't think it would be appropriate
 8    that they be released.  Phillip Burden is looking at a very
 9    lengthy sentence and at the discretion of the Court possibly
10    the possibility of life without parole, Judge; and, he's
11    aware of that.
12            THE COURT: Anything else from either side?
13            MR. CLARK: I just would like to add that, and
14    Ms. Baldwin touched on this, that I think the nature of this
15    case deserves some consideration in the bond hearing.  This
16    was basically a street fight, a street argument, that
17    escalated to a homicide.  And I think it would be really
18    taking an unnecessary risk, now that the verdicts have come
19    in, to permit these people to reenter that community with the
20    feelings the way they are, the way they have been, including
21    Anthony.  I mean, I realize that Anthony was convicted as an
22    accomplice.  But, there were some circumstances in this case
23    about people making threats and then shaking hands again and
24    some reconciliation and then this shot occurred anyway.  And,
25    you know, my feeling about Anthony's involvement in this case
```

*** Frances L. Roark ***

1    is that, true he didn't pull the trigger, but I think this

2    case is a little bit unusual in that I think a pretty good

3    argument can be made that this crime might never have

4    occurred if it hadn't been for Anthony's encouragement.

5              MR. RADNEY: Judge, if I may add one thing.

6    Mr. Clark has made reference to hostilities in the

7    neighborhood.  Just for the record and the Court, Phillip

8    Burden does not live in the area where the offense occurred.

9    He actually lives a couple of miles away, and would entertain

10   any sort of request by the Court to stay away from that area

11   of town if the Court made that a condition of his bond.

12             MR. OWENS: Judge, I need to say that the community

13   knows that Sean Baker was the person that continued to

14   maintain the battle between he and Phillip, and that it was

15   not, in fact, Anthony Burden, no matter what the verdict was.

16   Those are the facts.  We contend, Your Honor, that he has

17   been out on bond and has not created ....

18             MR. RADNEY: Sean Baker, Judge, is in prison, if

19   that makes any difference.

20             MR. OWENS:  Right.

21             THE COURT: Okay.  Next, let us take up the issue,

22   which has previously been placed on the record on a motion by

23   Mr. Owens.  And, Mr. Owens has additional submissions in

24   which Mr. Radney joins.

25             MR. RADNEY: Yes, sir.

1   MR. OWENS: Judge, if you recall, back on the day

2   following the verdict, we had a request made by the Defense

3   that Your Honor call in Juror Patricia Boykin.  Ms. Boykin,

4   for the record, has what I call salt and pepper curly hair,

5   which makes her distinctive.  There were no other jurors that

6   I saw in the panel that even had hair that would reflect that

7   statement and be a legitimate statement of her appearance.

8   She wore that style every day that I saw her for the week

9   that we were here.  I understand that may be her style of

10   hair.

11      I have, first of all, we had a hearing regarding

12   Ms. Phillips.  And, after I left the hearing, I went outside

13   and Ms. Phillips stopped me and said, "Mr. Owens, there were

14   some other people who saw that lady out there."  I

15   immediately came back to the Court and told you that.  Judge,

16   this lady is saying to me there are other people, and you had

17   already begun some other proceeding, and you said to me to

18   get their affidavits.  I have in front of me, and I will just

19   quickly name the persons, and there are -- there's James

20   Burden, whose affidavit that I have.  If I can, mark them and

21   just admit them.  I think --

22      THE COURT: Yes.

23      MR. OWENS: -- it would probably be simpler.  Mark

24   these for me please.  Defendant's Exhibit and then I'll refer

25   to them as numbers.  Defendant's Exhibit and then I'll refer

1  to them as numbers.   [Repeating.]

2  (WHEREUPON, DOCUMENTS WERE MARKED AS DEFENDANTS EXHIBITS 1-6

3  FOR IDENTIFICATION AND WERE ADMITTED.)

4      MR. OWENS: All right, Judge.  I would refer to

5  Defendants Exhibit 1, which is an affidavit from Mr. James

6  Burden, who says:  "My name is James Burden.  I was summonded

7  by both the State and Defense to testify, but neither called

8  me as a witness.  I was waiting on Wednesday, October 30,

9  2002, in the hall outside the Courtroom.  I noticed Jeanette

10  Baker all week long embracing several white people as they

11  came up to her.  I noticed that she sat down on the bench at

12  the far end of the hall, away from the courtroom, with a

13  white female with salt and pepper hair, and they talked for

14  several minutes.  I did not think anything of it until I was

15  allowed in the courtroom for closing arguments, and I saw

16  that same salt-and-pepper-haired white female sitting in the

17  jury section.  I thought to myself 'this was not right.'"

18      Further affidavit of a Wendell Hendricks.  "I am 20

19  years of age.  My grandmother is Jeanette Baker.  I used to

20  go to the same church where she would go.  I have on, at

21  least, three different times, maybe a fourth time, been at

22  East Roanoke Church of God at the same time with my

23  grandmother who was there while I was there and I saw a white

24  female with salt and pepper, long and curly hair.  I saw this

25  same white female Wednesday, October 30, 2002, while I was

*** Frances L. Roark ***

1   waiting in the hall outside the courtroom.  I saw her sitting

2   and talking to my grandmother, Jeanette Baker.  I know she

3   was the same woman.  After I was allowed into the courtroom,

4   I saw her get up and leave before the other jurors when the

5   Judge said she could go."

6       Defendants Exhibit 3.  "My name is Terita Hendricks.  On

7   Wednesday, October 30, 2002, while I was standing in the hall

8   near the door of the Courtroom, I saw a white female with

9   curly, salt and pepper hair, sitting and talking to Jeanette

10  Baker, a witness in this case.  I know that they were talking

11  for more than 10 minutes, because I saw them sitting together

12  before I went outside to smoke a cigarette, and they were

13  still there when I returned to the place I had been sitting.

14  I told Gwen Phillips to look at them talking.  I also saw the

15  tall, slender white female with kind of short brown hair come

16  out of the District Attorney's office, and she stopped where

17  Jeanette Baker and this juror with the salt and pepper hair

18  were sitting.  She had to see them sitting talking to each

19  other."

20      Defendants Exhibit 4.  "My name is Gwendolyn Phillips.

21  On Wednessday, October 30, during the lunch break, I went out

22  in the hall of the courthouse just outside the courtroom, and

23  I noticed Jeanette Baker sitting next to a white female with

24  salt and pepper hair talking.  They were sitting on the far

25  end of the hall across from the district attorney's office.

*** Frances L. Roark ***

*** Frances L. Roark ***

1   I saw other people out in the hall that should have seen

2   them.  Terita Hendricks tried to get my attention, but I went

3   outside to smoke.  When I came back she showed me that the

4   white female with the salt and pepper hair was still talking

5   to Jeanette Baker.  She asked me wasn't that one of jurors

6   who was talking to Jeanette.  I stood and watched to make

7   sure I could recognize this woman.  When I came back in the

8   courtroom, Mr. Owens was talking to the Judge.  The first

9   chance I got to tell Mr. Owens what I saw was after the

10  verdict before he left the courtroom.  I told him what I had

11  seen and he told me to wait right there.  He was going to go

12  talk to the Judge.  He talked to the Judge.  He later told me

13  to come back to the courthouse on Thursday morning by 8:30

14  a.m.  On Thursday, October 31, 2002, I went back to the

15  Randolph County Courthouse and was called to the judge's

16  chamber.  I went into the room.  I saw the Judge and several

17  other people, the court reporter, and Mr. Owens.  They told

18  me to go back outside.  I saw the white female with the salt

19  and pepper hair who had been in the judge's chamber leave

20  out.  I was then called in the judge's chamber and after I

21  was sworn in, Mr. Owens asked me questions about what I had

22  told him about seeing Jeanette Baker and the white female

23  juror with salt and pepper hair sitting and talking the day

24  before.  After I told the group what happened they sent me

25  out.  after Mr. Owens came outside where I was, I told him

1  about the other people who saw Jeanette Baker and the salt

2  and pepper, curly-haired juror sitting and talking on

3  Wednesday, October 30, 2002.  I took him to them and they

4  gave him their statements."

5      Defendants Exhibit 5.  "My name is Marion Adkinson.  I

6  was at the Randolph County Courthouse on Wednesday, October

7  30, 2002, standing by the bathroom door in the hall leading

8  to the courtroom.  I looked down the hall and saw on a bench

9  near the district attorney's office Jeanette Baker, a witness

10 in this case, was sitting next to a white female juror with

11 salt and pepper curly hair.  They were talking.  I stood

12 there five to ten minutes waiting on a lady in the bathroom

13 to come out.  I was not close enough to them to hear what

14 they were talking about."

15     Finally, Defendants 6.  The affidavit of Kathy

16 Hendricks.  "I was sitting in the hall just outside the

17 courtroom on Wednesday, October 30, 2002.  I saw Jeanette

18 Baker, one of the witnesses in this case.  I noticed that she

19 was sitting on the bench on the other end of the hall talking

20 to a white woman with curly salt and pepper hair.  I later

21 saw that same woman sitting with the rest of the jurors when

22 I came in to testify."

23     There ends those six affidavits. Judge, this lady with

24 the salt and pepper hair, although she served as an

25 alternate, she said to the group of us under questioning that

*** Frances L. Roark ***

1    she had discussed some parts of this case, but she said it

2    was only those things that they didn't understand or

3    whatever.  This is the same lady that said that she was not

4    sure about Jeanette Baker, whether she knew her, but she did

5    recognize her when she came in the courtroom.  And, that she

6    didn't think much of it and didn't tell anybody.  But, then,

7    she said, and I think we could have it read back, that she

8    may have been to Jeanette Baker's church maybe once.  And,

9    that she did not have a conversation with Jeanette Baker on

10   Wednesday.  That she, in fact, did not sit down with Jeanette

11   Baker on Wednesday, the date that we were asking her about.

12       I don't know why she chose to say what she did.  But

13   there are six people who saw her seated next to Jeanette

14   Baker.  If you recall, Jeanette Baker is the one witness that

15   caused this Court to take a recess because of someone being

16   upset by this situation.

17       I need to add another element that I had not brought to

18   the Court's attention.  A juror by the name of Detina Jones.

19   Detina Jones is the cousin of John Wesley Bell, which makes

20   it okay.  But, John Wesley Bell is married to Jeanette

21   Baker's sister.

22       Now, we have had a trial.  That has been based on a

23   number of factors, but one major factor, I believe, had to be

24   the emotional impact of Jeanette Baker's testimony.  I know

25   that she was upset.  But, I know that Jeanette Baker caused a

*** Frances L. Roark ***

1    great deal of attention to be brought to her.  Now, why this

2    lady, Ms. Detina Jones, did not respond to the questions of

3    were you related to Ms. Baker, have any relationship, any

4    kind of things, I don't know why, but jurors do that.  But,

5    when we have a person who is the focal point of an emotional

6    part, I am just going to use that as my basis, and that one

7    individual seems to come up in two, as I see it, vital points

8    in this argument for a mistrial, because we've got a juror

9    who sits there all week who -- well, let's see, cousin

10   married to sister's child.  We've got the alternate juror who

11   feels it necessary to lie to the Court about being seated

12   next to her.  We don't know what they were talking about, but

13   she felt it necessary not to say that.  And, all of it comes

14   back to Jeanette Baker.

15        My summation here.  Murder is serious.  There should be

16   no person in the jury, as a juror or alternate, that would

17   have any personal bias, any reason for personal bias, and I

18   believe we've got two people, one of whom who served all week

19   long as a juror, but the other one who was only released at

20   the time closing arguments ended.  And, she, I believe it is

21   on the record, said, yes, we had discussed some things.

22        I renew my Motion for a Mistrial, Judge, on the basis of

23   wrong jury contact.  Richard Nixon lost his presidency over

24   not what he did, but what he said.  This lady has said to the

25   Court a lie.  I don't know why.

*** Frances L. Roark ***

```
 1              MR. RADNEY: Your Honor, on behalf of Phillip Burden
 2    I will second the evidence and argument presented by
 3    Mr. Owens for Tony Burden and additionally move the Court for
 4    a mistrial based upon that evidence on behalf of Phillip
 5    Burden.  I believe, Your Honor, that sufficient evidence has
 6    been presented to show improper contact and conduct by both
 7    the main prosecution witness, as well as by two jurors.  I
 8    don't think the Court can take into consideration at all the
 9    fact that one of those jurors was an alternate juror.  But,
10    for the appearance of the Court for three full days, no one
11    knew who was the alternate.  The jurors did not know that
12    they were alternates.  This conduct that has been presented
13    to the Court by this one Ms. Boykin.  She didn't know she was
14    an alternate at the time she was committing this improper
15    contact and was not released until after closing arguments.
16    So, I would, therefore, ask for a mistrial on behalf of
17    Phillip Burden as well, Your Honor.
18              MR. CLARK: Just a couple things and in no
19    particular order.  Assuming the worst, and I emphasis the
20    word assuming.  That if this had come to the attention of the
21    Court earlier, Ms. Boykin, perhaps, would have been released.
22    And, had she not been an alternate, one of the other
23    alternates would have served in her place.  That happened
24    anyway because she was an alternate.
25         Secondly, and Mr. Owens seems to have already concluded
```

1   that the juror, Ms. Boykin, is the one who is lying here.  If

2   anybody is lying, there are six Defense Exhibits that have

3   been admitted.  The first one is from James Burden.  You

4   know, he was the gentleman who probably is the source of the

5   murder weapon in this case.

6       Your Honor, the other one, Wendell Hendricks, is the one

7   that was walking up and down the street saying, "Somebody is

8   going to die today."

9       And, one of the other affidavits is from his mother.

10      I am sorry, I can't remember now, you know, I

11  remembering from the testimony that we took the other day

12  from Ms. Boykin, but that her testimony was that she didn't

13  recognize Ms. Baker until Ms. Baker got on the witness stand,

14  and then she felt that she was a person she recognized from

15  having attended the same church a couple of times, I think is

16  what she is.

17          MR. OWENS: She said once.

18          MR. CLARK: Okay.  Thank you.  Once.  And, what she

19  said was that, as I recall, she came up the stairs to the

20  hallway outside the courtroom and basically spoke and denied

21  that this conversation that these other people say they saw

22  took place.  I'm a little curious too as to the repeated

23  reference to salt and pepper hair.  You know, I thought that

24  these folks were sure that they saw Ms. Baker talking to

25  Ms. Boykin.  Ms. Baker is here.  I have not spoken to her.

1         THE COURT: Ms. Baker is here?

2         MR. CLARK: Yes, she's sitting right there.  I have

3    not talked to  her about it.  I asked her if she understood

4    what was going on that they say she was talking to a juror.

5    That is all I told her.  I don't know what she's going to

6    say.  If you want to call her as the Court's witness, you can

7    do that.

8         THE COURT:  That's exactly what I intend to do.

9         MR. RADNEY: Judge, if I may bring up one thing

10   before you call her.  The six folks that have given

11   affidavits in this case, the reason they have given

12   affidavits, is they were subpoenaed in this case.  They are

13   the ones that were sitting in the hall for three days.

14        THE COURT: I will understand that.

15        MR. RADNEY: It wasn't as if the Defense ran out on

16   the street and tracked these folks down.  They were sitting

17   out there for six [sic.] days and that is why they have the

18   factual basis to give these affidavits.

19        THE COURT: I think there is, at least, one

20   affidavit where he mentions being subpoenaed.

21        MR. CLARK: All right.

22        MR. RADNEY:  All six were subpoenaed or ....

23        MR. OWENS: Requested to be here.

24                        **JEANETTE BAKER**

25       **HAVING FIRST BEEN DULY SWORN TO TELL THE TRUTH,**

*** Frances L. Roark ***

1      THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,

2                TESTIFIED AS FOLLOWS:

3                     EXAMINATION

4   BY THE COURT:

5   Q    Ms. Baker, you testified in the trial last week against

6   -- the indictment in the case and the charges were against

7   Phillip and Anthony Burden.  You remember, of course, giving

8   your testimony in that trial.

9   A    Yes, sir.

10  Q    Do you remember anywhere, during the course of that

11  trial, having a conversation with a lady down the hall while

12  sitting on a bench in the near proximity of the district

13  attorney's office?

14  A    Yes, sir.

15  Q    Okay.  Tell me what your conversation was.

16  A    This lady was waiting for the Health Department to open

17  and we were talking about it.  She said she had a 9:00, 9:30

18  appointment to go to the Health Department.  And, we sat

19  there and we just conversated.  And, then she just got up and

20  left.  It was a white lady.

21  Q    What color hair did she have?

22  A    Gray, mousy gray.  Might have had a little black in it.

23  It was mostly gray.

24  Q    She said she was waiting ....

25  A    To go to the Health Department to get a shot or

1   something.  She said her appointment was at 9:30.  Health

2   Department never did open and she got up and she left.

3   Q    The Health Department door, was it located near the

4   proximity of where you were seated on the bench?

5   A    Yes, I think so.  And, I didn't know her name.  I

6   didn't ask her.

7   Q    Let me go ahead.  Now, you had occasion to see the

8   jurors --

9   A    Yes, sir.

10  Q    -- over a space of several days.

11  A    Yes, sir.

12  Q    You know there were 14 jurors.  Do you recall speaking

13  -- first let me ask:  Do you recall speaking, or having a

14  conversation with, any of those 14 folks?

15  A    I never had a conversation with any of the 14.

16  Q    Do you recall seeing any one of those jurors and

17  recognizing that juror as somebody that you had been to

18  church with?

19  A    Any of the jurors?

20  Q    Yes, ma'am.

21  A    One of them; yes, sir.

22  Q    Do you know her by name?

23  A    Her first name is Joyce.

24  Q    Do you know her last name?

25  A    No, sir.

*** Frances L. Roark ***

1    Q    Do you recall whether during any of the course of the

2    trial you might have had occasion to simply speak to her

3    without having a conversation, but simply speak to her in the

4    hall at any time?

5    A    No, sir.

6    Q    You don't recall?

7    A    No, sir, not speaking to her.

8         THE COURT:  Questions from either counsel for State

9    or Defense.

10                          **EXAMINATION**

11   BY MR. OWENS:

12   Q    Was there any one of the jurors that you had been to

13   church with before?

14   A    One.

15   Q    Which one is that?

16   A    She is a black lady.  Joyce.

17   Q    Joyce was a black lady?

18   A    Um-hmmm.

19   Q    What's the name of the church where you attend?

20   A    Where I attend?

21   Q    Yes, ma'am.

22   A    East Roanoke Church of God.

23   Q    It is East Roanoke Church of God.  Is Wendell Hendricks

24   your grandson?

25   A    Yes, sir.

*** Frances L. Roark ***

*** Frances L. Roark ***

1   Q   Did Wendell go to church there?

2   A   I carried them to church when they were babies.   When

3   they got grown, they did not go.   He's been once or twice

4   since then, sir.

5   Q   He has been up there.

6   A   Yes, sir.

7   Q   Were you there?

8   A   I am always at church, sir.

9   Q   All right.   On Wednesday, October the 30th, did you

10  have occasion -- is that day you say you were sitting in the

11  hall next to the lady that was going to the -- you say what?

12  A   She said she was going to the Health Department.

13  Q   And, you say her -- how would you describe her hair?

14  You said it was gray.

15  A   Yes.   I described it as being gray.   It wasn't curly.

16  It was combed down like in.

17  Q   It is your testimony that you didn't sit next to any

18  other person that day on that bench in the hall?

19  A   No, sir.   No.   Nobody else white.

20  Q   Did you see your grandson in the hallway that day?

21  A   Yes.

22  Q   Did you see Terita Hendricks in the hall while you were

23  out there?

24  A   All of them were there.

25  Q   And, you saw Gwendolyn Phillips in the hall?   Did you

*** Frances L. Roark ***

```
 1    see her or know her?

 2    A    I don't know her by name.  I might know her by ....

 3    Q    Is your sister married to John Wesley Bell?

 4    A    Yes.

 5    Q    What's her name?

 6    A    Cynthia Bell.

 7    Q    Cynthia Bell.

 8    A    You should know.  You're related by marriage.

 9    Q    By marriage.  There's a distant relationship there.

10    A    Okay.

11    Q    Is your -- Detina Jones.  Did you know her?

12    A    No.

13    Q    You don't know Detina Jones?

14    A    Not by name.  I know a lot of people by face, but not

15    by name, sir.

16    Q    Tininie is your sister?

17    A    My niece.

18    Q    Your niece.  All right.  And, she is the mother of?

19    A    Jermicah, Rat.

20    Q    Rat.  Do you know John Wesley Bell?

21    A    He's my brother-in-law.

22    Q    So, you know him.

23    A    Um-hmmm.

24    Q    Did you see him up here Wednesday?

25    A    Yes.
```

*** Frances L. Roark ***

```
 1   Q     And Thursday?

 2   A     Thursday.  Yes, he was here Wednesday and Thursday.

 3   Q     All right.  Did you see him leave with Detina Jones?

 4   A     No.
```

**EXAMINATION**

**BY MR. RADNEY:**

```
 7   Q     Detina Jones is one of the black ladies that was a

 8   juror.  Did you recognize her by face as being the cousin of

 9   John Wesley Bell?

10   A     No, I didn't recognize her as a cousin of John Wesley

11   Bell.

12   Q     Did you recognize her as being someone you knew?

13   A     Yeah.  I recognized her as being somebody I knew.  Like

14   I said, I know a lot of people, but I don't know them by

15   name.

16         MR. RADNEY: That's all, Judge.

17         THE COURT: Anything from the State?

18         MR. CLARK: No.  Nothing further.

19         THE COURT: Ms. Baker, at this point I'm going to

20   place you under an order that you not talk with anyone,

21   including the attorneys or anybody else involved in this

22   matter, without my express permission about any of the things

23   that you have been questioned here today about or about any

24   part of the trial.

25         Yes, sir.
```

*** Frances L. Roark ***

1       THE COURT:  Should it become necessary, I'll have

2   you contacted and come back at the appropriate time, but

3   until I do that, do not speak with anyone about any part of

4   this trial or about your testimony today.

5       Yes, sir.

6       THE COURT: You may step down.

7   (WHEREUPON, THE WITNESS TESTIMONY CONCLUDED.)

8       MR. RADNEY:  Your Honor, if I may bring one point

9   up.  It is my understanding there is a very strict burden

10  that the Court must adhere to in favor of the moving party as

11  to juror misconduct.  I am unclear as to specifics of that

12  standard, and to the benefit of the doubt or the presumption

13  that you are supposed to give to the moving party when such

14  issue is raised.  I would ask that the Court reserve ruling

15  on this matter to give the Defense an opportunity to present

16  in writing to the Court exactly what the legal standard you

17  must live by is, as it relates to juror misconduct, which I

18  think is exactly what we are looking at in this case.  And, I

19  think that not only counsel but the Court may need some

20  guidance to determine what your standard is and what you have

21  got to determine.

22      THE COURT: That is granted.

23      MR. RADNEY: Thank you.

24      THE COURT: All right.  That will be it on the

25  record at this time.  We will be moving on to another case.

*** Frances L. Roark ***

1    I await any research from Defense or State and I will, of

2    course, do my own.

3    (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

4                                    *****

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*** Frances L. Roark ***

146

```
                        IN THE CIRCUIT COURT
                 FIFTH JUDICIAL CIRCUIT OF ALABAMA
                         RANDOLPH COUNTY


   STATE OF ALABAMA,          *   CR-02-0954
                              *   CRIMINAL NO.
   versus                     *   CC-2001-000115, CC-2001-000114
                              *   Wedowee, Alabama
                              *   2 December, 2002
   ANDREW PHILLIP BURDEN      *
   ANTHONY EUGENE BURDEN,     *
        Defendants.           *
   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


      TRANSCRIPT OF MOTION FOR MISTRIAL AND SENTENCING BEFORE


                   THE HONORABLE RAY D. MARTIN,


                        CIRCUIT JUDGE.


   A P P E A R A N C E S
   FOR THE STATE OF ALABAMA:  REA S. CLARK, DISTRICT ATTORNEY
                              FIFTH JUDICIAL CIRCUIT
                              CHAMBERS COUNTY COURTHOUSE
                              COUNTY OFFICE BUILDING
                              LAFAYETTE, ALABAMA 36862


                              BY: REA S. CLARK, DA
                                  MELODY BALDWIN, ADA


   FOR THE DEFENDANT:         RADNEY, RADNEY & BROWN
   (Phillip Burden)           ATTORNEYS AT LAW
                              56 COURT SQUARE
                              ALEXANDER CITY, AL 35010


                              BY: TOM RADNEY, ESQUIRE


   FOR THE DEFENDANT:         NATHANIEL D. OWENS, ESQUIRE
   (Anthony Burden)           ATTORNEY AT LAW
                              POST OFFICE BOX 2641
                              ANNISTON, AL 36202



                              FRANCES L. ROARK, CSR
                              OFFICIAL COURT REPORTER
                              FR2W642
```

*** Frances L. Roark ***

```
 1   PROCEEDINGS:   In Open Court.

 2           THE COURT:  I think we can proceed with both cases

 3   as far as pending motions.  This would be State versus Andrew

 4   Phillip Burden and State versus Anthony Eugene Burden.  Both

 5   Defendants are here with their attorneys.  Certain motions

 6   have been filed relative to request for mistrial.  We may

 7   proceed.

 8           MR. RADNEY:  Judge, I'll go quickly and then let

 9   Nathaniel wrap it.

10       I represent Phillip Burden and, as the Court knows, soon

11   after the trial of this matter, as a matter of fact on the

12   day of the trial, of this matter after jury had returned

13   their verdict, it came to the attention of the Court that

14   family members of the victim, as well as some of the jurors,

15   had had some contact with each other.  It came out that that

16   may have been one of the alternate jurors.  Additionally,

17   Judge, it came out that a juror had failed to disclose a

18   familial relationship to the lead prosecution witness,

19   Ms. Jeanette Baker.  Testimony has been taken from some

20   witnesses, affidavits have been presented, briefs have been

21   submitted by all parties as it relates to that issue, Judge.

22   I don't think anyone disagrees that the standard that the

23   Court must apply in this case is, at least, in essence

24   whether there was an appearance of impropriety.  Cases were

25   cited to the Court that reference that, and it is very clear
```

*** Frances L. Roark ***

1   that the Court does not have to make a finding that by God it

2   happened.  There's a case that has been cited that points to

3   the appearance of impropriety and that there may have been

4   some prejudice.  In this particular case, Judge, you are

5   looking at two defendants, both of which are facing extensive

6   prison terms, one of them, the possibility of life without

7   parole.  This is not an issue to be looked at lightly.  This

8   is as serious an issue as I can think of.  When you are

9   dealing with a murder, you are dealing with a horrible

10  situation at it relates to prosecution and the victim in this

11  case and at the same time you are looking at basically the

12  lives of these two defendants.  I believe it has been

13  presented to the Court factually that a mistrial is due to be

14  granted, and that both of these fellows are afforded the

15  right to a new trial for a jury that does not have the

16  appearance of any impropriety to make a decision.

17          MR. OWENS: May it please the Court, I realize,

18  first of all, Judge, that the dynamics of declaring a

19  mistrial means that everybody has got to start over.  This

20  was a four-day trial that had a number of witnesses.  But one

21  of the things that sort of starts with why we need to have a

22  mistrial in this case centers around the fact that there was

23  one witness for the State, Jeanette Baker, that appeared to

24  be, if we want to use a term to recognize someone, a key

25  witness.  A person that on which -- well, we know there was a

*** Frances L. Roark ***

*** Frances L. Roark ***

1    delay of maybe 40 minutes or so, even the lights blinked.

2    Was that a signal, Judge?

3            MS. BALDWIN: Somebody leaned on the switch.

4            MR. OWENS: But the dynamics of a person who,

5    because of her grief over the death of her nephew, we were

6    delayed, obviously everybody, including every juror and every

7    party here, sympathized with her.  But, we know that Jeanette

8    Baker was very upset over what had happened to her nephew,

9    Jermicah.  The question was after we got a verdict and it was

10   brought to my attention that Ms. Boykin, one of the alternate

11   jurors, had been seen the day before sitting, talking to the

12   same Jeanette Baker, whether or not that is important.  We

13   not only presented a direct witness that says that they saw

14   her and Ms. Baker seated, but then there were affidavits of,

15   I think, maybe five or six, and they were presented to the

16   Court.  People who say they were out there in the same

17   hallway and saw Jeanette Baker seated with this lady.  For

18   whatever the reason, Ms. Boykin said that didn't happen.  One

19   of the affidavits that I want to make sure I point out to the

20   Court and for the record was the grandson of Jeanette Baker,

21   who testified that he, in fact, saw his grandmother out there

22   in the hallway seated next to the lady that was described by

23   I think every one of them as the white woman with salt and

24   pepper hair.  And, I noted in the State's response that they

25   said there was some ambiguity about the identity of this

*** Frances L. Roark ***

1    woman talking to Ms. Baker.  There's never been any

2    indication that there was anyone other than Ms. Boykin,

3    Judge, that they identified.  Everyone of those witnesses

4    described her in the same way as Ms. Phillips had described

5    her when she came in and viewed her, left the room, came back

6    in front of the Court, and said that is the lady that was out

7    there in the hall seated on the bench talking to Jeanette

8    Baker.

9        The question that comes up in regard to whether or not

10    improper contact is such that it creates a bias, and that's

11    really, I think, the standard.  We cited the Pelley case and

12    I noted the State made us a copy and I just want to refer to

13    one little piece in it where it says, on page 893, where

14    Pelley actually cites the *Rowan versus State* case that is at

15    143 Southern 2nd, 454.  It says, "Where the test is

16    articulated in terms of whether the context might have had a

17    prejudicial affect on the juror. The test of, and I think

18    that word is vitiating, vi-ating [pronouncing] ...

19        THE COURT: Vitiating.  Vish-ating [pronouncing].

20        MR. OWENS: "... influence is not that it did

21    influence a member of the jury to act without the evidence,

22    but that it might have unlawfully influenced that juror and

23    others with whom he deliberated and might have unlawfully

24    influenced its verdict render."

25        Well, Judge, if you, in this particular case, in Pelley,

*** Frances L. Roark ***

```
 1   they sent it back.  It was a murder case and it was a nasty
 2   one, and the State said, well, it doesn't have any relevance
 3   to this, but it set out the standard.  And, in that case,
 4   even though they were five people murdered in that and a lot
 5   of factual difference, the Court sent it back because there
 6   was a question of could it have, might have, influenced.
 7   Now, might have.  If I recall correctly, the Court said after
 8   considering what was stated by the witnesses that Ms. Boykin
 9   had been talking, the Court said this lady was an alternate
10   and if she were a juror, we might have a different situation,
11   if I'm quoting correctly, and I am sure the record will
12   reflect.  I don't know what was going through the Court's
13   mind at that time, but after we have got involved
14   investigating what happened with Ms. Boykin, we find only
15   then that there was another incidence that relates to this.
16   The common person being Jeanette Baker again, but this time
17   we are dealing with a lady who sat throughout the whole of
18   the trial, who went through all the venire identification,
19   and never seemed to find a place where she could indicate her
20   relationship with the victim's family.  Jeanette Baker is the
21   sister of a man by the name of John Wesley Bell's wife, who
22   is the uncle of Ms. Jones by marriage.  Now, I realize
23   Roanoke is a fairly large town, but it is no more than six
24   maybe 7,000 folks, those people who are married would
25   generally know who are in their family and the relatives
```

*** Frances L. Roark ***

*** Frances L. Roark ***

1   would, but the State says in her response that Ms. Jones --
2   let me make sure that I quote it.  Number 12, it is just as
3   likely that Ms. Jones also was not aware of any relationship
4   that might exist between Mr. Bell and Ms. Baker.  That
5   Mr. Bell, who is the brother-in-law of Ms. Baker, that
6   Ms. Jones, the juror, wouldn't know about this.  Well, Judge,
7   I have got witnesses, and their affidavits are included, who
8   saw Mr. Bell leave the courthouse on Wednesday with
9   Ms. Jones in the front seat of his car.  Now, I'm not saying
10  that merely because he picks her up and he takes her away
11  from the courthouse that that means that Mr. Bell had any
12  influence.  But, if Mr. Bell is married to Jeanette Baker's
13  sister, I think we are into an area where might influence is
14  now getting a little more serious.

15      Now, let me jump to the end of where I'm trying to get
16  to.  One of the things that Pelley also talks about is
17  sufficiency of the evidence.  And, I want to make, in
18  addition to my Motion for New Trial, on the basis of there
19  being improper jury contact, I want to make it in
20  additionally on the issue of insufficiency of evidence.  I
21  think this insufficiency of evidence, and I make it in that,
22  taken the totality of everything that the State established,
23  including the arguments of the prosecutor, established only
24  that Anthony Burden, out of the mouths of three people
25  Jeanette Baker, her daughter, and her niece, was said to have

1   said the words, "Shoot the B.  Kill him," or words to that

2   effect, and for that reason he was found guilty of murder.

3   Because there was no gun established in his hand.  In fact,

4   there was no other evidence presented of his actions.  But we

5   have got a murder conviction.  And, it is our position that

6   but for the bias that had already been carried into the jury

7   room, Anthony Burden would not have been found guilty of

8   murder on such flimsy evidence.

9        Now, one of the exciting things about investigating this

10  case, and going through all of the witnesses and what they

11  have said, we come back to why are we saying there is such a

12  big deal about improper contact with an alternate, maybe even

13  there being a relative who was a juror, and I don't think

14  there is any question there's been -- there's no real reason

15  why we cannot go on and go beyond the affidavits and have,

16  even if the Court feels it necessary to show that Detina

17  Jones, the juror, was, in fact, the person that was the

18  relative -- that is the relative of Jeanette Baker, who, as I

19  said earlier, was the key prosecution witness.  So, now we

20  must answer our question with, well, we've got a verdict of

21  guilty for Anthony Burden, and he's charged as an accomplice

22  to the murder of Jermicah Foster by Phillip Burden.  Now,

23  Phillip Burden testified that he went after, not Anthony

24  Burden, but a man named Shawn, and that when the gun shot was

25  fired, he was not firing at Jermicah Foster, that, in fact,

*** Frances L. Roark ***

1   Jeanette Baker and others were so close to him that he

2   doesn't know which one, but someone hit his elbow when the

3   shot was fired.

4       Assuming that we take every fact that has been

5   presented, including that, there's no intent on the part of

6   the Defendant, Anthony Burden, established when you take the

7   actions of Phillip Burden to its total completion, including

8   the shot, yet he was found guilty of murder.    The State

9   did not put on any other evidence.

10       Now, in conclusion, we have opportunity by this Court's

11   taking a rough situation, and this has been a rough one,

12   because jury impropriety is not something that happens every

13   day.  It effects our whole system.  It doesn't matter what

14   the evidence is, it doesn't matter -- in fact, our supreme

15   court has even made another statement in Pelley that I want

16   to quote.  Which one of the justice's wrote this opinion?  I

17   can't remember which one wrote it.  He says that if we had

18   had a civil case involving a partner -- here it is on page

19   893.  It says and I quote, "If this were a civil case with a

20   substantial punitive damages award, we would be deeply

21   troubled by evidence of similar conduct by the partner of a

22   plaintiff's attorney who was not himself involved in the

23   trial of the case."  I take that to mean that when you are

24   talking about a murder case, that it would surely be more

25   serious than a civil case involving punitive damages.  And,

*** Frances L. Roark ***

1    the issue of whether or not a jury was biased goes all the

2    way to the core of our consitutional protection of due

3    process and; therefore, without the hope that the Court, when

4    it is brought to your attention, would say, hey, it doesn't

5    matter whether or not Ms. Boykin remembers for sure whether

6    she was sitting there for that period of time.  It doesn't

7    matter whether or not Ms. Boykin can tell us what they were

8    talking about.  We've got to look at what might have been.

9    And, Judge, I believe once you do that, you will grant

10   us a mistrial in part because of the very seriousness of the

11   charge of murder, but more importantly the fact that it might

12   have been a bias that was projected into the jury

13   deliberations that caused this verdict.

14       Thank you for your attention, Judge.

15           THE COURT: What says the State?

16           MS. BALDWIN:  Judge, first of all, it is sort of a

17   factual argument, I won't go into all the argument I put in

18   the brief or the response, rather, because the Court can read

19   that, and I don't think it bears repeating word for word.  I

20   will make a couple of comments, specifically with regard to

21   the law.

22       I attached Pelley for this very reason because it was

23   mentioned in their responses, or their briefs, or

24   memorandums, whatever you want to call them, but what was not

25   discussed in any detail so that the Court could realize what

*** Frances L. Roark ***

1   the case was about with regard to facts.

2       The case law is not as they would basically like to

3   argue that the issue is whether the contact may have

4   occurred.  The issue is whether having occurred that they

5   might have had a prejudicial effect on the juror.  In this

6   case there's an argument, and I would say, a very good one on

7   our part, that the contacts did not occur.  And, that is not

8   the case law.

9       If you read Pelley, you will see that clearly in that

10  case as in the other cases cited that there was no question

11  as to whether or not the contacts occurred or whether or not

12  they might have prejudiced a juror.  That is not what we are

13  looking at here.  The argument here is whether or not you

14  basically believe what's been presented by the State in

15  testimony and the Court's witness as well, Ms. Baker, and

16  whether or not -- or whether or not you believe the witnesses

17  testimony presented by the defendants and the affidavits

18  presented by the defendants.  And, it is not whether or not

19  the -- the issues basically are whether or not the contacts

20  may have occurred, and that's not the case law.  If the

21  contacts had occurred, we would have a different issue.  But,

22  we are submitting that that is not the case here.

23      Furthermore, Boykin was sure that she did not sit.  I

24  just want to briefly make that in response to Mr. Owens'

25  statements that she wasn't sure.  She was very clear that she

*** Frances L. Roark ***

1   did not sit with Ms. Baker.  Ms. Baker was very clear that

2   she did not sit with her.  Ms. Baker did, however, say that

3   there was one lady one day sitting outside waiting for the

4   health department to open, she left because the health

5   department did not open, and that is reflected in the record.

6   And she described that person always being a person with gray

7   hair.

8       Now, as to a relationship with the regard to Detina

9   Jones.  There is no relationship between Ms. Baker and Detina

10  Jones.  I dare say that anybody would consider that they are

11  related in any sort of way.  Ms. Baker testified that she did

12  not even know that Detina Jones was related to John Wesley

13  Bell.  She didn't know it.  And she, herself, is not related

14  to Detina Jones, and they consistently say that Detina Jones

15  failed to disclose a relationship that she had with

16  Ms. Baker, and there is simply no facts to support that.

17      Now, with regard to sufficiency of the evidence, if we

18  need to address that.  I really don't think there's any point

19  in it, but I will simply say, that with regard to Anthony

20  Burden, I think this was addressed earlier, there's certainly

21  an argument that if he had kept his mouth closed, and not

22  entered into this fight in any sort of way, there is a

23  chance, at least, that Phillip Burden could have been talked

24  down and not have shot Jermicah Foster, but that's not what

25  occurred.

1    I guess I should also comment, although it is in the

2    memo to the Court, that all the people who gave statements to

3    the Court in the form of affidavits or testimony, did not

4    come to, and there's no testimony and no evidence to this

5    effect, they did not come to the Court or to Mr. Owens at any

6    time during deliberations.  The jury was out for over an

7    hour.  After the trial and the verdict came in was not the

8    first time they would have had an opportunity to approach the

9    Court or Mr. Owens with regard to the information they now

10   say they have.  They are all related in some manner which is

11   included in the memo.  They are related in some manner to the

12   defendants, one or the other defendant.  And, they waited

13   until the testimony came in, the verdict was rendered, and

14   hour after deliberations occurred.

15        We would just state there's not -- Motion for Mistrial

16   is due to be denied.

17             THE COURT: Anything else to be put on record?

18             MR. RADNEY: Not for Defendant, Phillip Burden.

19             MR. OWENS: Only thing for Defendant, Anthony

20   Burden, the witnesses that did, during the whole of the

21   State's case, testify about the actions of Anthony Burden,

22   were Jeanette Baker, her daughter, Lenice, and her niece

23   LaTarsha.  All of these people were relatives of Jeanette

24   Baker.  All of these three witnesses are the only ones of the

25   25 or 40 people that were out there who happened to testify

*** Frances L. Roark ***

```
 1   that they heard Anthony Burden say anything.  They are the

 2   only ones who come in and say that out of all of this

 3   commotion, all of this time when Phillip Burden is walking

 4   around with the shotgun, that they hear him, Anthony Burden,

 5   make these comments, but the only thing that everybody did

 6   say was that Anthony Burden had not been there earlier, that

 7   there had been a fight between Phillip and Shawn Baker.  And,

 8   that that fight was the basis of Shawn Baker's saying, as

 9   Mr. Phillip Burden testified, I went after him because he

10   kept egging it on.  He kept telling me to come on.  It was

11   not someone else.  It was only his egging it on that caused

12   Phillip to go up to -- I wanted to make sure we corrected

13   that.

14              THE COURT: Anything else?

15              MR. RADNEY: No, sir, Your Honor.

16              THE COURT: Motion for Mistrial denied.

17       We will proceed with sentencing on Phillip Burden.  The

18    Defendants can stay where they are.  Mr. Radney, do you have

19   anything to submit?

20              MR. RADNEY: Nothing to submit, Your Honor.  I would

21   actually defer to the argument of the prosecution and ask to

22   rebut that since this is a habitual offender situation,

23   Judge, I think it would be best if I rebut what she presents.

24              THE COURT: What has the State to present on

25   sentencing of Andrew Phillip Burden?
```

*** Frances L. Roark ***

1        MS. BALDWIN: We have -- well, I'll just go through

2    and submit individually, Judge, his priors, which are

3    extensive.  If the Court will, just bear with me.

4    **(WHEREUPON, DOCUMENTS WERE MARKED AS STATE EXHIBITS 1 - 4 FOR**

5    **IDENTIFICATION.)**

6        MS. BALDWIN:  State Exhibit 1, CC-87-054, receiving

7    stolen property in the first degree.  Judge, it is the first

8    conviction we will submit.

9        MR. RADNEY: May I see them as you mark them?

10        MS. BALDWIN: Sure.  State Exhibit 2, certified copy

11    of CC-86-007, theft in the first degree.

12        State Exhibit 3, CC-92-017, is a certified copy of a

13    burglary third and a theft second conviction.

14        State's Exhibit 4, CC-92-020, burglary third and theft

15    second convictions.

16        THE COURT: All right.  Those will be admitted.

17    **(WHEREUPON, DOCUMENTS MARKED AS STATES EXHIBITS 1-4 WERE**

18    **ADMITTED.)**

19        THE COURT:  Anything further?

20        MS. BALDWIN: Well, only with regard to our

21    recommendation, Judge.  Life without parole is the minimum.

22    Of course, there is the discretionary matter with the Court,

23    because none of those are prior class A.  We do submit that.

24    However, that is our recommendation based on the nature of

25    the offense.

1         MR. RADNEY: Your Honor, each of these convictions

2    that have been presented to the Court occurred in a four-year

3    period.  Excuse me, a five-year period from 1986 to 1991.

4    Each of them is a property offense:  Burglary, theft, or

5    receiving stolen property are the four that have been

6    admitted to the Court.  None of them are class A felonies.

7    The Court is looking at the possibility of either straight

8    life or life without.  The Court heard for three-and-a-half

9    days the testimony in this case.  This is a horrible tragic

10   situation.  However, we are talking about a 39-year-old man;

11   correct?

12        THE DEFENDANT:  Right.

13        MR. RADNEY:  Judge, we're asking the Court and

14   begging the mercy of the Court to impose the life sentence to

15   give this man an opportunity to, at some point, come back and

16   be a productive citizen.  That may be 20 or 30 years from now

17   based on the 85 percent rule on the Violent Offenders Act

18   that has been passed.  We're talking a long time.  Maybe 30

19   years of incarceration.  I would simply ask the Court to

20   leave some light at the end of the tunnel.  This man served

21   -- has been out on parole for -- excuse me, out on bond for

22   over a year pending the trial of this matter.  He was a

23   working man, a tax paying man during the time he was out, and

24   this Court can close the door for ever, and we're asking the

25   Court to give him a chance one day to get back out and a

*** Frances L. Roark ***

1    member of society.

2              THE COURT: What says the State?  Anything further?

3              MS. BALDWIN: No, sir, other than the fact we submit

4    that life without parole is an appropriate sentence based on

5    the facts here.  This was a gun fight in the City of Roanoke

6    in a residential area.  Of course, the victims are here,

7    Judge, and they are -- Jermicah's mother may want to address

8    the Court.  I don't mean to leave out that opportunity,

9    because I know by law she's allowed to have that.

10        This is Ms.  Deloris Foster, Judge.

11              THE COURT:  Go ahead.

12              MS. BALDWIN:  You can tell the Court.

13              MS. FOSTER:  I feel that Phillip should have life

14   without the possibility of ever being paroled.  He took my

15   child's life for no reason at all and we want ever have a

16   chance to see Jermicah anymore.

17              MS. BALDWIN:  How old was Jermicah, Deloris?

18              MS. FOSTER:  At the time 20.

19              MS. BALDWIN: Judge, essentially he gave the victim

20   a life sentence by killing him.

21              THE COURT: Anything further?

22              MS. BALDWIN: Nothing further from the State.

23              THE COURT: Any recommendation by the probation

24   officer?

25              THE PROBATION OFFICER: No.

1    MR. RADNEY:  For the record, Judge, I have reviewed

2    the Report of Investigation prepared by Mr. Gagne and have no

3    objection.  My client and I have been over it and it

4    accurately represents the facts but for one thing.  He has

5    him listed as a 29-year-old man and he's actually 39.

6        THE COURT: In one respect, the law was amended

7    specifically for cases such as this, as far as habitual

8    offender.  The legislature saw fit to change the mandatory

9    nature of life without parole in a case such as this where

10   none of the prior felonies committed by a defendant are, in

11   fact, class A felonies.

12       MS. BALDWIN: Judge, I understand there may be some

13   situations where even in a homicide or a murder, Judge, that

14   it being a class A felony that the Court would exercise the

15   discretion to give him less than life without the possibility

16   of parole.  Judge, I could -- you know, this was not a

17   reckless homicide.  Well, I guess it depends on who you

18   believe, but the jury certainly didn't believe the

19   Defendant's statement that this was any sort of accident.

20   This was intentional act.  He took a loaded firearm, he went

21   to ....

22       THE COURT: There's no doubt about that.  One thing

23   that I -- since this law has been amended that I have

24   continually struggled with is, whether or not the legislature

25   is looking at life without parole in the absence of prior

*** Frances L. Roark ***

1    class A felonies as being something reserved for capital

2    cases.

3         MS. BALDWIN: But that's why we have the death

4    penalty, Judge.

5         THE COURT: In capital cases it is the death penalty

6    or life without parole.

7         MR. RADNEY: Judge, if may refute what Melody says,

8    I think that is exactly what this was, was a reckless act.

9    And that was heatedly discussed with the Court as it relates

10   to negligent homicide, reckless acts as it relates to

11   manslaughter and murder.  I think that's exactly what we're

12   dealing with here, and having no prior class A felonies, I

13   agree with the Court and with Ms. Foster that this is a

14   horrible situation, but I would ask the Court to give this

15   man a chance.

16        MS. BALDWIN: Of course, the jury disagreed with

17   that.

18        THE COURT: And, but for this Defendant's prior

19   crimes, which you have admitted into the record, and is now

20   part of the record, the range of punishment would be 20 years

21   to 99 years or life.

22        MR. RADNEY: Correct.

23        THE COURT: I think the jury found it to be

24   intentional murder and I think, under the law as it exists

25   now, I'm going to, of course, uphold their finding that it is

*** Frances L. Roark ***

1  an intentional murder, and while I may be incorrect in my

2  analysis of what the legislature is doing, I feel that they

3  have sent to the trial courts, at least, an implied statement

4  of the purpose of the amendment, that being where there's no

5  class As in the background ....

6          MS. BALDWIN: I don't think it is a requirement,

7  Judge.  I don't mean to interrupt the Court.  I don't mean to

8  be rude about that, Judge, but probably that came from

9  pressure from D.O. C. to keep bed space.  That is probably

10 what that came from, Judge.  I don't know that there is any

11 other reason for it.

12         THE COURT: Well, I guess in one respect it is

13 really not for us to try to decide what the intent of the

14 legislature was, but I almost feel compelled to in a case

15 like this.  I don't know what their motivitation was.  It may

16 be -- it may have been overcrowding; or, it may be, just as I

17 said, a mandate for the trial courts to consider.

18         MS. BALDWIN: Yes, sir, but there are other class A

19 felonies.  Had this been a trafficking charge and he had

20 three prior felonies, Judge, he would have been looking at

21 life or life without parole.  That's the kind of case we are

22 talking about.  But that's not what happened here.  We have

23 got a homicide, an intentional killing, not a trafficking

24 charge, not any other class A felony with three priors, but a

25 homicide, and I don't think that is the same thing.

*** Frances L. Roark ***

1       THE COURT: Do you have anything else to say before

2   the Court passes sentence?

3       THE DEFENDANT:  No, sir.

4       THE COURT: It is the judgment and sentence of the

5   Court that you be, and hereby are, sentenced to the

6   penitentiary of the State of Alabama for a term of life

7   imprisonment.  All costs and assessments that are to be

8   assessed by law are hereby entered.  The State will be given

9   an opportunity to supplement the record with any applicable

10  restitution affidavits.

11      MS. BALDWIN: There are.

12      MR. RADNEY: That has been presented to me, Judge.

13  We don't have any objection to them.

14      THE COURT: That will be incorporated into the

15  record and that will be incorporated into the order.

16      MR. RADNEY: Thank you, Your Honor.

17      THE COURT: As to Anthony Eugene Burden, what says

18  the Defense?

19      MR. OWENS: Your Honor, may it please the Court,

20  after reviewing the report made by the probation officer, our

21  only correction, and it is not really a correction, it

22  appears that they talk about the actions of Phillip Burden as

23  opposed to Anthony.  I see a reference at approximately this

24  time Anthony Burden came to Phillip Burden.  There was no

25  testimony at the trial of this, Judge.  I'm hard pressed as

*** Frances L. Roark ***

1   to the report of the probation officer being something

2   different from the trial testimony.

3           THE COURT: You make the request and that will be

4   stricken on the record.

5           MR. OWENS: All right.  I request that from the

6   point of -- it appears that it would be mid the paragraph

7   which is only -- well, there are two paragraphs.  The second

8   major paragraph starting with, "Anthony Burden had words with

9   Foster," then it says, "Anthony Burden kept saying, 'Kill the

10  motherfucker.'  Anthony Burden had more words with Jermicah

11  Foster.  Witnesses stated that Phillip Burden had the gun

12  pointed at Michael Foster [sic.] but later backed off.  Then

13  Anthony Burden hit Jermicah Foster and as it looked he was

14  going to fight back, Anthony Burden told Phillip Burden to

15  kill the motherfucker.  Phillip Burden then shot Foster once

16  in the side of the face, causing his death."  We ask that,

17  other than the evidence that was presented, Judge, I don't

18  know which witness he's referring to when he does this

19  report.

20          THE COURT: What I'm going to do on the record is

21  note that, of course, the narrative is prepared by the

22  probation officer, and that is included in his report.  You

23  have drawn exception to the factual stating of the narrative.

24  What I'm going to tell you is that what I will rely on is the

25  actual testimony and evidence at trial.

*** Frances L. Roark ***

1          MR. OWENS: That's fine, Your Honor.  I just know

2     the testimony did not go with what is here.  I want to make

3     sure that we pointed that out.  Also we point out that it

4     appears that the only conviction is a 1999 theft by taking

5     misdemeanor that had a fine of $375; is that right?  Is that

6     a misdemeanor?  In LaGrange, Georgia.

7          THE DEFENDANT:  I guess so.  I don't remember.

8          MR. OWENS:  Is that correct?  That was the only --

9     and there were no other convictions noted.

10         We would just ask the Court to consider the fact that

11    the totality of the evidence and the factual basis of

12    Mr. Anthony Burden's conviction in your sentencing.

13         THE COURT: Anything else?

14         MR. OWENS: No, sir.

15         THE COURT: From the State?

16         MS. BALDWIN: Well, Judge, we would simply point out

17    what we have before:  That Anthony Burden, had he not

18    participated in this crime, may have -- this crime may not

19    have occurred.  We don't know that for sure, of course.  But,

20    very likely there would have been a better opportunity for

21    the people who were trying to get Phillip Burden to back off

22    to have been successful in doing so.  However, Anthony Burden

23    did participate and we make a recommendation of 35 years,

24    which we think is reasonable in light of the circumstances,

25    Judge.

*** Frances L. Roark ***

*** Frances L. Roark ***

1    THE COURT: Do you have anything to say before the

2    Court passes sentence, Mr. Burden?

3    THE DEFENDANT: I already spoke with her after it

4    was over with. I told her that I was sorry it happened and I

5    wanted to let her know that she could look at me all day and

6    don't know how I feel. But, if I didn't tell her, she

7    wouldn't know. She heard it personally from me. But, the

8    way the case went, there a lot of stuff I couldn't say,

9    because it would have went against my uncle. So, I was in a

10   situation where I couldn't state my case. But, the truth of

11   the matter is, we got into it. It was broke up. And, it was

12   left at that. I had no intent to ask anyone to kill him or

13   tell anyone to kill him. I was raised that older people in

14   the family tell the younger people in the family what to do;

15   not the other way around. That's all, Your Honor.

16   THE COURT: It is the judgment and sentence of the

17   Court that you be, and hereby are, sentenced to the

18   penitentiary of the State of Alabama for a term of 30 years.

19   As such I don't think there could be any application made.

20   You may, whatever your post trial motions are, as soon

21   as they are timely filed, they will be considered and I'll

22   set them for hearing.

23   MR. OWENS: Thank you, Judge.

24   THE COURT: Everybody remain in the courtroom until

25   you are discharged.

```
 1
 2                    IN THE CIRCUIT COURT

 3            FIFTH JUDICIAL CIRCUIT OF ALABAMA
 4                     RANDOLPH COUNTY
 5
 6   STATE OF ALABAMA,        *   CR-02-0954
 7                            *   CRIMINAL NO.
 8   versus                   *   CC-2001-000115, CC-2001-000114
 9                            *   Wedowee, Alabama
10                            *   2 December, 2002
11   ANDREW PHILLIP BURDEN    *
12   ANTHONY EUGENE BURDEN,   *
13       Defendants.          *
14   * * * * * * * * * * * * * * * * * * * * * * * * * * *
15
16                  C E R T I F I C A T E
17

18   STATE OF ALABAMA  )

19   AT LARGE          )

20       I do hereby certify that the above and foregoing

21   transcript of testimony in the matter aforementioned was

22   taken down by me in computerized machine shorthand and

23   transcribed under my supervision, and that the foregoing

24   represents a true and correct transcript of the proceedings

25   had upon said hearing.

26                                    _____

27                             FRANCES L. ROARK, CSR, OFFICIAL
28                             COURT REPORTER, NOTARY PUBLIC
29                               STATE OF ALABAMA AT LARGE
30
31                             My Commission Expires 09/23/06.
32

33   Delivered and filed with the Circuit Clerk

34   the _____ day of _____, 2003.

35
```